**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

THE PUEBLO OF ISLETA,                    )
a federally-recognized Indian tribe,     )
THE PUEBLO OF SANDIA, a                   )
federally-recognized Indian tribe, and   )
THE PUEBLO OF TESUQUE,                    )
a federally-recognized Indian tribe,     )
                                          )
                    Plaintiffs,           )
                                          )
                                          )   Civil Action No.  17-654
v.                                        )
                                          )
Susana Martinez, in her official capacity as the  )
Governor of the State of New Mexico,      )
Jeffrey S. Landers, in his official capacity  )
as Chair of the Gaming Control Board of the  )
State of New Mexico, Paulette Becker, in her  )
official capacities as State Gaming       )
Representative and a member of the Gaming  )
Control Board of the State of New Mexico, and  )
Salvatore Maniaci, in his official capacity  )
as a member of the Gaming Control Board,  )
of the State of New Mexico,               )
                                          )
                    Defendants.           )
_____ )

**COMPLAINT FOR**
**INJUNCTIVE AND DECLARATORY RELIEF**

The Plaintiffs, the Pueblo of Isleta ("Isleta"), the Pueblo of Sandia ("Sandia"), and the

Pueblo of Tesuque ("Tesuque") by and through their counsel, hereby allege as follows:

## I.      NATURE OF THE ACTION

This is an action for declaratory and prospective injunctive relief brought by the

Plaintiffs, the Pueblos of Isleta, Sandia, and Tesuque (individually, the "Pueblo," or collectively,

"the Pueblos"), under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), against the following

defendant State officials, all of whom are sued in their official capacities, Susana Martinez, in her official capacity as Governor of the State of New Mexico; Jeffrey S. Landers, in his official capacity as Chair of the Gaming Control Board of the State of New Mexico; Salvatore Maniaci, in his official capacity as a member of the Gaming Control Board of the State of New Mexico; and Paulette Becker, in her official capacities as State Gaming Representative and a member of the Gaming Control Board of the State of New Mexico (collectively "Defendants" or "defendant State officials").

The Plaintiffs seek a declaration, pursuant to 28 U.S.C. § 2201, that the Defendants' ongoing effort under the 2015 Tribal-State Gaming Compacts with the State of New Mexico ("2015 Compact") to require each Pueblo to retroactively treat all free play credits used on Gaming Machines as revenue for purposes of calculating State revenue sharing payments under the 2007 Tribal-State Gaming Compacts with the State of New Mexico ("2007 Compact") violates federal law.   All three Pueblos were and are authorized by the Indian Gaming Regulatory Act ("IGRA") and their 2007 and 2015 Compacts to permit the use of free play credits on Gaming Machines, which provides patrons an incentive to game on those machines. By unilaterally requiring that free play credits be treated as revenue, the Defendants are imposing an exaction on each Pueblo's use of free play that violates the *per se* rule of federal law that bars state taxation of an Indian tribe unless Congress has authorized such taxation in terms that are unmistakably clear, *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 215 n.17 (1987), and IGRA, which provides that a State may not "impose any tax, fee, charge or other assessment upon an Indian tribe" under a Tribal-State compact, 25 U.S.C. § 2710(d)(4), except for any assessment agreed upon as necessary to defray the cost to the State of regulating gaming

conducted under the compact, *id.* § 2710(d)(3)(C)(iii).  That exception has no application here because the Defendants' free play claim is not a regulatory cost, nor was it agreed upon.  Furthermore, federal law expressly bars each Pueblo from treating free play as revenue by requiring that gaming revenues be accounted for in accordance with generally accepted accounting principles ("GAAP"), 25 C.F.R. § 571.12, under which free play is not treated as revenue and has no effect on Net Win.  In these circumstances, the additional revenue sought by the State on its free play claim constitutes an illegal exaction, as the Secretary of the Interior ("Secretary") correctly determined in proceedings on the 2015 Compact that were conducted under 25 U.S.C. § 2710(d)(8), as a result of which the 2015 Compact went into effect only to the extent consistent with IGRA, *id.* § 2710(d)(8)(C).

The Plaintiffs also seek a declaration that the claims asserted in this action are not subject to arbitration under the 2015 Compacts because: (i) this action is expressly authorized by § 7(B) of the 2015 Compact, and provides the only remedy for the claims alleged in this action; (ii) the arbitration provisions of § 7(A) of the 2015 Compact on which the Defendants rely to assert their free play claim are permissive, not exclusive, and categorically exclude the claims alleged by the Pueblos in this action; (iii) because the Defendants' claim that free play credits must be treated as revenue under the 2007 Compact violates federal law, the 2015 Compact cannot and does not preserve that claim, nor does it provide an arbitration forum for its resolution; and (iv) in enacting IGRA, Congress did not authorize tribes and states to vest authority in an arbitration panel to determine whether the provisions of a compact violates IGRA or other federal law, nor does the 2015 Compact purport to authorize an arbitration panel to do so.

152886-1

Finally, the Plaintiffs seek to enjoin the Defendants, and any of their agents, officers, employees, or representatives, from: (a) continuing their efforts to impose a tax or other assessment on the Pueblos in violation of federal law in the guise of asserting a claim for additional revenue sharing payments under the 2007 and 2015 Compacts; and (b) continuing their efforts to arbitrate the dispute over that effort under the 2015 Tribal Compact, or under any provision of the 2007 Compact.

## II.      THE PARTIES

1.      The Pueblo of Isleta is a federally-recognized Indian tribe.  *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 82 Fed. Reg. 4915, 4918 (Jan. 17, 2017).

2.      The Pueblo of Sandia is a federally-recognized Indian tribe.  *See id.*

3.      The Pueblo of Tesuque is a federally-recognized Indian tribe.  *See id.*

4.      Defendant Susana Martinez is the Governor of the State of New Mexico, and is sued in her official capacity.

5.      Defendant Jeffrey S. Landers is Chair of the Gaming Control Board of the State of New Mexico, and is sued in his official capacity as Chair of the Board.

6.      Defendant Paulette Becker is the State Gaming Representative and a member of the Gaming Control Board of the State of New Mexico, and is sued in her official capacities as State Gaming Representative and a member of the Board

7.      Defendant Salvatore Maniaci is a member of the Gaming Control Board of the State of New Mexico, and is sued in his official capacity as a member of the Board.

152886-1

## III.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362 because it is brought by federally-recognized Indian tribes with governing bodies duly recognized by the Secretary of the Interior and states substantial questions of federal law arising under federal common law, federal statutes and regulations, and Tribal-State compacts entered into under IGRA.

9.      Venue is proper in the District of New Mexico under 28 U.S.C. § 1391(b), because this District includes the territory governed by the Pueblos, because the Pueblos conduct gaming within this District, and because the Defendants all reside and exercise their official capacities within this District.

## IV.    BACKGROUND

**A.    The Pueblos' Sovereign Right to Undertake Gaming Activities Free from State Taxation and Regulation is Secured by Their Inherent Tribal Sovereign Authority, IGRA and Their Gaming Compacts.**

10.     "[U]nless and 'until Congress acts, the tribes retain' their historic sovereign authority," *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014), which includes the right to be free from state interference with tribal activities on reservation lands.  As the Supreme Court recognized long ago, "absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."  *Williams v. Lee*, 358 U.S. 217, 220 (1959).  The Supreme Court applied these principles to Indian gaming in *Cabazon Band*, in which the Court upheld the tribes' rights to conduct gaming on the reservation free from state regulation, ruling that "State regulation would impermissibly infringe on tribal government," 480 U.S. at 222, and reaffirming

5

that "[i]n the special area of state taxation of Indian tribes and tribal members, [the Court has] adopted a *per se* rule" under which the Court "'will find the Indians' exemption from state taxes lifted only when Congress has made its intention to do so unmistakably clear,'" *id.* at 215 n.17 (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765 (1985)).

11.     The year after *Cabazon Band* was decided, Congress enacted IGRA, which divides Indian gaming into three categories.  Class I gaming, comprised of social games played for prizes of minimal value and traditional forms of Indian gaming, 25 U.S.C. § 2703(6), is exclusively regulated by the tribes.  *Id.* § 2710(a)(l).  Class II gaming, consisting of bingo and similar games, *id.* § 2703(7), is regulated by the tribes subject to standards set forth in IGRA and the oversight of the National Indian Gaming Commission.  *Id.* § 2710(a)(2).  Class III gaming includes all other games, including casino-type gaming, *e.g.*, slot machines, banking card games, pari-mutuel betting, blackjack, and roulette, *id.* § 2703(8), and is subject to exclusive regulation by the tribes (with oversight by the National Indian Gaming Commission) except as otherwise agreed upon in a Tribal-State compact.  The enactment of IGRA "left states with no regulatory role over gaming except as expressly authorized by IGRA, and under it, the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact." *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 546 (8th Cir. 1996).

12.     In enacting IGRA, Congress' intent was to codify the common law doctrines under which Indian tribes have authority to engage in gaming free from state taxation or regulatory interference.  As the Senate Committee Report on IGRA explained:

> In determining what patterns of jurisdiction and regulation should govern the conduct of gaming activities on Indian lands, the Committee has sought to preserve the principles which have guided the evolution of Federal–Indian law for over 150 years.  In so doing, the Committee has attempted to balance the need for

152886-1

sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land . . . .

Consistent with these principles, the Committee has developed a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities.

The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact.  In no instance, does [the draft IGRA] contemplate the extension of State jurisdiction or the application of State laws for any other purpose.

S. Rep. No. 100-446 at 5-6 (1988), *reported in* 1988 U.S.C.C.A.N. 3071, 3075-76.

13.     In order to conduct Class II and Class III gaming under IGRA, an Indian tribe must enact an ordinance regulating that activity.  25 U.S.C. § 2710(b)(1)(B), (d)(1)(A).  The ordinance must provide, *inter alia*, that an "annual outside audit[] of the gaming, which may be encompassed within existing independent tribal audit systems, will be provided by the Indian tribe to the [National Indian Gaming] Commission . . . ."  *Id.* § 2710(b)(2)(C).  That audit, and the tribe's financial statement, are required to conform to generally accepted accounting principles.  25 C.F.R. § 571.12(b).  The Pueblos have each enacted an ordinance that satisfies IGRA's requirements, and those ordinances have been approved by the Chairman of the National Indian Gaming Commission pursuant to 2710(d)(2)(B).

14.     Under IGRA, a Tribal-State gaming compact is also required to authorize class III gaming.  25 U.S.C. § 2710(d)(1)(C).  IGRA lists comprehensively and exclusively the subjects that the terms of a compact may relate to, stating that:

(C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to –

> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

> (v) remedies for breach of contract;

> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

> (vii) any other subjects that are directly related to the operation of gaming activities.

*Id*. § 2710(d)(3)(C).

15.    IGRA explicitly confirms the applicability of the *per se* rule to Indian gaming conducted under a compact by providing that except for any assessment that may be agreed under § 2710(d)(3)(C)(iii), "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity."  *Id*. § 2710(d)(4).

16.    Tribal-State compacts are also subject to approval by the Secretary of the Interior. *Id*. § 2710(d)(3)(B).  Under IGRA, the Secretary of the Interior ("Secretary") may approve or disapprove a proposed compact within 45 days of its submission.  *Id*. § 2710(d)(8)(A)-(B).  If the

Secretary does not approve or disapprove the proposed compact with forty-five (45) days, the compact is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]." *Id.* § 2710(d)(8)(C).

17.     The Pueblo of Isleta and State of New Mexico entered into a Gaming Compact (the "2007 Compact"), Ex. A, 2007 Tribal-State Class III Gaming Compact (2007 Compact as approved by the State's Legislature), that was approved by the Secretary of the Interior on July 5, 2007, *see* Indian Gaming, 72 Fed. Reg. 36,717 (July 5, 2007).

18.     The Pueblo of Isleta and State of New Mexico subsequently entered into a successor compact (the "2015 Compact"), Ex. B, 2015 Tribal-State Class III Gaming Compact (2015 Compact as approved by the State's Legislature), that was submitted for review by the Secretary of the Interior pursuant to IGRA on May 24, 2015, *see* Indian Gaming, 80 Fed. Reg. 44,992 (July 28, 2015).  The Secretary of the Interior took no action on the 2015 Compact, as a result of which it is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]."  25 U.S.C. § 2710(d)(8)(C).  In the Secretary's letter providing notice to the State and the Pueblo that the 2015 Compact was considered to have been approved by the Secretary only to the extent it is consistent with IGRA, the Secretary specifically addressed the free play claim that the Defendants are now seeking to assert under the 2015 Compact based on provisions of the 2007 Compact.  The Secretary determined that treating free play credits as revenue in calculating the Pueblos' net win and State revenue sharing payments is inconsistent with IGRA.  The Secretary found that to do so would conflict with generally accepted accounting principles and would therefore "constitute an impermissible tax on tribal gaming revenues in violation of IGRA."  Ex. C, Letter from Kevin K.

Washburn, Assistant Sec'y-Indian Affairs, U.S. Dep't of the Interior, to Hon. E. Paul Torres, Governor, Pueblo of Isleta, at 3 (Jul. 21, 2015) ("Secretary's Isleta Letter").  The Secretary's determination is correct.

19.     The Pueblo of Sandia and State of New Mexico entered into a Gaming Compact (the "2007 Compact"), that was approved by the Secretary of the Interior on July 5, 2007, Ex. A, *see* 72 Fed. Reg. 36,717.

20.     The Pueblo of Sandia and State of New Mexico entered into a successor Gaming Compact (the "2015 Compact"), Ex. B, that was submitted for review by the Secretary of the Interior pursuant to IGRA on December 21, 2015, *see* Indian Gaming, 81 Fed. Reg. 19,235 (April 4, 2016).  The Secretary of the Interior took no action on the 2015 Compact, as a result of which it is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]."  25 U.S.C. § 2710(d)(8)(C).  In the Secretary's letter providing notice to the State and the Pueblo that the 2015 Compact was considered to have been approved by the Secretary only to the extent it is consistent with IGRA, the Secretary reaffirmed that treating free play as revenue is inconsistent with IGRA, emphasizing that "[f]ree play and point play must be treated according to industry standards and Generally Accepted Accounting Principles (GAAP) by excluding both from the definition of 'net win,' which forms the basis for revenue sharing calculations."  Ex. D, Letter from Lawrence S. Roberts, Acting Assistant Sec'y-Indian Affairs, U.S. Dep't of the Interior, to Hon. Francisco I. Lujan, Governor, Pueblo of Sandia, at 2 (Mar. 29, 2016) ("Secretary's Sandia Letter").  The Secretary's determination is correct.

21.     The Pueblo of Tesuque and State of New Mexico entered into a Gaming Compact (the "2007 Compact"), Ex. A, 2007 Tribal-State Class III Gaming Compact (2007 Compact as approved by the State's Legislature), that was approved by the Secretary of the Interior on July 5, 2007, *see* Indian Gaming, 72 Fed. Reg. 36,717 (July 5, 2007).

22.     The Pueblo of Tesuque and State of New Mexico subsequently entered into a successor compact (the "2015 Compact"), Ex. B, 2015 Tribal-State Class III Gaming Compact (2015 Compact as approved by the State's Legislature), that was submitted for review by the Secretary of the Interior pursuant to IGRA on August 10, 2015, *see* Indian Gaming, 80 Fed. Reg. 64,443 (October 23, 2015).  The Secretary of the Interior took no action on the 2015 Compact, as a result of which it is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]."  25 U.S.C. § 2710(d)(8)(C).  In the Secretary's letter providing notice to the State and the Pueblo that the 2015 Compact was considered to have been approved by the Secretary only to the extent it is consistent with IGRA, the Secretary specifically addressed the free play claim that the Defendants are now seeking to assert under the 2015 Compact based on provisions of the 2007 Compact.  The Secretary determined that treating free play credits as revenue in calculating the Pueblos' net win and State revenue sharing payments is inconsistent with IGRA.  The Secretary found that to do so would conflict with generally accepted accounting principles and would therefore "constitute an impermissible tax on tribal gaming revenues in violation of IGRA."  Ex. E, Letter from Kevin K. Washburn, Assistant Sec'y-Indian Affairs, U.S. Dep't of the Interior, to Hon. Milton P. Herrera, Governor, Pueblo of Tesuque, at 3 (Oct. 16, 2015) ("Secretary's Tesuque Letter").   The Secretary's determination is correct.

23.    The 2007 and 2015 Compacts were executed on behalf of the State pursuant to the State's Compact Negotiation Act, NMSA 1978 §§ 11-13A-1 to -5 (1999), which provides that the State's Governor "shall approve and sign" a compact which is "identical to a compact . . . previously approved by the legislature except for the name of the compacting tribe . . . ."  *Id.* § 11-13A-4(J).  Thus, the Pueblo of Isleta's, the Pueblo of Sandia's, and the Pueblo of Tesuque's 2007 Compact are identical, except for the difference in each Pueblo's name.  *See* Ex. A.  The Pueblo of Isleta's, the Pueblo of Sandia's, and the Pueblo of Tesuque's 2015 Compact are also identical, except for the difference in each Pueblo's name.  *See* Ex. B.

24.    The 2007 Compact authorizes each Pueblo to conduct "any or all forms of Class III Gaming," *id.* § 3(A), which means "all forms of gaming as defined in 25 U.S.C. § 2703(8), and 25 C.F.R. § 502.4," *id.* § 2(A).  Class III Gaming includes "[a]ny slot machines as defined in 15 U.S.C. 1171(a)(1) and electronic or electromechanical facsimiles of any game of chance . . . ," 25 C.F.R. § 502.4(b), and thus includes Gaming Machines.  Under § 2(F) of the 2007 Compact, a Gaming Machine is "a mechanical, electromechanical or electronic contrivance or machine that, upon insertion of a coin, token or similar object, or upon payment of any consideration in any manner, is available to play or operate a game of chance in which the outcome depends to a material degree on an element of chance, notwithstanding that some skill may be a factor."  Thus, each Pueblo may authorize a player to initiate play with cash, or an authorized form of electronic currency, such as a free play credit.  Such credits provide players an incentive to extend their playing time by effectively improving their chances to win prizes.  Whether and to what extent to authorize free play on Gaming Machines is a decision for each

152886-1

Pueblo in the exercise of its right to conduct Class III Gaming under IGRA and the 2007 Compact, *id*. § 3(A).

25.     Whether cash or a free play credit is used to initiate play on a Gaming Machine, each Pueblo must pay the prize if the player wins the game, "whether the payoff is made automatically from the Gaming Machine or in any other manner . . . ." *Id*. § 2(F).  In addition, each Gaming Machine is required to "pay out a mathematically demonstrable percentage of all amounts wagered, which must be not less than eighty percent (80%)," and players must be informed of the Pueblo's compliance with this requirement in plain terms.  *Id.* § 4(B)(12).  The Pueblos pay out a percentage that meets and exceeds this requirement.

26.     Since 1993, federal law has required Indian tribes to maintain their gaming records and account for their gaming revenues in accordance with GAAP.  *See* 25 C.F.R. §§ 542.19(b), 571.12(b) (2015) (current regulations); Compliance and Enforcement Procedures Under the Indian Gaming Regulatory Act, 58 Fed. Reg. 5833, 5843 (Jan. 22, 1993) (promulgating regulations requiring GAAP in 1993).

27.     In conformance with federal law, the 2007 Compact explicitly "require[s] all books and records relating to Class III Gaming to be maintained in accordance with generally accepted accounting principles," *id.* § 4(C).  The terms of the 2007 Compact control all financial recordkeeping and accounting requirements that apply to the conduct of Class III Gaming under the Compact.  *Id.*

28.     The 2007 Compact expressly requires each Pueblo to maintain records of the total amount wagered and the total amount paid out in prizes on Gaming Machines, and to have its calculation of Net Win verified each year by an independent certified public accountant.  For

152886-1

Gaming Machines, the Pueblo is required to maintain "analytic reports which show the *total amount of cash wagered and the total amount of prizes won*." *Id*. § 4(C)(3) (emphasis added). And each year "an audit and a certified financial statement covering all financial activities of the Gaming Enterprise, *including written verification of the accuracy of the quarterly Net Win calculation*, [must be prepared] by an independent certified public accountant licensed by the State." *Id*. § 4(C) (emphasis added).  The financial statement "shall be prepared in accordance with generally accepted accounting principles and shall specify the total amount wagered in Class III Gaming on all Gaming Machines at the Tribe's Gaming Facility for purposes of calculating 'Net Win' under Section 11 of this Compact using the format specified therein." *Id.* Both the financial statement and the audit report are to be submitted to "the Tribal Gaming Agency, the State Gaming Representative, and the State Treasurer, within one hundred twenty (120) days of the close of the Tribe's fiscal year." *Id.*

29.    The 2007 Compact also requires each Pueblo to make revenue sharing payments to the State.  It provides that each Pueblo "shall pay to the State a portion of its Class III Gaming revenues" in exchange for "the exclusive right within the State to conduct all types of Class III Gaming described in this Compact," with the exception of the limited use of Gaming Machines at racetracks and by certain veterans' and fraternal organizations. *Id.* § 11(A).

30.    The 2007 Compact further provides that the State's right to receive a portion of each Pueblo's Class III Gaming revenue terminates if the State "passes, amends, or repeals any law, or takes any other action, that would directly or indirectly attempt to restrict, or has the effect of restricting, the scope or extent of Indian gaming." *Id.* § 11(D)(1)(a).   Under that

152886-1

provision, the State's right to revenue sharing payments terminates if it attempts to interfere with the Pueblos' right to authorize free play on Gaming Machines.

31.     Under § 11(C)(1), the State's portion of each Pueblo's Class III Gaming revenues is based on each Pueblo's Net Win on Gaming Machines.  The term "Net Win" has the same meaning whenever it is used in the Compact, *id.*  Each Pueblo's Net Win is calculated under § 11(C)(1); the State's share is determined under § 11(C)(2); the Pueblo make four quarterly payments to the State under § 11(C)(3), and corrects any over or under payments in the fourth quarterly payment, *id*.  Each Pueblo's Net Win each year is then used to estimate its Net Win for the next year under § 11(C)(3).

32.     The starting point for calculating Net Win is to determine the "total amount wagered."  That determination is made under § 4(C) of the 2007 Compact by relying on books and records kept in accordance with GAAP to prepare a financial statement that "shall be prepared in accordance with generally accepted accounting principles and shall specify the total amount wagered in Class III Gaming on all Gaming Machines at the Tribe's Gaming Facility for purposes of calculating 'Net Win' under Section 11 of this Compact using the format specified therein."  *Id.*  Accordingly, the total amount wagered is determined under § 4(C).

33.     Neither § 4(C), nor § 11, nor any other provision of the 2007 Compact provides for free play credits to be treated as revenue.  Instead, the 2007 Compact requires compliance with GAAP, under which free play credits are not revenue and are not included in the calculation of Net Win, as the Secretary correctly determined.  The reporting procedures required by GAAP, which each Pueblo is required to comply with by § 4(C)(3) of the 2007 Compact and 25 C.F.R. § 571.12, are defined in the American Institute of Certified Public Accountants, Audit &

152886-1

Accounting Guide: Gaming (2014 ed.) ("AICPA Gaming Guide") which is the judicially-recognized source of GAAP for Indian gaming. *See Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 813 (6th Cir. 2007). The AICPA Gaming Guide provides that the use by patrons of free play "has no effect on the reporting of net win or loss from gaming activities." *Id.* § 6.13.[1] That is so because revenue is "measured based on an aggregate daily (or shift) basis, rather than on a bet or customer basis." *Id.* As the AICPA Gaming Guide explains, this means that "if a customer bets $5 of his or her own cash and wins $1, the gaming entity reports revenue of $4. If a customer bets $5 of his or her own cash, uses $5 of credits from his or her club card, and wins $1, the gaming entity reports revenue of $4." *Id.*

34.     Each Pueblo's Net Win is then determined by deducting from the total amount wagered: the amount paid out in prizes to winning players, *id.* § 11(C)(1)(a); the State's regulatory costs, *id.* § 11(C)(1)(b); and the Pueblo's regulatory costs, *id.* § 11(C)(1)(c). The percentage of each Pueblo's Net Win to which the State is entitled is then determined by reference to the chart set forth in § 11(C)(2). And that amount is then paid to the State on a quarterly basis. *Id.* § 11(C)(3). Each payment "shall be based upon the Net Win during the preceding quarter" as well as the prior year's Net Win and applicable revenue sharing percentage, and the Pueblo's best estimate of the Net Win for the current year. *Id.* Each Pueblo corrects any over or under payments for the first three quarters in the fourth quarterly payment by either paying the additional amount due for the first three quarters or showing a credit in the amount of the overpayment. *Id.*

---

[1] The prior edition of the AICPA Gaming Guide took the same exact position, in the same exact language. Am. Instit. of Certified Pub. Accountants, Audit & Accounting Guide for Gaming (2011 ed.) ("2011 AICPA Gaming Guide").

152886-1

35.     The final determination of the accuracy of the quarterly Net Win calculation from which the State's revenue sharing payments are made is controlled by § 4(C), which requires that "an audit and a certified financial statement covering all financial activities of the Gaming Enterprise, *including written verification of the accuracy of the quarterly Net Win calculation*, [must be prepared each year] by an independent certified public accountant licensed by the State." *Id.* (emphasis added).

36.     The 2007 Compact was "supplant[ed] and replac[ed]" by the 2015 Compact, *id.* § 9(A).  Its terms expressly reject the State's claim that the Pueblos' Net Win includes free play used on Gaming Machines.  *See* 2015 Compact App. § III(C) ("Free Play and Point Play do not increase Net Win, and amounts paid as a result of Free Play or Point Play reduce Net Win for purposes of the revenue sharing calculation in Section 11(C).").[2]

37.     The only exception to the replacement effect of the 2015 Compact on the 2007 Compact is narrow and limited.  The 2015 Compact provides that "the terms of any Predecessor Agreement . . . shall survive to permit the resolution of payment disputes" which "shall be resolved through the procedures set forth in Section 7 of th[e 2015] Compact."  *Id.* § 9(B).  The terms of § 7 and § 9 do not address free play, the treatment of which is controlled by other provisions of the 2015 Compact.  *See* 2015 Compact Appendix, Section III(C).  Instead, Section 7 makes available two remedies for payment disputes, neither of which is mandatory or exclusive.

38.     The remedy that the defendant State officials purport to rely on to assert their free play claim is set forth in § 7(A), which provides that "if the State believes that, prior to the

---

[2] The Pueblos are not challenging the State's right to receive revenue sharing payments under the 2015 Compact by bringing this action.

Effective Date of this Compact, the Tribe has failed to comply with or has otherwise breached any provision of a Predecessor Agreement affecting payment, the State may invoke" the procedures described in § 7(A) "within two (2) years of the Effective Date of this Compact, as permitted in Section 9(B) . . . ."[3]

39.    The remedies available to the Pueblos are set forth in § 7(B), which provides that:

> Nothing in Subsection 7(A) shall be construed to waive, limit or restrict any remedy that is otherwise available to either party to enforce or resolve disputes concerning the provisions of this Compact.   Nothing in this Section shall be deemed a waiver of the Tribe's sovereign immunity.   Nothing in this Section shall be deemed a waiver of the State's sovereign immunity.

*Id.*  Under this provision, the remedies otherwise available to the Pueblos include a determination made by the Secretary under § 2710(d)(8) of IGRA, and the initiation of this action.

40.    In the statutorily mandated review of the 2015 Compact conducted under § 2710(d)(8), the Secretary of the Interior determined that the State's position on the treatment of free play under the 2007 Compact violates IGRA.   Ex. F, Letter from Kevin K. Washburn, Assistant Sec'y-Indian Affairs, U.S. Dep't of the Interior, to Hon. Susana Martinez, Governor, New Mexico, at 3 (Jun. 9, 2015) ("Secretary's Letter") (Jicarilla Apache Nation, Mescalero Apache Tribe, Navajo Nation, Pueblo of Acoma, and Pueblo of Jemez Compacts); Ex. C, Secretary's Isleta Letter; Ex. D, Secretary's Sandia Letter; Ex. E, Secretary's Tesuque Letter.[4]

---

[3] The 2007 Compact is a "Predecessor Agreement" under the terms of the 2015 Compact, because it is the "the last tribal-state Class III Gaming compact, if any, entered into between the Tribe and the State preceding the execution of this Compact."  2015 Compact § 2(S).

[4] The State has now entered into the 2015 Compact with fifteen Tribes, including the Pueblos of Isleta, Sandia, and Tesuque with a form of compact approved by the State's Legislature under the State's Compact Negotiation Act.  *See supra* at ¶23.  Five other Tribes (Jicarilla, Mescalero, Navajo, Acoma, and Jemez) were the first signatories to the 2015 Compact, and in reviewing the 2015 Compact, the Secretary previously considered and rejected the State's position on the treatment of free play under those Tribes' Predecessor Compacts.  *See* Secretary's Letter.  The

152886-1

41.     The Secretary acknowledged that the 2015 Compact reserved a two-year period for the assertion of payment disputes, and that the State asserted "that the Tribes' net win – and, thus, their revenue sharing payments – should include wins and losses arising from free play or point play."  Secretary's Letter at 3.  But the Secretary determined that the State's position on the 2007 Compact did not comport with IGRA, stating unequivocally that it would be contrary to GAAP to include free play credits in the calculation of Net Win and the payment of revenue sharing and that to do so would be inconsistent with IGRA.  The Secretary found that "the State's unilateral determination to include such sums in revenue sharing calculations would constitute an impermissible tax on tribal gaming revenues in violation of IGRA."  *Id.*  The Secretary ultimately decided to take no action on any of the 2015 Compacts that were submitted to him by tribes in New Mexico, as a result of which "the 2015 Compacts are considered to have been approved, but only to the extent they are consistent with the provisions of IGRA."  *Id.* at 4; *see* 25 U.S.C. § 2710(d)(8)(C).

42.     The Secretary's determination is correct.  And as a result of the Secretary's determination, the 2015 Compact is not effective to preserve the defendant State officials' free play claim under the 2007 Compact, nor does the 2015 Compact provide the defendant State officials a means of pursuing that claim.  Furthermore, the Secretary's determination is not subject to arbitration under the 2015 Compact.  IGRA does not authorize tribes and states to confer on a dispute resolution forum the power to review a Secretarial determination under §

---

Secretary took the same position in her determination on the Pueblos' 2015 Compact.  *See* Secretary's Isleta Letter at 1 (noting that the "the Compact is identical to compacts submitted earlier this year by five sister tribes located in New Mexico and our concerns remain the same."); Secretary's Sandia Letter at 2 ("Our position remains the same."); Secretary's Tesuque Letter at 3 ("Our position remains the same.").

152886-1

2710(d)(8). And in any event, the 2015 Compact expressly provides that "the arbitrators shall have no authority to determine any question as to the validity or effectiveness of this Compact or of any provision hereof." *Id.* § 7(A)(3). Such determinations are instead to be made in court, as § 19 of the 2015 Compact acknowledges in addressing the validity of the compact "[s]hould any provision of this Compact be found to be invalid or unenforceable by any court." *Id.*

**B.     The Defendant State Officials' Attempt to Treat Free Play as Revenue in Violation of Federal Law and to Require that Any Challenge to that Tax Be Determined in Arbitration.**

43.     On April 13, 2017, the defendant Paulette Becker, acting on behalf of the defendant State officials, sent letters to the Executive Directors of each Pueblos' Gaming Commissions that purport to provide written notice of noncompliance to the Pueblos pursuant to §§ 7(A) and 9(B) of the 2015 Compact. The defendant State officials' letter asserted that each Pueblo "failed to comply with or has otherwise breached provisions of the 2007 Amended Tribal-State Gaming Compact ('2007 Compact') affecting payment." Ex. G, Letter from Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd., to Georgene Louis, Exec. Dir., Pueblo of Isleta Gaming Regulatory Agency, at 1 (Apr. 13, 2017) ("Board's Isleta Letter"); Ex. H, Letter from Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd., to Frank Paisano, Interim Exec. Dir., Sandia Tribal Gaming Comm'n, at 1 (Apr. 13, 2017) ("Board's Sandia Letter"); Ex. I, Letter from Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd., to Jessica Baker, Interim Exec. Dir, Pueblo of Tesuque Gaming Comm'n, at 1 (Apr. 13, 2017) ("Board's Tesuque Letter") (collectively "Board's Letters"). The Board's Letters asserted that the Pueblos "failed to comply with the requirements of Section 11 of the 2007 Compact related to the computation of 'Net Win' and the

payment of revenue sharing," *id.* at 1, and demanded additional payments.  The Board's Isleta

Letter demanded $10,107,462.00 from the Pueblo of Isleta for the period from April 1, 2011

through July 27, 2015, and interest in the amount of $252,687.00 for a total of $10,360,149.00,

*id.* at 1-2.  The Board's Sandia Letter demanded $25,845,220.00 from the Pueblo of Sandia for

the period from April 1, 2011 through April 3, 2016, and interest in the amount of $646,130.00

for a total of $26,491,350.00, *id.* at 1-2.  The Board's Tesuque Letter demanded $3,173,535.00

from the Pueblo of Tesuque for the period from April 1, 2011 through October 22, 2015, and

interest in the amount of $79,338.00 for a total of $3,252,873.00, *id.* at 1-2.

44.     The Board's Letters purported to justify the demand for payment by asserting that

"prizes awarded as a result of the use of 'free play' are not deductible unless the face value of the

'free play' is included in the calculation of the total amount wagered."  *Id.* at 1.  The Board's

Letters further asserted that "the 2007 Compact contains no provision that states or infers that the

parties are to utilize GAAP for the calculation of 'Net Win.'"  *Id.* at 2.  At the same time,

however, the Board's Letter admitted that § 4(C) of the 2007 Compact requires that "the

Pueblo[s'] audited financial statements are to be prepared utilizing GAAP" and that § 4(C)

controls the "verification of the accuracy of the 'Net Win' calculation and provides an additional

requirement with respect to the reporting of the 'Net Win' calculation in the financial

statements."  Board's Isleta Letter at 4; Board's Sandia Letter at 3-4; Board's Tesuque Letter at

3-4.  Nevertheless, the Board's Letters asserted that the calculation of "Net Win" for the

purposes of making quarterly payments to the State was governed by § 11(C)(1), and that

"[t]here is no language in Section 11.C.1 that permits a deduction for 'free play'" or any

provision that "compels the parties to utilize some 'industry standard' for calculating 'Net Win' that is not provided for in the 2007 Compact." Board's Letters at 4.

45.     In taking the position set forth in the Board's Letters, the defendant State officials ignored the Secretary's determination that the State's assertion that it has the right to treat free play as revenue under the 2007 Compact violates IGRA, as a result of which the 2015 Compact is not effective to preserve that claim, nor does it provide a means of pursuing that claim.

46.     Nor did the defendant State officials address the provisions of IGRA, 25 U.S.C. § 2710(d)(4), and its implementing regulations, 25 C.F.R. § 571.12, that show that the Secretary is correct and that the State's position is contrary to federal law.

47.     The Board's Letters requested payment within twenty (20) days, but the Board subsequently notified the Pueblos by letter of April 27 than it agreed to extend the period of time for the Pueblos to respond until May 19, 2017, or until May 30, 2017 if the Pueblos' response proposed a settlement.

48.     On May 19, each Pueblo sent a letter to the State's Acting Gaming Representative. Letter from J. Robert Benavides, Governor, Pueblo of Isleta, to Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd. (May 19, 2017); Letter from Malcolm Montoya, Governor, Pueblo of Sandia, to Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd. (May 19, 2017); Letter from Hon. Mark Mitchell, et al., Governor, Pueblo of Tesuque, to Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd. (May 19, 2017). In those letters, the Pueblos explained that the defendant State officials' interpretation of the 2015 and 2007 Compacts had been rejected by the Secretary

of the Interior, conflicted with IGRA and its implementing regulations, was not subject to arbitration under the 2015 Compact, and was based on a misreading of the 2007 Compact.  *Id.*

49.     On May 31, the defendant Paulette Becker, acting on behalf of the defendant State officials, sent letters to the Executive Director of each Pueblo's Gaming Commission that purported to be "notices to cease conduct" under Section 7 of the 2015 Compact.  Ex. J, Letter from Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd., to Tommy Simmons, Exec. Dir., Sandia Tribal Gaming Comm'n (May 31, 2017); Ex. K, Letter from Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd., to Georgene Louis, Exec. Dir., Pueblo of Isleta Gaming Regulatory Comm'n (May 31, 2017); Ex. L, Letter from Paulette Becker, Acting State Gaming Representative, N.M. Gaming Control Bd., to Jessica Baker, Interim Exec. Dir., Pueblo of Tesuque Gaming Comm'n.  (May 31, 2017). These letters demanded that the Pueblos either "cure" their alleged breaches of the 2007 Compact by paying the amount demanded by the State, or "invoke arbitration within 10 days of this notice."  These letters did not address the legal arguments raised in the Pueblos' response letters of May 19.  The Board subsequently agreed to extend the time period for the Pueblos to respond to June 19, 2017.

50.     On information and belief, the defendant State officials will initiate the arbitration process and will appoint an arbitrator if the Pueblos do not initiate arbitration or make the payment demanded in the Board's Letters by June 19, 2017.  Allowing the defendant State officials to advance their free play claim in an arbitration proceeding under the 2015 Compact would cause certain and great injury to the Pueblos' federal right to be free from state taxation and regulation in their conduct of gaming on reservation lands in accordance with IGRA.  That is

23

so because the Pueblos would be required to submit their federal rights for determination by an arbitration panel without a prior judicial determination of the arbitrability of the claims presented in this action, and to then proceed before an arbitration panel that does not have the power to decide the claims presented in this action.  The Pueblos would also be forced to expend time, money, and effort to arbitrate the dispute.  These are injuries that cannot be remedied by money damages.

## COUNT I

51.     The Pueblos reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

52.     The defendant State officials' free play claim, presented in the Board's Letters, is an attempt to impose a tax or other assessment on the Pueblos' conduct of Class III Gaming under the 2007 Compact that violates both the *per se* rule of federal law that bars state taxation of Indian tribes absent clear congressional authorization and IGRA, which explicitly confirms that its terms contain no such authorization.  IGRA provides that except for any assessment that may be agreed under § 2710(d)(3)(C)(iii), "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity."  25 U.S.C. § 2710(d)(4).  The defendant State officials' free play claim is not authorized by § 2710(d)(3)(C)(iii) and is therefore invalid under the *per se* rule and § 2710(d)(4).

152886-1

53.     In the 2015 Secretary's Letter, the Secretary correctly determined that the defendant State officials' unilateral decision to impose an additional revenue sharing requirement on the Pueblos constitutes illegal taxation in violation of IGRA.  Secretary's Letter at 3.

54.     By unilaterally demanding that free play be treated as revenue in calculating each Pueblo's Net Win, and the State's share of each Pueblo's Net Win, and then demanding payment thereof, the defendant State officials are taxing and imposing an assessment on the Pueblos' exercise of their right to conduct Class III gaming on Gaming Machines by authorizing the use of free play credits.  More specifically, the Pueblos have the right to authorize Gaming Machines to be played using house-recognized currency, as provided for under §§ 3(A) and 2(F) of the 2007 Compact, and free play credits are an authorized form of house-recognized currency.  The State's free play claim constitutes both a tax and an assessment because it seeks the payment of money to the State based on the Pueblos' exercise of their right to authorize free play on Gaming Machines, and because including free play in calculating the Pueblos' Net Win and the State's revenue sharing payments is contrary to GAAP and therefore violates federal law.  For the same reasons, the State's free play claim restricts the Pueblos' right to engage in Class III Gaming, and therefore violates § 11(D)(1)(a) of the 2007 Compact.

55.     The defendant State officials attempt to mask their tax by presenting it as a demand in the dispute resolution process, and by referring to the tax as a revenue sharing "payment."  But whether an assessment is a "tax" for purposes of protecting tribal immunities from state taxation is determined in light of its "substance and application," *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2595 (2012) (quoting *United States v. Constantine*, 296 U.S. 287, 294 (1935)); *accord City of Detroit v. Murray Corp. of Am.*, 355 U.S. 489, 492-93

(1958), and practical operation, not the language the State uses to describe the demand, *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 188 (1980) (Rehnquist, J., concurring in part and dissenting in part).  The Defendants' assessment is a tax because its purpose is to obtain a fixed percentage of the Pueblos' free play as general State revenue, which is the quintessential form and purpose of taxation.  *Dep't of Revenue v. Kurth Ranch*, 511 U.S. 767, 779-80 (1994) (taxes are "usually motivated by revenue-raising . . . purposes"); *see New York v. United States*, 505 U.S. 144, 171 (1992) (a levy on waste transmission, calculating as a percentage of a state-charged surcharge, is "no more than a federal tax on interstate commerce").  For the same reasons, the Defendants' free play claim constitutes a "tax, fee, charge, or other assessment" that is invalid under 25 U.S.C. § 2710(d)(4).

56.     The 2007 Compact could not and does not give the defendant State officials authority to treat free play used on Gaming Machines as revenue for purposes of calculating State revenue sharing payments.  Treating free play as revenue violates the Pueblos' right under federal law and the 2007 Compact to authorize the use of free play on Gaming Machines.  Doing so also violates federal law, 25 C.F.R. § 571.12, and the financial recordkeeping and accounting responsibilities set forth in the 2007 Compact, *id.* § 4(C), both of which require the application of GAAP to the determination of the Pueblos' Net Win.  Under GAAP, free play is not treated as revenue.  In these circumstances, the treatment of free play as revenue constitutes a tax.  State taxation of an Indian tribe is forbidden by federal law absent congressional authorization that is unmistakably clear, *Cabazon Band*, 480 U.S. at 215 n.17, and nothing in IGRA purports to authorize state taxation of Indian tribes.  To the contrary, IGRA expressly forbids States from imposing "any tax, fee, charge, or other assessment upon an Indian tribe" with the sole exception

26

of assessments necessary to defray the cost to the state of regulating gaming conducted under a compact, *see* § 25 U.S.C. § 2710(d)(4).  The defendant State officials' claim is not authorized by § 2710(d)(4), and is therefore illegal and in violation of federal law.

57.     The State is not authorized under IGRA, its implementing regulations, the 2015 Compact, or the 2007 Compact to violate federal law or to require the Pueblos to violate federal law.

58.     The Pueblos have no adequate remedy at law for the defendant State officials' continuing violations of federal law.

## COUNT II

59.     The Pueblos reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

60.     This action falls squarely within the remedies expressly authorized by § 7(B) of the 2015 Compact, which provides that "[n]othing in Subsection 7(A) shall be construed to waive, limit or restrict any remedy that is otherwise available to either party to enforce or resolve disputes concerning the provisions of this Compact."  *Id.*  Under § 7(B), a remedy is "otherwise available" if it does not rely on the provisions of § 7(A) and may be asserted notwithstanding that: "[n]othing in this Section shall be deemed a waiver of the Tribe's sovereign immunity. Nothing in this Section shall be deemed a waiver of the State's sovereign immunity."  *Id.*

61.     This action is the only remedy available for the Pueblos' claim that federal law bars the State's reliance on the 2015 and 2007 Compacts to seek additional revenue sharing payments from the Pueblos based on its free play claim.  That is so because the 2015 Compact expressly provides that "the arbitrators shall have no authority to determine any question as to

27

the validity or effectiveness of this Compact or of any provision hereof." *Id.* § 7(A)(3). Such determinations are instead to be made in court, as § 19 of the 2015 Compact acknowledges in addressing the possibility of a judicial decision invalidating a portion of the Compact: "[s]hould any provision of this Compact be found to be invalid or unenforceable by any court." *Id.* For the same reasons, the defendant State officials free play claim is not subject to arbitration under the 2015 Compact. To the contrary, the questions of federal law presented by this action must be determined by this Court because their presentation to an arbitration panel would violate the very federal rights which this action seeks to protect, namely the Pueblos' right to be free from State interference with the exercise of their sovereign rights.

62. On information and belief, the State will initiate the arbitration process and appoint an arbitrator if the Pueblos do not initiate arbitration or make the payment demanded in the Board's Letters by June 19, 2017.

63. The Pueblos have no adequate remedy at law for the defendant State officials' illegal and invalid attempt to arbitrate the claim set forth in the Board's Letters.

## COUNT III

64. The Pueblos reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

65. The defendant State officials' free play claim is not subject to arbitration under the 2015 Compact because in the statutorily mandated review of the 2015 Compact conducted under 25 U.S.C. § 2710(d)(8), the Secretary determined that the 2015 Compact does not authorize the State to require the Pueblos to pay the State additional revenue sharing on free play under the 2007 Compact, Secretary's Isleta Letter at 3; Secretary's Sandia Letter at 2;

Secretary's Tesuque Letter at 3, and whether a compact's terms violate IGRA is reserved for determination by the Secretary of the Interior in deciding whether to approve, disapprove, or take no action on a compact submitted for the Secretary's approval under IGRA, 25 U.S.C. § 2710(d)(8)(A)-(C).

66. The Secretary's determination that accounting for free play in the calculation of Net Win and State revenue sharing payments would violate GAAP, and "constitute an impermissible tax on tribal gaming revenues in violation of IGRA," Secretary's Letter at 3, is correct and based on long-standing requirements of federal law. Since 1993, IGRA's regulations have expressly required Indian tribes to comply with GAAP in the preparation of financial statements and audits. 25 C.F.R. § 571.12(b) (2015) (current regulations, requiring that financial statements and annual audits "shall conform to generally accepted accounting principles"); 58 Fed. Reg. at 5843 (promulgating 25 C.F.R. § 571.12, requiring that financial statements and annual audits shall be prepared and conducted "in accordance with generally accepted accounting principles"). And under GAAP, the use of free play "has no effect on the reporting of net win or loss from gaming activities." AICPA Gaming Guide § 6.13; 2011 AICPA Gaming Guide § 6.13. In these circumstance, accounting for free play in the calculation of Net Win and State revenue sharing payments would violate the *per se* rule of federal law barring state taxation of Indian tribes and IGRA's reliance on that rule to prohibit the imposition of State taxation and assessments on Indian gaming, 25 U.S.C. § 2710(d)(4).

67. Because the defendant State officials' claim violates federal law, it is not subject to arbitration under the 2015 Compact, and the 2015 Compact neither preserves that claim, nor

provides a process for its resolution.  The State may not rely on the 2015 Compact to bootstrap a claim that violates IGRA.

68.     This action is the only remedy available for the Pueblos' claim that as a result of the Secretary's determination, the 2015 Compact is invalid and ineffective to preserve the defendant State officials' free play claim under the 2007 Compact, or to provide the defendant State officials with a means of pursuing that claim.

69.     The Pueblos have no adequate remedy at law for the defendant State officials' illegal and invalid attempt to arbitrate the claim set forth in the Board's Letters.

## COUNT IV

70.     The Pueblos reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

71.     Neither the claims set forth in this Complaint nor the defendant State officials' free play claim is subject to arbitration under the 2015 Compact because in enacting IGRA, Congress did not authorize tribes and states to vest authority in an arbitration panel to resolve disputes over whether a compact violates IGRA or other federal law.

72.     In enacting IGRA, Congress specifically defined the subjects that the terms of a compact may address, 25 U.S.C. § 2710(d)(3)(C), which include "remedies for breach of contract."  *Id.* § 2710(d)(3)(C)(v).  That provision allows the parties to agree upon a process for resolving disputes that fall only within that category.  IGRA does not authorize the parties to a compact to agree that disputes over whether a compact's terms violate the provisions of IGRA and settled federal law shall be decided in arbitration conducted under a compact's dispute resolution provision.  To the contrary, IGRA separately provides that whether a compact's terms

152886-1

violate IGRA is to be determined by the Secretary of the Interior in deciding whether to approve, disapprove, or take no action on a compact submitted for Secretarial approval under IGRA. *Id.* § 2710(d)(8)(A)-(C). Otherwise, IGRA would allow parties to submit any and all questions concerning the scope and interpretation of IGRA, including the permissible scope of compact terms, to exclusive determination in a forum established by themselves for themselves. That is not the law. Instead, "[a] gaming compact is a creation of the IGRA, which determines the compact's effectiveness and permissible scope," *Pueblo of Santa Ana v. Nash*, 972 F. Supp. 2d 1254, 1265 (D.N.M. 2013) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 49 (1996)). And "the interpretation of [IGRA] presents a federal question suitable for determination by a federal court." *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557 (10th Cir. 1997).

73. Nor does the 2015 Compact purport to authorize an arbitration panel to determine whether a provision of the compact violates IGRA. The provisions of the 2015 Compact which authorize arbitration to resolve compact disputes are narrowly drawn, and permissive rather than mandatory. They permit only the resolution of claims that a party "has failed to comply with or has otherwise breached any provision of this Compact," and provide that a "party may invoke" the provisions of § 7(A) for that limited purpose. *Id.* § 7(A). And while § 7(A) also provides that the State may invoke those procedures to assert certain claims under the 2007 Compact, that provision is even narrower. It extends only to claims that "the Tribe has failed to comply with or has otherwise breached any provision of a Predecessor Agreement affecting payment," which the State may assert "within two (2) years of the Effective Date of this Compact, as permitted in Section § 9(B)." *Id.* § 7(A).

152886-1

74.     These terms do not allow an arbitration panel to determine whether the *per se* rule of federal law barring state taxation of Indian tribes and IGRA's express prohibition on state taxation under a compact preclude the defendant State officials' claim under the 2007 Compact and invalidate and render ineffective their reliance on the 2015 Compact to assert that claim. Indeed, § 7(A)(3) of the 2015 Compact expressly provides that "the arbitrators shall have no authority to determine any question as to the validity or effectiveness of this Compact or of any provision hereof." *Id.*

75.     Nor does anything in § 9(B) expand the narrow scope of § 7(A)'s arbitration provision.   Section 9(B) simply provides for the survival of the terms of any Predecessor Agreement to allow for the resolution of payment disputes, and directs that "[s]uch disputes shall be resolved through the procedures set forth in Section 7 of this Compact." *Id.*  Furthermore, § 9(B) makes no specific reference to § 7(A).   Instead, § 9(B) provides for the resolution of payment disputes under the provisions of § 7, and thus applies with equal force to the resolution of payment disputes through remedies, such as this action, that are otherwise available under § 7(B).

76.     The Pueblos have no adequate remedy at law for the defendant State officials' illegal and invalid attempt to arbitrate the claim set forth in the Board's Letters.

WHEREFORE, the Pueblos respectfully ask this Court to enter judgment in their favor and to:

A. Issue a declaratory judgment, declaring that the defendant State officials' claim for additional revenue sharing payments under the 2007 Compact, which is advanced under the 2015 Compact and presented in the Board's Letters of April 13 to the

152886-1

Pueblos, violates the *per se* rule of federal law barring state taxation of Indian tribes and IGRA, 25 U.S.C. § 2710(d)(4), and is also rejected by the generally accepted accounting principles that federal law requires each Pueblo to comply with, 25 C.F.R. § 571.12, as the Secretary of the Interior correctly determined, and that the 2015 Compact is therefore invalid and ineffective to preserve the defendant State officials' claim.

B.  Issue a declaratory judgment, declaring that neither the claims alleged in this action, nor the defendant State officials' claim for additional revenue sharing, which is advanced under the 2015 Compact and presented in the Board's Letters of April 13 to the Pueblos, is subject to arbitration under the 2015 Compact because: (1) this action is expressly authorized by § 7(B) of the 2015 Compact, and provides the only available remedy for the claims alleged in this action; (2) the arbitration provisions of § 7(A) of the 2015 Compact on which the defendant State officials rely are permissive, not exclusive, and categorically exclude the claims alleged by the Pueblos in this action; (3) the defendant State officials' claim that free play credits must be treated as revenue under the 2007 Compact violates the *per se* rule of federal law barring state taxation of Indian tribes, and IGRA, 25 U.S.C. § 2710(d)(4), and that claim is therefore not preserved by § 7(A) of the 2015 Compact, and may not be asserted under the arbitration provisions of the 2015 Compact; and (4) in enacting IGRA, Congress did not authorize tribes and states to vest authority in an arbitration panel to resolve disputes over whether a compact violates IGRA or other federal law, nor does the 2015 Compact purport to do so.

152886-1

C.  Enjoin the defendant State officials, and any of their agents, officers, employees, or representatives, from continuing to violate federal law by, *inter alia*, seeking to impose a tax, fee, charge, or other assessment on the Pueblos in the guise of asserting a claim for additional revenue sharing payment under the 2007 and 2015 Compacts.

D.  Enjoin the defendant State officials, and any of their agents, officers, employees, or representatives, from continuing their efforts to arbitrate the dispute over their claim that free play credits must be treated as revenue under the 2015 Compact, or under any provision of the 2007 Compact.

Award the Pueblos their costs, and such other and further relief as this Court deems just or equitable.

Dated:  June 19, 2017

By:  /s/ David C. Mielke
David C. Mielke, Esq.
Sonosky, Chambers, Sachse,
   Mielke & Brownell, LLP
500 Marquette Avenue NW, Suite 660
Albuquerque, NM 87102
(505) 247-0147
*dmielke@abqsonosky.com*

*Attorneys for Pueblo of Isleta and Pueblo of Sandia*

By:  /s/ Tom Peckham
Thomas J. Peckham, Esq.
Nordhaus Law Firm, LLP
6705 Academy Rd. NE, Ste. A
Albuquerque, NM 87109-3361
(505) 243-4275
*tpeckham@nordhauslaw.com*

152886-1

Maxine R. Velasquez, Esq.
General Counsel
Pueblo of Tesuque
Rt. 42 Box 360-T
Santa Fe NM 87506
(505) 955-7701
*mvelasquez@puebloftesuque.org*

*Attorneys for Pueblo of Tesuque*