# EXHIBIT B

# INDIAN GAMING COMPACT

# BETWEEN

# THE STATE OF NEW MEXICO

# AND

# THE _____

TABLE OF CONTENTS

SECTION 1.    Purpose and Objectives........................................................................... 2

SECTION 2.    Definitions. ........................................................................................... 2

SECTION 3.    Authorized Class III Gaming.................................................................. 5

SECTION 4.    Conduct of Class III Gaming. ................................................................ 6

SECTION 5.    Licensing Requirements. .................................................................... 18

SECTION 6.    Providers of Class III Gaming Equipment or Devices or Supplies. ............... 19

SECTION 7.    Dispute Resolution............................................................................. 19

SECTION 8.    Protection of Visitors. ....................................................................... 21

SECTION 9.    Execution; Effective Date; Claims under Predecessor Agreement. ............... 23

SECTION 10.   Criminal Jurisdiction......................................................................... 23

SECTION 11.   Revenue Sharing. .............................................................................. 24

SECTION 12.   Duration; Termination for Non-Payment. ........................................... 27

SECTION 13.   Notice to Parties................................................................................ 28

SECTION 14.   Entire Agreement.............................................................................. 28

SECTION 15.   Filing of Compact with State Records Center. ................................... 28

SECTION 16.   Counterparts..................................................................................... 28

SECTION 17.   Internet Gaming. ............................................................................... 28

SECTION 18.   Applicability. .................................................................................... 29

SECTION 19.   Severability. ...................................................................................... 29

INDIAN GAMING COMPACT BETWEEN THE STATE OF NEW MEXICO
AND THE_____

FEBRUARY 2015

INTRODUCTION

The State of New Mexico ("State") is a sovereign State of the United States of America, having been admitted to the Union pursuant to the Act of June 20, 1910, 36 Statutes at Large 557, Chapter 310, and is authorized by its constitution to enter into contracts and agreements, including this Compact, with the Tribe;

The _____ Tribe ("Tribe") is a sovereign federally recognized Indian tribe and its governing body has authorized the officials of the Tribe to enter into contracts and agreements of every description, including this Compact, with the State;

The Congress of the United States has enacted the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2701 et. seq. (hereinafter "IGRA"), which permits Indian tribes to conduct Class III Gaming on Indian Lands pursuant to tribal-state compacts entered into for that purpose;

The 1999 State Legislature has enacted SB 737, as 1999 N.M. Laws, ch. 252, known as the "Compact Negotiation Act," creating a process whereby the State and the Tribe have engaged in negotiations leading to this Compact, with review by a joint legislative committee, and with final approval by a majority vote in each house of the Legislature;

The Tribe owns or controls Indian Lands and by Ordinance has adopted, or will adopt, rules and regulations governing Class III games played and related activities at any Gaming Facility;

The State and the Tribe, in recognition of the sovereign rights of each party and in a spirit of cooperation to promote the best interests of the citizens of the State and the members of the Tribe, have engaged in good faith, government-to-government negotiations recognizing and respecting the interests of each party and have agreed to this Compact, and following those individual negotiations, have combined multiple tribal-state negotiations to develop this single Compact;

The Tribe has informed the State that it does not intend to conduct Class III Gaming on Indian Lands that are eligible for gaming pursuant to 25 U.S.C. §§ 2719 (a)(2)(B), (b)(1)(A), (b)(1)(B)(ii) or (b)(1)(B)(iii).  If, in the future, the Tribe desires to conduct Class III Gaming on Indian Lands eligible for gaming pursuant to 25 U.S.C. §§ 2719 (a)(2)(B), (b)(1)(A), (b)(1)(B)(ii) or (b)(1)(B)(iii), the Tribe intends to negotiate a separate compact with the State to address the unique circumstances and conditions associated with such lands.  The Tribe acknowledges and agrees that it has not addressed those circumstances and conditions in the negotiations leading up to this Compact and that there are federal authorizations required to determine eligibility to game on those lands.  For those reasons, the Tribe agrees that the execution of this Compact is not evidence of and cannot be used to support a determination that

any land located in the State is eligible for gaming pursuant to the 25 U.S.C. §§ 2719 (a)(2)(B), (b)(1)(A), (b)(1)(B)(ii) or (b)(1)(B)(iii).

NOW, THEREFORE, the State and the Tribe agree as follows:

SECTION 1.   Purpose and Objectives.

The purpose and objectives of the State and the Tribe in making this Compact are as follows:

A.      To evidence the good will and cooperative spirit between the State and the Tribe;

B.      To continue the development of an effective government-to-government relationship between the State and the Tribe;

C.      To provide for the regulation of Class III Gaming on Indian Lands within the State of New Mexico as required by the IGRA;

D.      To fulfill the purpose and intent of the IGRA by providing for tribal gaming as a means of generating tribal revenues, thereby promoting tribal economic development, tribal self-sufficiency, and strong tribal government;

E.      To provide revenues to fund tribal government operations or programs, to provide for the general welfare of the tribal members and for other purposes allowed under the IGRA;

F.      To provide for the effective regulation of Class III Gaming in which the Tribe shall have the sole proprietary interest and be the primary beneficiary; and

G.      To address the State's interest in the establishment, by the Tribe, of rules and procedures for ensuring that Class III Gaming is conducted fairly and honestly by the owners, operators, employees and patrons of any Class III Gaming Enterprise on Indian Lands.

SECTION 2.   Definitions.

For purposes of this Compact, the following definitions pertain:

A.      "Adjusted Net Win" is Net Win with certain deductions for purposes of calculating revenue sharing as set forth in Section 11(C) of this Compact.

B.      "Card Minder" means a technological aid for a bingo game that serves as an electronic substitute for bingo cards and is used by a player to monitor bingo cards and called bingo numbers.  A Card Minder does not include a device which permits a player to cover or daub a bingo card other than through overt action after numbers are released.

C.      "Class III Gaming" means all forms of gaming as defined in 25 U.S.C. § 2703(8), and 25 C.F.R. § 502.4.

D.      "Compact" means this compact between the State and the Tribe, and including the Appendix attached hereto.

2

E.      "Compliance Report" is the report submitted annually to the State Gaming Representative by the Tribal Gaming Agency according to the requirements set forth in the Appendix attached to this Compact.

F.      "Effective Date" has the meaning set forth in Section 9(A) of this Compact.

G.      "Free Play" means play on a Class III Gaming Machine initiated by points or credits provided to patrons without monetary consideration, and which have no cash redemption value.

H.      "Gaming Employee" means a person connected directly with the conduct of Class III Gaming, handling the proceeds thereof, or handling any Gaming Machine; but "Gaming Employee" does not include:

        1.      Bartenders, cocktail servers or other persons engaged solely in preparing or serving food or beverages;

        2.      Secretarial or janitorial personnel;

        3.      Stage, sound and light technicians; or

        4.      Other nongaming personnel.

I.      "Gaming Enterprise" means the tribal entity created and designated by the Tribe as having authority to conduct Class III Gaming pursuant to this Compact.

J.      "Gaming Facility" means each separate physical building or structure in which Class III Gaming is conducted on the Tribe's Indian Lands.

K.      "Gaming Machine" means a mechanical, electromechanical or electronic contrivance or machine that, upon insertion of a coin, token or similar object, or upon payment of any consideration in any manner, is available to play or operate a game of chance in which the outcome depends to a material degree on an element of chance, notwithstanding that some skill may be a factor, whether the payoff is made automatically from the Gaming Machine or in any other manner; but Gaming Machine does not include a Card Minder or a Table Game or any devices utilized in Table Games.   Additional clarification of the definitions of a Gaming Machine and a Table Game is set forth in the attached Appendix.

L.      "Indian Lands" means:

        1.      all lands within the exterior boundaries of the Tribe's reservation and its confirmed grants from prior sovereigns; or

        2.      any other lands title to which is either held in trust by the United States for the exclusive benefit of the Tribe or a member thereof or is held by the Tribe or a member thereof subject to restrictions against alienation imposed by the United States, and over which the Tribe exercises jurisdiction and governmental authority, but not including any land within a

municipality that is outside of the boundaries of the Tribe's reservation or confirmed Spanish grant as those boundaries existed on October 17, 1988.

M.      "Key Employee" means that term as defined in 25 C.F.R. § 502.14.

N.      "Management Contract" means a contract within the meaning of 25 U.S.C. §§ 2710(d)(9) and 2711.

O.      "Management Contractor" means any person or entity that has entered into a Management Contract with the Tribe or the Gaming Enterprise.

P.      "Net Win" means the win from gaming activities, which is the difference between gaming wins and losses before deducting costs and expenses or deducting incentives or adjusting for changes in progressive jackpot liability accruals.  Generally, Net Win is the difference between patron wagers and payouts made on winning wagers. Additional clarification of the accounting for Free Play, Point Play, Participation Fees, and amounts paid with respect to wide area progressive Class III Gaming Machines is set forth in the attached Appendix.

Q.      "Ordinance" means the gaming ordinance, any amendments thereto adopted by the Tribal Council of the Tribe, and any regulations which are promulgated pursuant to the gaming ordinance.

R.      "Point Play" means play on a Class III Gaming Machine initiated by points earned or accrued by a player through previous Gaming Machine play, players' clubs, or any other method, and which have no cash redemption value.

S.      "Predecessor Agreement" means the last tribal-state Class III Gaming compact, if any, entered into between the Tribe and the State preceding the execution of this Compact.

T.      "Primary Management Official" means that term as defined in 25 C.F.R. §502.19.

U.      "State" means the State of New Mexico.

V.      "State Gaming Representative" means that person designated by the Gaming Control Board pursuant to the Gaming Control Act [NMSA 1978, §§ 60-2E-1 to -62 (1997, as amended through 2014)] who will be responsible for actions of the State set out in the Compact. The State Legislature may enact legislation to establish an agency of the State to perform the duties of the State Gaming Representative.

W.      "Table Game" means a Class III game of chance, in which the outcome depends to a material degree on an element of chance, notwithstanding that some skill may be a factor, that is played using a wheel, cards or dice, and that requires an attendant to initiate the game or to collect wagers or pay prizes.  Additional clarification of this definition is set forth in the attached Appendix.

X.      "Tribal Gaming Agency" means the tribal governmental agency which will be identified to the State Gaming Representative as the agency responsible for actions of the Tribe

set out in the Compact.  It will be the single contact with the State and may be relied upon as such by the State.

Y.      "Tribe" means the federally recognized Indian Tribe, Nation, or Pueblo located within the State of New Mexico entering into this Compact.

SECTION 3.   Authorized Class III Gaming.

A.      Permitted Class III Gaming.  The Tribe may conduct, only on Indian Lands, subject to all of the terms and conditions of this Compact, any or all forms of Class III Gaming.

B.      Limitations.   Subject to the foregoing, and subject to all of the terms and conditions of this Compact, the Tribe shall establish, at its discretion, by tribal law, such limitations as it deems appropriate on the amount and type of Class III Gaming conducted, the location of Class III Gaming on Indian Lands, the hours and days of operation, and betting and pot limits, applicable to such gaming.

C.      Number of Facilities.

1.      The Tribe may operate:

(a)      Two (2) Gaming Facilities; or

(b)      Three (3) Gaming Facilities if the Tribe has at least seventy five thousand (75,000) tribal members residing in the State.  The Tribal membership shall be based on official figures from the Tribe's tribal enrollment office.  Prior to the opening of a third Gaming Facility, the Tribe shall provide the State Gaming Representative with documentation to show that its Tribal membership numbers meet the requirements set forth herein.

2.      In addition to the number of Gaming Facilities permitted under Section 3(C)(1), the Tribe may operate one (1) Legacy Gaming Facility if it meets the requirements in Section (C)(5) below.

3.      If the Tribe is eligible for a third Gaming Facility pursuant to Section (C)(1)(b) above, it shall not open such Gaming Facility to the public earlier than the date that is six (6) years from the Effective Date of the Compact.

4.      In no event shall the Tribe be permitted to operate more than the number of Gaming Facilities authorized under Section (C)(1) and one (1) Legacy Gaming Facility.

5.      If, as of June 30, 2015, the Tribe is already operating more than two Gaming Facilities and those Gaming Facilities are permitted under the terms of its Predecessor Agreement, it may designate one (1) Gaming Facility as a "Legacy Gaming Facility" and the following shall apply:

(a)      The Legacy Gaming Facility shall be that Gaming Facility with the fewest Class III Gaming Machines in operation as of June 30, 2015 (the "Legacy Gaming Facility Deadline Date"), or in the event that a Tribe has more than one (1) Gaming Facility that

5

operates less than one hundred and thirty (130) Class III Gaming Machines, the Tribe may designate one of those Gaming Facilities as its Legacy Gaming Facility by the Legacy Gaming Facility Deadline Date.

(b)     Within ten (10) days of the Legacy Gaming Facility Deadline Date, the Tribe shall have an authorized representative sign a sworn affidavit that designates the Legacy Gaming Facility, provides the location of the Legacy Gaming Facility, and a detailed description of its gaming operations at the Legacy Gaming Facility as of that date, including the specific number of Gaming Machines and any other gaming activities and shall submit said affidavit to the State Gaming Representative.

(c)     The Legacy Gaming Facility shall be permitted to move one (1) time from its location as of June 30, 2015 (the "Existing Location"), subject to the following restrictions:

i)     the Legacy Gaming Facility shall not be moved more than seventeen (17) miles from its Existing Location; and

ii)     the Legacy Gaming Facility shall not be permitted to move if its Existing Location is located within fifty (50) miles from another Tribe's Gaming Facility located within the State.

(d)     The Gaming Enterprise shall not operate in excess of one hundred thirty (130) Class III Gaming Machines at the Legacy Gaming Facility.

SECTION 4.   Conduct of Class III Gaming.

A.     Tribal Gaming Agency.  The Tribal Gaming Agency will assure that the Tribe will:

1.     operate all Class III Gaming pursuant to this Compact, tribal law, the IGRA and other applicable federal law;

2.     provide for the physical safety of patrons in any Gaming Facility;

3.      provide for the physical safety of personnel employed by the Gaming Enterprise;

4.     provide for the physical safeguarding of assets transported to and from the Gaming Facility and cashier's cage department;

5.     provide for the protection of the property of the patrons and the Gaming Enterprise from illegal activity;

6.     participate in licensing of Primary Management Officials and Key Employees of a Class III Gaming Enterprise;

7.      detain persons who may be involved in illegal acts for the purpose of notifying law enforcement authorities;

8.      record and investigate any and all unusual occurrences related to Class III Gaming within the Gaming Facility; and

9.      comply with all applicable provisions of the Bank Secrecy Act, 31 U.S.C. §§ 5311-5314, and all reporting requirements of the Department of the Treasury, the Internal Revenue Service, the Financial Crimes Enforcement Network, and any other related divisions thereof, as applicable, and make all such documentation available to the State Gaming Representative for inspection, scanning, or copying upon request.

B.      Regulations.  Without affecting the generality of the foregoing, the Tribe shall adopt laws:

1.      prohibiting participation in any Class III Gaming by any person under the age of twenty-one (21);

2.      prohibiting the employment of any person as a Gaming Employee who is under the age of twenty-one (21) or who has not been licensed in accordance with the applicable requirements of federal and tribal law;

3.      requiring the Tribe to take all necessary action to impose on its gaming operation standards and requirements equivalent to or more stringent than those contained in the federal Fair Labor Standards Act of 1938, the federal Occupational Safety and Health Act of 1970, and any other federal laws generally applicable to Indian tribes relating to wages, hours of work and conditions of work, and the regulations issued thereunder;

4.      requiring that, on any construction project involving any Gaming Facility or related structure that is funded in whole or in part by federal funds, all workers will be paid wages meeting or exceeding the standards established for New Mexico under the federal Davis-Bacon Act;

5.      prohibiting the Tribe, the Gaming Enterprise and a Management Contractor from discriminating in the employment of persons to work for the Gaming Enterprise or in the Gaming Facility on the grounds of race, color, national origin, gender, sexual orientation, age or handicap, provided, however, that nothing herein shall be interpreted to prevent the Tribe from granting preference in employment actions to tribal members or other Indians in accordance with established tribal laws and policies;

6.      requiring the Tribe, through its Gaming Enterprise or through a third-party entity, to provide to all employees of the Gaming Enterprise employment benefits, including, at a minimum, sick leave, life insurance, paid annual leave or paid time off and medical and dental insurance as well as providing unemployment insurance and workers' compensation insurance through participation in programs offering benefits at least as favorable as those provided by comparable State programs, and which programs shall afford the employees due process of law and shall include an effective means for an employee to appeal an adverse determination by the insurer to an impartial forum, such as (but not limited to) the Tribe's Tribal Court, which appeal

shall be decided in a timely manner and in an administrative or judicial proceeding and as to which no defense of tribal sovereign immunity would be available; and provided that to fulfill this requirement the Tribe may elect to participate in the State's program upon execution of an appropriate agreement with the State;

7.     providing a grievance process for an employee of the Gaming Enterprise in cases of disciplinary or punitive action taken against an employee that includes a process for appeals to persons of greater authority than the immediate supervisor of the employee;

8.     permitting inspectors from the Indian Health Service, a federal agency within the Department of Health and Human Services, to inspect the Gaming Facility's food service operations during normal Gaming Facility business hours to assure that standards and requirements equivalent to the State's Food Service Sanitation Act [NMSA 1978, § 25-1-1 (1977, as amended through 2014)] are maintained and if such inspections have occurred, the Tribe shall provide documentation of the inspections to the State Gaming Representative with the Compliance Report referenced in Section 4(E)(2) of this Compact, or if the Indian Health Service does not conduct such inspections, permitting the State Department of Environment to conduct such inspections;

9.     prohibiting the Gaming Enterprise, and the Tribe in connection with gaming, from cashing any paycheck or any type of government assistance check, including Social Security, TANF, pension, and other similar checks, for any patron;

10.     prohibiting the Gaming Enterprise, and the Tribe in connection with gaming, from extending credit by accepting IOUs or markers from its patrons, except that short-term credit may be extended to certain qualified patrons with sufficient demonstrated available cash balances to cover the amount of the credit extended (not less than ten thousand dollars ($10,000) to be repaid within thirty (30) days); provided that the Tribe complies with all applicable federal law and all provisions of the Appendix related to credit (including the State reporting requirements), and provides a copy of the regulations referenced in the Appendix to the State for review and comment prior to implementation;

11.     requiring that automatic teller machines on Gaming Facility premises be programmed so that the machines will not accept cards issued by the State to TANF recipients for access to TANF benefits;

12.     providing that each electronic or electromechanical gaming device in use at the Gaming Facility must pay out a mathematically demonstrable percentage of all amounts wagered, which must not be less than eighty percent (80%), and requiring the Gaming Enterprise to prominently post in visible locations within the Gaming Facility notices stating that the Gaming Enterprise is in compliance with this requirement, and providing a comprehensible explanation of the meaning of this requirement;

13.     providing that all Class III Gaming Machines on the premises of the Gaming Facility will be connected to a central computerized monitoring and control system on the Gaming Facility premises, which shall collect on a continual basis the unaltered activity of each Gaming Machine in use at the Gaming Facility, and that the wager and payout data of each

machine, electronically captured by the Gaming Enterprise's central computer, may be accessed and downloaded electronically by the State Gaming Representative by a dedicated telecommunications connection, on a "read-only" basis, upon entry of appropriate security codes; but provided that in no event shall the State Gaming Representative be able to alter or affect the operation of any Gaming Machine or other device on the premises of the Gaming Facility, or the data provided to the central computer, and provided further that the system for electronic access to the machine wager and payout data collected by the Gaming Enterprise's central computer shall be constructed and installed at the State's cost, and shall be designed in conjunction with Gaming Enterprise technical staff so as to preserve the integrity of the system and the data contained therein, to minimize any possibility of unauthorized access to the system or tampering with the data, and to minimize any access by the State Gaming Representative to information other than machine wager and payout data residing in the central monitoring and control system;

      14.    enacting provisions that:

      (a)    prohibit an employee of the Gaming Enterprise from selling, serving, giving or delivering an alcoholic beverage to an intoxicated person or from procuring or aiding in the procurement of any alcoholic beverage for an intoxicated person at the Gaming Facility;

      (b)    require Gaming Enterprise employees that dispense, sell, serve or deliver alcoholic beverages to attend Alcohol Server Education Classes similar to those classes provided for in the New Mexico Liquor Control Act; and

      (c)    require the Gaming Enterprise to purchase and maintain a liquor liability insurance policy that will provide, at a minimum, personal injury coverage of one million dollars ($1,000,000) per incident and two million dollars ($2,000,000) aggregate per policy year;

      15.    prohibiting alcoholic beverages from being sold, served, delivered, or consumed in that part of a Gaming Facility where gaming is allowed;

      16.    requiring the Gaming Enterprise to spend, annually, an amount that is no less than one-quarter of one percent (.25%) of its Adjusted Net Win as that term is defined in Section 11(C)(1), to fund or support programs that the Tribe selects for the treatment and assistance of compulsive gamblers in New Mexico or who patronize New Mexico gaming facilities, and for the prevention of compulsive gambling in New Mexico; and requiring that a substantial portion of such funds be distributed to an organization that has expertise in and provides counseling, intervention or other services for compulsive gamblers in New Mexico, and whose services are available to all persons without regard to race or tribal membership; and requiring that the Tribe submit a report accounting for the use of these funds as described in the attached Appendix, and that this report and any other information existing as a result of this paragraph, not including information that may identify or contain information referring to any gaming patron, shall not be subject to the confidentiality provisions of Section 4(E)(4) of this Compact and shall be made available for inspection and publication without restriction or limitation;

17.     governing any Management Contract regarding its Class III Gaming activity so that it conforms to the requirements of tribal law and the IGRA and the regulations issued thereunder;

18.     prohibiting the Gaming Enterprise and the Tribe from providing, allowing, contracting to provide or arranging to provide alcoholic beverages for no charge or at reduced prices within a Gaming Facility; and

19.     prohibiting the Gaming Enterprise and the Tribe from providing, allowing, contracting to provide or arranging to provide food or lodging for no charge or at reduced prices, at a Gaming Facility or lodging facility as an incentive or enticement for patrons to game ("Complimentaries"),  except that (i) this provision shall not apply to rewards received by patrons in exchange for points or credits accrued under any form of a players' club program; and (ii) the Gaming Enterprise or Tribe may provide discretionary Complimentaries provided that the cumulative market value of all discretionary Complimentaries, on an annual basis, does not exceed three percent (3%) of the Tribe's annual Adjusted Net Win for the same year.  The Tribe shall, on a quarterly basis, report to the State the total amount of the discretionary Complimentaries during the previous quarter in dollars and as a percentage of Adjusted Net Win for such quarter.  The Tribe shall adopt and follow the minimum internal control standard and policies and procedures set forth in the Appendix,  shall comply with all applicable federal law and all provisions of the Appendix related to Complimentaries (including the State reporting requirements), and shall provide a copy of the regulations referenced in the Appendix to the State for review and comment prior to implementation.

C.     Audit and Financial Statements.

1.     Annual Audit.  Not less than annually at the Gaming Enterprise's fiscal year end, the Tribal Gaming Agency shall require, at the expense of the Gaming Enterprise, an audit and audit report of the financial statements covering all financial activities of the Gaming Enterprise in the State of New Mexico.  The audit and audit report shall be prepared by an independent certified public accountant licensed by the New Mexico Public Accountancy Board. The audit report shall include written verification by the independent certified public accountant of the accuracy of the quarterly Adjusted Net Win calculation as required by Section 11(C) and shall specify the total amount of patron wagers and total amount of payouts made on winning wagers in Class III Gaming on all Gaming Machines at the Tribe's Gaming Facilities for purposes of calculating Adjusted Net Win.  The financial statements shall be prepared in accordance with generally accepted accounting principles (GAAP).  All books and records relating to Class III Gaming shall be retained for a period of at least five (5) years from the date of creation, as required by 25 C.F.R. § 571.7(c).  The independent certified public accountant shall issue a report on audited financial statements of the Tribe's Gaming Enterprise in the State of New Mexico.  The independent certified public accountant shall perform the audit in accordance with generally accepted auditing standards published by the American Institute of Certified Public Accountants, and submit the audited financial statements, along with any reports or management letter(s) the accountant has prepared, to the Tribal Gaming Agency within one hundred twenty (120) days after the Gaming Enterprise's fiscal year end.  Promptly upon receipt of the audited financial statements, and in no event later than one hundred twenty (120) days after the fiscal year end, the Tribal Gaming Agency shall provide copies of the financial

statement and audit report to the State Gaming Representative, along with copies of any and all documents the independent certified public accountant has provided to the Tribe or the Tribal Gaming Agency concerning the audit, including but not limited to copies of any and all reports and management letter(s).  If the Gaming Enterprise changes its fiscal year end, it may elect either to prepare financial statements for a short fiscal year or for an extended fiscal year, but in no event shall an extended fiscal year extend more than fifteen (15) months.

2.      Maintenance of Records.  The Tribe will maintain the following records for not less than five (5) years:

(a)      revenues, expenses, assets, liabilities and equity for the Gaming Enterprise;

(b)      daily cash transactions for each Class III Gaming activity at each Gaming Facility, including but not limited to transactions relating to each gaming table bank, game dropbox and gaming room bank;

(c)      individual and statistical game records, except for card games, to reflect statistical drop and statistical win; for electronic, computer, or other technologically assisted games, analytic reports which show the total amount of cash wagered and the total amount of prizes won;

(d)      contracts, correspondence and other transaction documents relating to all vendors and contractors;

(e)      records of all tribal gaming enforcement activities;

(f)      audits prepared by or on behalf of the Tribe;

(g)      records documenting compliance with the terms of this Compact; and

(h)      personnel information on all Class III Gaming employees or agents, including rotation sheets, hours worked, employee profiles and background checks.

D.      Violations.  The agents of the Tribal Gaming Agency shall have unrestricted access to the Gaming Facility during all hours of Class III Gaming activity, and shall have immediate and unrestricted access to any and all areas of the Gaming Facility for the purpose of ensuring compliance with the provisions of this Compact and the Ordinance.  The agents shall report immediately to the Tribal Gaming Agency any suspected violation of this Compact, the Ordinance, or regulations of the Tribal Gaming Agency by the Gaming Enterprise, Management Contractor, or any person, whether or not associated with Class III Gaming.

E.     State Gaming Representative.  The State Gaming Representative may utilize staff from the Gaming Control Board or contract with private persons, firms, or other entities for the purpose of assisting in performing his functions set forth in this Compact, but the State Gaming Representative will be the single contact with the Tribe and may be relied upon as such by the Tribe.

1.     Background Investigations.  Upon written request by the State to the Tribe, the Tribal Gaming Agency will provide information on Primary Management Officials, Key Employees and suppliers, sufficient to allow the State to conduct its own background investigations, as it may deem necessary, so that it may make an independent determination as to the suitability of such individuals, consistent with the standards set forth in Section 5 of this Compact.  The Tribal Gaming Agency shall consider any information or recommendations provided to it by the State as to any such person or entity, but the Gaming Enterprise or the Tribal Gaming Agency shall have the final say with respect to the hiring or licensing of any such person or entity.

2.     Compliance Reports. Notwithstanding that the Tribe has the primary responsibility to administer and enforce the regulatory requirements of this Compact, the Tribal Gaming Agency will certify annually to the State Gaming Representative that the Tribe has met its obligations under this Compact in accordance with the instructions and Form A set forth in the attached Appendix.  The Tribal Gaming Agency shall allow the State Gaming Representative to inspect and verify, and obtain copies (either scanned electronically or in paper form), upon request, of any and all documents related to any item in the Compliance Report, including all source documents and data.

3.     Inspections.  The State Gaming Representative shall have the right to inspect a Gaming Facility and any Class III Gaming activity, including all Gaming Machines, and to inspect, verify, and obtain copies (either scanned electronically or in paper form), upon request, of any and all records relating to any Class III Gaming of the Tribe, including all source documents and data, subject to the following conditions:

(a)     with respect to public areas of a Gaming Facility, at any time without prior notice during normal Gaming Facility business hours;

(b)     with respect to private areas of a Gaming Facility not accessible to the public, at any time during normal Gaming Enterprise business hours, immediately after notifying the Tribal Gaming Agency and Gaming Enterprise of his or her presence on the premises and presenting proper identification, and requesting access to the non-public areas of the Gaming Facility.  The Tribe, in its sole discretion, may require an employee of the Gaming Enterprise or the Tribal Gaming Agency to accompany the State Gaming Representative at all times that the State Gaming Representative is on the premises of a Gaming Facility, but if the Tribe imposes such a requirement, the Tribe shall require such an employee of the Gaming Enterprise or the Tribal Gaming Agency to be available at all times for such purpose;

(c)     with respect to inspection and copying of all management records relating to Class III Gaming, at any time without prior notice between the hours of 9:00 a.m. and 4:00 p.m. Monday through Friday, excluding official holidays.  The reasonable costs of copying

will be borne by the State, although the State may, at its option, choose to scan documents electronically at no charge;

        (d)      whenever the State Gaming Representative, or his designee, enters the premises of the Gaming Facility for any such inspection, such Representative, or designee, shall identify himself to security or supervisory personnel of the Gaming Enterprise; and

        (e)      in accordance with the additional requirements set forth in the attached Appendix.

        4.      Confidentiality.

        (a)      Any information, documents or communications provided to the State Gaming Representative, his agents or contractors, or to any other official, agency or entity of the State (all of which are collectively hereinafter referred to as "the State entities") by the Tribe, the Tribal Gaming Agency or the Gaming Enterprise, or prepared from information obtained from the Tribe, the Tribal Gaming Agency or the Gaming Enterprise, or any information, documents or communications provided to the Tribe, the Tribal Gaming Agency, or the Gaming Enterprise by any State entity, or prepared from information obtained from any State entity, under the provisions of this Compact or under the provisions of any Predecessor Agreement, are confidential. Any State entity that has received any information, documents or communications from the Tribe, the Tribal Gaming Agency or the Gaming Enterprise: i) may release or disclose the same only with the prior written consent of the Tribe or pursuant to a lawful court order after timely notice of the proceeding has been given to the Tribe; ii) shall maintain all such information, documents and communications in a secure place accessible only to authorized officials and employees of the State entity that has received the same; and iii) shall adopt procedures and regulations to protect the confidentiality of the information, documents and communications provided by the Tribe, Tribal Gaming Agency or Gaming Enterprise.

        (b)      These prohibitions shall not be construed to prohibit:

        i)      the furnishing of any information to a law enforcement or regulatory agency of the Federal Government;

        ii)      the State from making known the names of persons, firms, or corporations conducting Class III Gaming pursuant to the terms of this Compact, locations at which such activities are conducted, or the dates on which such activities are conducted;

        iii)      publishing the terms of this Compact;

        iv)      disclosing information as necessary to audit, investigate, prosecute or arbitrate violations of this Compact or other applicable laws or to defend suits against the State;

        v)      disclosures to other State agencies as required by State law, provided that the confidentiality provisions of this Section shall apply to the agencies receiving such information; and

vi)    complying with subpoenas or court orders issued by courts of competent jurisdiction.

(c)    Notwithstanding the foregoing, the Tribe agrees that:

i)    the following documents and information may be released by a State entity to the public: the gaming ordinance and regulations of the Tribe or Tribal Gaming Agency; official rulings of the Tribal Gaming Agency in matters not subject to a confidentiality order imposed by the Agency; other information and documents of the Tribal Gaming Agency or the Gaming Enterprise ordinarily available to the public; quarterly Net Win and Adjusted Net Win figures used as the basis for computation of the Tribe's revenue sharing payment under the provisions of Section 11 of this Compact; information that exists as a result of the requirements in Section 4(B)(16); and correspondence between the Tribe or a tribal entity and a State entity, unless such correspondence is specifically labeled "Confidential;"

ii)    a State entity may release to the public aggregate figures compiled by totaling comparable figures from the annual financial statements of all of the New Mexico gaming tribes; and

iii)    the report of the annual audit of the Gaming Enterprise that is provided by the Tribe to the State Gaming Representative shall be available to the public to the same extent that similar information that is required to be provided to the State by non-Indian gaming entities is available to the public, pursuant to the provisions of applicable law and the policies and regulations of the Gaming Control Board, at the time the request for the report of the annual audit is made.

5.    Records and Annual Meeting.

(a)    Information to be Provided by Tribe.

i)    The Tribal Gaming Agency will provide true copies of all tribal laws and regulations affecting Class III Gaming conducted under the provisions of this Compact to the State Gaming Representative within the earlier of: (i) thirty (30) days after the Effective Date of this Compact, or (ii) thirty (30) days after the Tribe's first day of operation of a Gaming Facility, and will provide true copies of any amendments thereto or additional laws or regulations affecting gaming within thirty (30) days after their enactment or approval, if any.

ii)    Regardless of whether the State exercises the option set forth in Section 4(B)(13), the Tribe shall make wager and payout data available to the State Gaming Representative on a monthly basis, by secure transmission through encrypted email communications, file transfer protocol, or other secure means provided for by the State Gaming Representative. The method of secure transmission must meet industry standards for security sufficient to minimize the possibility of any third party intercepting data transmitted to the State Gaming Representative.  Such reports shall be generated to reflect monthly, quarterly, and annual activity, and shall identify, at a minimum:

i.  coin-in;

    ii.  coin-out;

    iii.  Free Play and Point Play;

    iv.  Net Win;

    v.  theoretical net win (including Free Play and Point Play);

    vi.  actual floor hold percentage; and

    vii.  theoretical floor hold percentage.

Within ninety (90) days of the Effective Date of this Compact, the State Gaming Representative, the Tribal Gaming Agency, and the Gaming Enterprise shall meet and in good faith coordinate and determine the contents of such reports and method of secure transmission to comply with this Section. For a Tribe that does not have any Gaming Facility in operation ("Non-Operational Tribe"), the State Gaming Representative, the Tribal Gaming Agency, and the Gaming Enterprise shall meet and in good faith coordinate and determine the contents of such reports and method of secure transmission to comply with this Section within fifteen (15) days before the Tribe's first day of operation of its Gaming Facility.

        (b)    Access to State Records. To the fullest extent allowed by State law, the Tribe shall have the right to inspect and copy State records concerning all Class III Gaming conducted by the Tribe with the Tribe bearing the reasonable cost of copying.

        (c)    Annual Meeting. At least annually, appropriate representatives of the Tribe and one or more representatives of the Office of the Governor appointed by the Governor, one or more members of the House of Representatives appointed by the Speaker of the New Mexico House of Representatives, and one or more members of the Senate appointed by the President Pro Tempore of the New Mexico Senate, shall meet to discuss matters of mutual interest arising under the terms of this Compact and concerning Indian gaming in New Mexico. Such meeting shall be coordinated so as to involve the representatives of as many New Mexico gaming tribes as possible, and shall be conducted in the context of the government-to-government relationship between the State and the Tribe.

        6.    Reimbursement for Regulatory Costs. The Tribe shall reimburse the State for the costs the State incurs in carrying out any functions authorized by the terms of this Compact. The Tribe and the State agree that to require the State to keep track of and account to the Tribe for all such costs would be unreasonably burdensome and that the amounts set forth in this Section represent a fair estimate of the State's cost of such activity. The Tribe and the State further agree that there is an increase in costs associated with the State's regulatory responsibilities based upon the number and size of the Tribe's Gaming Facilities and that the levels of regulatory cost reimbursement based upon the Adjusted Net Win of the Tribe as set forth in this Section represents a fair estimate the State's costs of regulation. In addition, Section 4(B)(10) and Section 4(B)(19) will increase the State's regulatory burden and the associated costs. The Tribe and State further agree that the State's cost of carrying out the terms of this Compact will increase over time. The Tribe therefore agrees to reimburse the State as set forth in the chart and provision below:

| The Tribe shall reimburse the State based on the amount of its annual Adjusted Net Win as follows: | Annual Amount of Regulatory Payment to the State: |
|---|---|
| Under $40 million | $75,000.00 |
| $40 million – under $80 million | $150,000.00 |
| $80 million and over | $182,500.00 |

The above amounts shall increase by five percent (5%) as of July 1 of 2017, and as of July 1 of every fifth year thereafter as long as this Compact remains in effect, such sum to be paid in quarterly payments of one-fourth of the annual amount due, in advance**.**  For a Non-Operational Tribe, quarterly payments shall be due at the next quarter following the Tribe's first day of operation of the Gaming Facility and shall be prorated during that first quarter based on the number of days the Gaming Facility was open to the public.

7.     Regulatory Requirements.  In the event the State believes that the Tribe is not administering and enforcing the regulatory requirements set forth herein, it may invoke the procedures set forth in Section 7 of this Compact.  Failure to abide by the procedures set forth in Section 7 or failure to comply with an arbitrator's final decision with respect to the parties' obligations constitutes a breach of this Compact.

F.     Problem Gambling.

1.     Signage.  The Gaming Enterprise shall post at all public entrances and exits of each Gaming Facility, signs in both English and Spanish, stating that help is available if a person has a problem with gambling and, at a minimum, provide an appropriate toll-free crisis hotline telephone number and information on the availability of a statewide self-exclusion program with the State Gaming Representative.

2.     Self-Exclusion Program.  Within six (6) months of the Effective Date of this Compact or for a Non-Operational Tribe, within thirty (30) days after the date of the Tribe's first day of operation of its Gaming Facility, the State Gaming Representative and the Tribal Gaming Agency shall comply with the following procedures to allow problem gamblers to voluntarily exclude themselves from Gaming Facilities statewide; however, nothing in this Section shall preclude the Tribal Gaming Agency from operating its own self-exclusion program in addition to these procedures:

(a)     The State Gaming Representative shall:

i)     establish a list of persons who voluntarily seek to exclude themselves from Gaming Facilities statewide;

ii)     create an application to compile identifying information concerning the self-excluded person;

        iii)     establish procedures for placement on and removal from the list; and

        iv)     provide the compiled information to the Tribal Gaming Agency on a monthly basis.

    (b)     The Tribal Gaming Agency shall:

        i)     require the Gaming Enterprise to train appropriate gaming personnel for the identification of self-excluded persons who enter or attempt to enter the Gaming Facility and take reasonable steps to identify the self-excluded person and to promptly escort the self-excluded person from the Gaming Facility;

        ii)     require the Gaming Enterprise to remove self-excluded persons from mailing lists for advertisements or promotions and any players' club or other similar membership-type promotions, and return the cashable value, if any, of the self-excluded person's membership in the players' club or other similar membership-type promotions;

        iii)     require that the self-excluded person forfeit all winnings (whether cash, property, or in any other form), credits, tokens or vouchers received from the Gaming Facility while excluded, and that all money or other property forfeited shall be used by the Gaming Enterprise to fund or support programs for the treatment and assistance of compulsive gamblers pursuant to Section 4(B)(16) of this Compact (this amount is in addition to the percentage of Adjusted Net Win already required under Section 4(B)(16) of this Compact); and

        iv)     require that, for jackpots requiring the patron to complete, prior to the pay-out of the jackpot,  paperwork required by the Internal Revenue Service, the Gaming Enterprise shall verify that the patron is not on the self-exclusion list and such certification shall be recorded in the appropriate documentation.  In the event the patron is listed on the self-exclusion list, the Gaming Enterprise shall comply with Section 4(F)(2)(b)(iii) above regarding forfeiture of all winnings.

    (c)     If a self-excluded person is removed from a Gaming Facility, the Tribal Gaming Agency shall report to the State Gaming Representative, at a minimum, the name of the self-excluded person, security staff involved, date of removal, amount of money forfeited, if any, and any other action taken.  This written report shall be provided to the State Gaming Representative.

    (d)     Removal From Self-Exclusion List.  If a self-excluded person is removed from the self-exclusion list by the State Gaming Representative, the State Gaming Representative shall provide written notice to the Tribal Gaming Agency of the self-excluded person's removal from the self-exclusion list.

    (e)     The self-exclusion list is not open to public inspection, and the Tribal Gaming Agency and State Gaming Representative shall ensure that it remains confidential except for use by:

i)        appropriate law enforcement agencies, if needed in the conduct of an official investigation or ordered by a court of competent jurisdiction; or

ii)       persons designated by either the Tribal Gaming Agency or the State Gaming Representative for the purposes of administrating and implementing the self-exclusion program.

(f)       Notwithstanding Section 8(D) of this Compact, the Tribe, the Gaming Enterprise, or the Tribal Gaming Agency shall not be deemed to have waived its sovereign immunity and will not be liable with respect to any self-excluded person for harm, monetary or otherwise, which may arise as a result of:

i)        its efforts to exclude a person identified on the self-exclusion list;

ii)       the failure of the Gaming Enterprise or the Tribal Gaming Agency to withhold or restore gaming privileges from or to a self-excluded person;

iii)      the permitting of a self-excluded person to engage in gaming activities or enter into a Gaming Facility; or

iv)      the disclosure or publication in any manner, other than a willful and unauthorized disclosure or publication, of the identity of any self-excluded person or persons.

SECTION 5.   Licensing Requirements.

A.       License Required.  The Gaming Facility operator (but not including the Tribe) including its principals, Primary Management Officials, and Key Employees; the Management Contractor and its principals, Primary Management Officials, and Key Employees (if the Tribe hires a Management Contractor); any person, corporation, or other entity that has supplied or proposes to supply any gaming device to the Tribe, the Gaming Enterprise or the Management Contractor; and any person, corporation or other entity providing gaming services within or without a Gaming Facility, shall apply for and receive a license from the Tribal Gaming Agency before participating in any way in the operation or conduct of any Class III Gaming on Indian Lands. The Tribal Gaming Agency shall comply fully with the requirements of this Section and of the IGRA, especially at 25 U.S.C. §§ 2710-2711, and the regulations issued thereunder at 25 C.F.R. Parts 550-559, as well as the requirements of the Tribe's gaming ordinance and any regulations issued thereunder or any regulations promulgated by the Tribal Gaming Agency, in processing license applications and issuing licenses.

B.       License Application.  Each applicant for a license shall file with the Tribal Gaming Agency a written application in the form prescribed by the Tribal Gaming Agency, along with the applicant's fingerprints, current photograph and the fee required by the Tribal Gaming Agency.

C.     Background Investigations.  Upon receipt of a completed application and required fee for licensing, the Tribal Gaming Agency shall conduct or cause to be conducted, at its own expense, a background investigation to ensure that the applicant is qualified for licensing.

D.     Provision of Information to State Gaming Representative.  Whenever the Tribal Gaming Agency is required by federal or tribal law or regulations to provide to the National Indian Gaming Commission ("the Commission") any information, document or notice relating to the licensing of any Key Employee or Primary Management Official of the Gaming Enterprise, such information, document or notice shall be made available for inspection by the State Gaming Representative.  The State Gaming Representative shall be entitled to the same right to request additional information concerning an applicant licensee, to comment on the proposed licensing of any applicant licensee, and to supply the Tribal Gaming Agency with additional information concerning any applicant licensee, as is enjoyed by the Commission.

SECTION 6.   Providers of Class III Gaming Equipment or Devices or Supplies.

A.     Within thirty (30) days after the Effective Date of this Compact, if it has not already done so, the Tribal Gaming Agency will adopt standards for any and all Class III Gaming equipment, devices or supplies to be used in any Gaming Facility, which standards shall be at least as strict as the comparable standards applicable to Class III Gaming equipment, devices or supplies within the State of Nevada.  Any and all Class III Gaming equipment, devices or supplies used by the Tribe shall meet or exceed the standards thereby adopted.

B.     Prior to entering into any future lease or purchase agreement for Class III Gaming equipment, devices or supplies, the Tribe shall obtain sufficient information and identification from the proposed seller or lessor and all persons holding any direct or indirect financial interest in the lessor or the lease/purchase agreement to permit the Tribe to license those persons in accordance with applicable federal and tribal law.

C.     The seller, lessor, manufacturer or distributor shall provide, assemble and install all Class III Gaming equipment, devices or supplies in a manner approved and licensed by the Tribe.

SECTION 7.   Dispute Resolution.

A.     In the event either party believes that the other party has failed to comply with or has otherwise breached any provision of this Compact, such party may invoke the following procedure within two (2) years from the date any alleged violation of this Compact is discovered or reasonably should have been discovered; or, if the State believes that, prior to the Effective Date of this Compact, the Tribe has failed to comply with or has otherwise breached any provision of a Predecessor Agreement affecting payment, the State may invoke the following procedure within two (2) years of the Effective Date of this Compact, as permitted in Section 9(B) of this Compact:

1.     The party asserting noncompliance shall serve written notice on the other party.  The notice shall identify the specific Compact provision believed to have been violated and shall specify the factual and legal basis for the allegation of noncompliance.  The notice shall specifically identify the date, time and nature of the alleged noncompliance.

19

2.     In the event an allegation by the complaining party is not resolved to the satisfaction of such party within twenty (20) days after service of the notice set forth in Paragraph A(1) of this Section, the complaining party may serve upon the other party a notice to cease conduct of the particular game(s) or activities alleged by the complaining party to be in noncompliance.  Upon receipt of such notice, the responding party may elect to stop the game(s) or activities specified in the notice or invoke arbitration and continue the game(s) or activities pending the results of arbitration.  The responding party shall act upon one of the foregoing options within ten (10) days of receipt of notice from the complaining party, unless the State and the Tribe (hereinafter the "parties") agree to a longer period, but if the responding party takes neither action within such period the complaining party may invoke arbitration by written notice to the responding party within ten (10) days of the end of such period.

3.     Unless the parties agree in writing to the appointment of a single arbitrator, or as otherwise provided below, the arbitration shall be conducted before a panel of three (3) arbitrators.  The arbitrators shall be attorneys who are licensed members in good standing of the State Bar of New Mexico or of the bar of another state.  The State will select one arbitrator, the Tribe will select a second arbitrator, and the two so chosen shall select a third arbitrator.  The party that served the written notice of noncompliance shall select its arbitrator within thirty (30) days after the party has invoked arbitration and the responding party shall select its arbitrator within thirty (30) days of the selection of the first arbitrator.  If the responding party fails to select an arbitrator within the thirty (30) days provided, the parties shall proceed to arbitration with the single arbitrator selected by the party that served the written notice of noncompliance.  If the responding party selects an arbitrator within the specified time period, the two arbitrators shall select a third arbitrator within thirty (30) days of the responding party's selection.  If the third arbitrator is not chosen within thirty (30) days after the second arbitrator is selected, the third arbitrator will be chosen by the American Arbitration Association.  The arbitrators thereby selected shall permit the parties to engage in reasonable discovery, and shall establish other procedures to ensure a full, fair and expeditious hearing on the matters at issue.  The arbitrators shall determine, after hearing from each party, whether the arbitration proceeding or any portions thereof shall be closed to the public, but in the absence of such determination the proceedings shall be open to the public.  The arbitrators shall make determinations as to each issue presented by the parties, but the arbitrators shall have no authority to determine any question as to the validity or effectiveness of this Compact or of any provision hereof.  All parties shall bear their own costs of arbitration and attorneys' fees.

4.     The results of arbitration shall be final and binding, and shall be enforceable by an action for injunctive or mandatory injunctive relief against the State and the Tribe in any court of competent jurisdiction.  For purposes of any such action, the State and the Tribe acknowledge that any action or failure to act on the part of any agent or employee of the State or the Tribe, contrary to a decision of the arbitrators in an arbitration proceeding conducted under the provisions of this Section, occurring after such decision, shall be wholly unauthorized and ultra vires acts, not protected by the sovereign immunity of the State or the Tribe.

B.     Nothing in Subsection 7(A) shall be construed to waive, limit or restrict any remedy that is otherwise available to either party to enforce or resolve disputes concerning the provisions of this Compact.  Nothing in this Section shall be deemed a waiver of the Tribe's

sovereign immunity.  Nothing in this Section shall be deemed a waiver of the State's sovereign immunity.

SECTION 8.   Protection of Visitors.

      A.      Policy Concerning Protection of Visitors.  The safety and protection of visitors to a Gaming Facility is a priority of the Tribe, and it is the purpose of this Section to assure that any such persons who suffer bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation.  To that end, in this Section, and subject to its terms, the Tribe agrees to carry insurance that covers such injury or loss, agrees to a limited waiver of its immunity from suit, and agrees to proceed either in binding arbitration proceedings or in Tribal, State, or other court of competent jurisdiction, at the visitor's election, with respect to claims for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise.  For purposes of this Section, any such claim may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal court that the IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.

      B.      Insurance Coverage for Claims Required.  The Gaming Enterprise shall maintain in effect policies of liability insurance insuring the Tribe, Gaming Enterprise, its agents and employees against claims, demands or liability for bodily injury and property damages by a visitor arising from an occurrence described in Paragraph A of this Section.  The policies shall provide bodily injury and property damage coverage in an amount of at least ten million dollars ($10,000,000) per occurrence and ten million dollars ($10,000,000) annual aggregate.  The Tribe shall provide the State Gaming Representative annually a certificate of insurance showing that the Tribe, its agents and employees are insured to the required extent and in the circumstances described in this Section.

      C.      Limitation on Time to Bring Claim.  Claims brought pursuant to the provisions of this Section must be commenced by filing an action in Tribal, State, or other court of competent jurisdiction or a demand for arbitration within three (3) years of the date the claim accrues.

      D.      Specific Waiver of Immunity and Choice of Law.  The Tribe, by entering into this Compact and agreeing to the provisions of this Section, waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage up to the amount of ten million dollars ($10,000,000) per occurrence, asserted as provided in this Section.  This is a limited waiver and does not waive the Tribe's immunity from suit for any other purpose.  The Tribe shall ensure that a policy of insurance that it acquires to fulfill the requirements of this Section shall include a provision under which the insurer agrees not to assert the defense of sovereign immunity on behalf of the insured, up to the limits of liability set forth in this Paragraph.  The Tribe and the State agree that in any claim brought under the provisions of this Section, New Mexico law shall govern if the claimant pursues the claim in State Court, and the tribal law of the forum shall apply if the claim is brought in Tribal Court.

E.       Election by Visitor.  A visitor having a claim described in this Section may pursue that claim in binding arbitration, or Tribal, State, or other court of competent jurisdiction.  The visitor shall make a written election that is final and binding upon the visitor.

F.       Tribal Court.  The Tribe shall establish written procedures and substantive law for the disposition of tort claims arising from bodily injury or property damage alleged to have been suffered by visitors and shall enact such tribal law as is necessary to implement these procedures. The procedures shall include all time limits applicable to the disposition of the tort claim and a provision that, upon request, the visitor, or the visitor's designated representative, shall be provided with a copy of the procedures as well as the name, address and telephone number of the Gaming Enterprise and the mailing address and telephone number of the clerk of the tribal court.

G.       Arbitration.   Arbitration pursuant to an election by a visitor as provided in Subsection E of this Section shall be conducted as follows:

1.       The visitor shall submit a written demand for arbitration to the Gaming Enterprise, by certified mail, return receipt requested;

2.       Unless the parties agree, in writing, to the appointment of a single arbitrator, the visitor and the Gaming Enterprise shall each designate an arbitrator within thirty (30) days of receipt of the demand, and the two arbitrators shall select a third arbitrator, but in the event that either party fails to designate an arbitrator within thirty (30) days, or the two arbitrators designated by the parties cannot agree on the selection of the third arbitrator within thirty (30) days of their appointment, the existing arbitrator(s) shall apply to the American Arbitration Association to appoint the remaining arbitrator(s);

3.       The arbitration panel shall permit the parties to engage in reasonable discovery, and shall establish other procedures to ensure a full, fair and expeditious hearing on the claim; and

4.       The award of the arbitration panel shall be final and binding, and may be enforced in a court of competent jurisdiction.

H.       Increase in Liability Limits.  As of the fifth anniversary of this Compact, and at five-year intervals thereafter, the liability insurance coverage requirements set forth in Paragraph B of this Section, and the limit on the Tribe's waiver of sovereign immunity set forth in Paragraph D of this Section, shall be increased by a percentage equal to the percentage increase in the CPI-U published by the Bureau of Labor Statistics of the United States Department of Labor, for the same period, rounded to the nearest one hundred thousand dollars ($100,000).

I.       Public Health and Safety.  The Tribe shall establish for its Gaming Facility health, safety and construction standards that are at least as stringent as the current editions of the National Electrical Code, the Uniform Building Code, the Uniform Mechanical Code, the Uniform Fire Code and the Uniform Plumbing Code, and any and all construction and maintenance of the Gaming Facility shall comply with such standards.  Inspections shall be conducted with respect to these standards at least annually.  If the State Gaming Representative requests sufficiently in advance of an annual inspection, the State Gaming Representative may be present during such inspection.  The Tribe agrees to correct any deficiencies noted in such

inspections within a time agreed upon between the State and Tribe.  The Tribal Gaming Agency will provide copies of such inspection reports to the State Gaming Representative, if requested to do so in writing.

SECTION 9.   Execution; Effective Date; Claims under Predecessor Agreement.

A.      This Compact shall take effect upon publication of notice in the Federal Register of its approval by the Secretary of the Interior, or of the Secretary's failure to act on it within forty-five (45) days from the date on which it was submitted to him (the "Effective Date"). Upon such publication, the terms and provisions of this Compact shall go into full force and effect, fully supplanting and replacing any Predecessor Agreement.

B.      Notwithstanding Paragraph A, the terms of any Predecessor Agreement (including, without limitation, any limited waiver of sovereign immunity and jurisdictional waivers and consents set forth therein) shall survive to permit the resolution of payment disputes. Such disputes shall be resolved through the procedures set forth in Section 7 of this Compact. Failure to abide by the procedures set forth in Section 7 or failure to comply with an arbitrator's final decision with respect to the parties' obligations under a Predecessor Agreement constitutes a breach of this Compact.  This survival provision is intended to provide for the reasonable resolution of past disputes without hindering a Tribe's ability to obtain a new compact.

SECTION 10. Criminal Jurisdiction.

A.      The Tribe and the State acknowledge that under the provisions of § 23 of Pub. L. No. 100-497, 102 Stat. 2467 (1988), which enacted the IGRA, especially that portion codified at 18 U.S.C. § 1166(d), jurisdiction to prosecute violations of State gambling laws made applicable by that Section to Indian country is vested exclusively within the United States, unless the Tribe and the State agree in a compact entered into pursuant to the IGRA to transfer such jurisdiction to the State.

B.      The Tribe and the State hereby agree that consistent with the Indian Civil Rights Act, 25 U.S.C. § 1301(2), in the event of any violation of any State gambling law on Indian Lands or any other crime against the Gaming Enterprise or any employee thereof that occurs on the premises of the Gaming Facility that is committed by any non-Indian, the State shall have and may exercise jurisdiction, concurrent with that of the United States, to prosecute such person, under its laws and in its courts. For purposes of clarity, if the Tribe qualifies for jurisdiction under the Violence Against Women Act Reauthorization of 2013 (which expanded tribal authority over domestic violence committed by non-Indians against Indian women in Indian country), Pub. L. No. 113-4, 127 Stat. 54 (2013) ("VAWA"), then, for crimes committed in the Gaming Facility, the Tribe shall have and may exercise jurisdiction over such persons, under its laws and in its courts to the extent authorized by VAWA.

C.      Immediately upon becoming aware of any such suspected crime by a non-Indian, the Gaming Enterprise or the Tribal Gaming Agency shall notify the State attorney general and the district attorney for the district in which the alleged crime occurred, supplying all particulars available to the tribal entity at the time.  The Tribe agrees that its law enforcement and gaming agencies shall perform such additional investigation or take such other steps in furtherance of the

investigation and prosecution of the violation as the district attorney may reasonably request, and otherwise cooperate fully with the district attorney and any state law enforcement agencies with respect to the matter, but once notice of a suspected violation has been given to the district attorney, the matter shall be deemed to be under the jurisdiction of the State; provided, however, that in the event of emergency circumstances involving a possible violation, the Tribe and its constituent agencies shall have the discretion to act as they see fit, and to call upon such other agencies or entities as they deem reasonable or necessary, in order to protect against any immediate threat to lives or property. The State may, in its discretion, refer the matter to federal authorities, but it shall notify the Tribal Gaming Agency upon doing so.

D.      The State agrees that no less frequently than annually it will provide the Tribal Gaming Agency with a written report of the status and disposition of each matter referred to it under the provisions of this Section since the last report or that was still pending at the time of the last report.   In the event the district attorney to whom a matter is referred under the provisions of this Section decides not to prosecute such matter, the district attorney shall promptly notify the Tribal Gaming Agency of such decision in writing.   The Tribal Gaming Agency may in that event ask the attorney general of the State to pursue the matter.

E.      The district attorney for a district in which the Tribe conducts Class III Gaming may decline to accept referrals of cases under the provisions of this Section unless and until the Tribe has entered into a memorandum of understanding with the office of the district attorney, to which memorandum of understanding the United States Attorney for the District of New Mexico may also be a party. The memorandum of understanding may address such matters as the specific procedures by which cases are to be referred, participation of the Tribal Gaming Agency and tribal law enforcement personnel in the investigation and prosecution of any such case, and related matters.

SECTION 11. Revenue Sharing.

A.      Consideration.  The Tribe shall pay to the State a portion of its Class III Gaming revenues identified in and under procedures of this Section, in return for which the State agrees that the Tribe has the exclusive right within the State to conduct all types of Class III Gaming described in this Compact, with the sole exception of the use of Gaming Machines, which the State may permit on a limited basis for racetracks and for veterans' and fraternal organizations as such organizations are described in NMSA 1978, § 60-2E-3(GG), as amended through 2014. The Tribe agrees to pay this portion of its revenue in acknowledgment of the fact that the State is forgoing significant revenue that it would otherwise receive from non-tribal gaming enterprises. The Tribe acknowledges that it has received meaningful concessions and significant benefits for the limitations set forth in Section 11(D).

B.      Revenue to State.  The parties agree that, after the Effective Date hereof or after July 1, 2015, whichever is later, the Tribe shall make the quarterly payments provided for in Paragraph C of this Section.  For a Non-Operational Tribe, quarterly payments shall be due at the next quarter following the Tribe's first day of operation of the Gaming Facility.  Each payment shall be made to the State Treasurer for deposit into the General Fund of the State.

C.      Calculation of Payment Amounts.

1.      "Adjusted Net Win" means the combined Net Win from all Class III Gaming Machines in the Gaming Facilities on the Tribe's Indian Lands, with the following adjustments:

(a)      Subtract the amount paid to the State by the Tribe under the provisions of Section 4(E)(6) of this Compact;

(b)      Subtract the sum of four hundred sixteen thousand dollars ($416,000) per year as the amount representing tribal regulatory costs, which amount shall increase by five percent (5%) as of July 1 of 2017, and as of July 1 of every fifth year thereafter as long as this Compact remains in effect; and

(c)      Account for the amounts paid for wide-area progressive Class III Gaming Machines as set forth in the attached Appendix.

2.      The Tribe shall pay the State a percentage of its Adjusted Net Win, determined in accordance with this chart:

| Annual Adjusted Net Win | July 1, 2015 – June 30, 2018 | July 1, 2018 – June 30, 2030 | July 1, 2030 – June 30, 2037 |
|---|---|---|---|
| Under $20 million: | 2% of the first $6 million, and 8.50% on the rest | 2% of the first $6 million, and 8.75% on the rest | 2% of the first $6 million, and 9.50% on the rest |
| $20-$40 million: | 8.50% | 8.75% | 9.50% |
| $40-$80 million: | 9.00% | 9.50% | 10.25% |
| More than $80 million: | 9.00% | 10.00% | 10.75% |

3.      Payments due pursuant to Section 11(C) shall be paid quarterly, no later than twenty-five (25) days after the last day of each calendar quarter, and shall be based upon the Adjusted Net Win during the preceding quarter; provided, however, that for any Tribe for whom this Compact becomes effective prior to July 1, 2015, the applicable revenue sharing rate from any Predecessor Agreement shall apply until the quarter beginning on July 1, 2015. The Tribe shall ascertain the applicable revenue sharing percentage in Section 11(C)(2) above and shall base its quarterly payments on the following factors: (1) the prior year's total Adjusted Net Win amount and the applicable revenue sharing percentage; and (2) its best good faith estimate of its annual Adjusted Net Win for the July 1 – June 30 period.  In the event its total Adjusted Net Win for any such period varies from such estimate, such that the amount due the State for the first three quarters as set forth in Section 11(C)(2), above, is different from the amount paid, the payment due for the fourth quarter shall include any additional amounts due for the first three quarters, or shall reflect a credit for any overpayment.  Any payment or any portion thereof that is not made within ten (10) days of the due date shall accrue interest at the rate of ten percent (10%) per annum, from the original due date until paid.  The Tribe shall accompany any payment to the State with a detailed breakdown of the particular obligation to which such payment applies, and the basis for the calculation of such payment on a form provided by the State Gaming Representative, and shall provide a copy of such documentation to the State Gaming Representative.

D.      Limitations.

1.      The Tribe's obligation to make the payments provided for in Paragraphs B and C of this Section shall apply and continue only so long as this Compact remains in effect; and provided that that obligation shall terminate altogether in the event the State:

(a)      passes, amends, or repeals any law, or takes any other action, that would directly or indirectly attempt to restrict, or has the effect of restricting, the scope or extent of Indian gaming;

(b)      licenses, permits or otherwise allows any person or entity other than six licensed horse racetracks and veterans and fraternal organizations as described in NMSA 1978, § 60-2E-3(GG) to operate Gaming Machines;

(c)      permits any licensed horse racetrack to operate a larger number of Gaming Machines, or to operate any Gaming Machines for longer hours, than is set forth in Subsection (D)(2)(e), below, or to operate any Gaming Machines outside of its licensed premises, or to operate any Table Game; or

(d)      licenses, permits or otherwise allows any non-Indian person or entity to engage in any other form of Class III gaming other than a state-sponsored lottery, pari-mutuel betting on horse racing and bicycle racing, operation of Gaming Machines, and limited fundraising by non-profit organizations, as set forth in Subsection (D)(2), below.

2.      The parties agree that the State's allowance of the following forms of Class III Gaming, subject to the limitations expressly set forth herein, shall not be considered an expansion of non-tribal Class III gaming for purposes of this agreement, and shall have no effect on the Tribe's obligation to make the payments provided for in Paragraphs B and C of this Section:

(a)      the operation of a State lottery;

(b)      the operation of Gaming Machines by any fraternal or veterans organization as described in NMSA 1978, § 60-2E-3(GG), but only for the benefit of such organization's members;

(c)      limited fundraising activities conducted by nonprofit tax-exempt organizations;

(d)      the conduct by licensed horse racetracks and bicycle tracks of pari-mutuel betting on races at such tracks, and on simulcast races at other tracks elsewhere in the country; and

(e)      the operation by a licensed horse racetrack of Gaming Machines on days on which live or simulcast horse racing occurs, provided that such operation is limited to no more than eighteen (18) hours in any one day, and to no more than a total of one hundred twelve (112) hours in any calendar week, and provided further that no licensed horse racetrack shall

have more than six hundred (600) licensed Gaming Machines, nor be authorized to operate more than seven hundred and fifty (750) Gaming Machines.

3.      The limitations set forth in this Section shall not prohibit a horse racetrack from relocating, selling, transferring or assigning its operations in accordance with applicable procedures and authorizations set forth in New Mexico law.

4.      Prior to granting the approval of an application for a racing license for a horse racetrack other than the five horse racetracks holding such licenses as of January 1, 2015, or the approval of an application by a licensed horse racetrack to move its racing and gaming facilities to a new location after January 1, 2015, the State Racing Commission shall adopt, put into effect, and shall have substantially complied with regulations requiring the Commission to solicit and consider the Tribe's views on the application.

E.      Third-Party Beneficiaries.  The provisions of this Section are not intended to create any third-party beneficiaries and are entered into solely for the benefit of the Tribe and the State.

SECTION 12. Duration; Termination for Non-Payment.

A.      This Compact shall have a term commencing on the date on which it goes into full force and effect as provided in Section 9, and ending at midnight on June 30, 2037.

B.      Notwithstanding the provisions of Paragraph A of this Section, if the Tribe fails to comply with any of its payment obligations to the State under Sections 4(E)(6), 9(B) or 11 of this Compact, and persists in such failure for a period of thirty (30) days after receipt, by certified mail, of a "Notice of Noncompliance and Termination for Non-Payment" sent by the State Gaming Representative to the Tribal Gaming Agency, which Notice shall specify the amount due and the provision of the Compact under which such payment is required, this Compact, and the conduct of all Class III Gaming by the Tribe hereunder, shall terminate automatically as of the end of the thirty (30)-day period, unless within such thirty (30)-day period the Tribe shall have either cured the non-payment to the satisfaction of the State Gaming Representative or invoked arbitration on a matter of fact as provided in Section 7(A)(2) of this Compact, and simultaneously shall have placed into escrow, in an institution that is unaffiliated with either the Tribe or the State, a sum of money equal to the amount claimed due by the State, with instructions to the escrow agent specifying that such sum shall not be released except by direction of the arbitrator or arbitration panel or pursuant to a settlement agreement of the parties. The Tribe shall give written notice to the State of the deposit of the amount in dispute into escrow, and of the escrow instructions.  At the conclusion of the arbitration proceeding, or, in the event the parties reach a settlement, immediately after execution of the settlement agreement, the escrow agent shall disburse the sum deposited by the Tribe in accordance with the settlement agreement or arbitration award, as applicable.  In the event the Tribe invokes arbitration, this Compact and the Tribe's right to conduct Class III gaming shall terminate automatically at the end of the thirtieth (30th) day after the entry of a final, non-appealable decision by the arbitrators or by a court having jurisdiction of the dispute, unless the full amount determined by the arbitrators or by such court to be due the State, if any, has been paid by such date.  The Tribe

shall not be entitled to avoid any pre-existing contractual obligations accruing to third parties under this Compact solely by virtue of the termination of the Compact.

SECTION 13. Notice to Parties.

A.      Within (10) days of the Effective Date of this Compact, or for a Non-Operational Tribe, prior to the Tribe's first day of operation of its Gaming Facility, the State Gaming Representative and the Tribal Gaming Agency shall provide to the other the address at which notices under this Section may be received.  Any change in address by the Tribe or the State shall be communicated in writing to the other party.

B.      Unless otherwise indicated, all notices, payments, requests, reports, information or demand that any party hereto may desire or may be required to give to the other party hereto, shall be in writing and shall be personally delivered, sent by first-class mail or another reliable courier service, or sent by electronic mail (with confirmation of receipt of transmission) at the address provided in writing by the other party. Every notice, payment, request, report, information or demand so given shall be deemed effective upon receipt or, if mailed, upon receipt or the expiration of the third day following the day of mailing, whichever occurs first, except that any notice of change of address shall be effective only upon receipt by the party to whom said notice is addressed.

SECTION 14. Entire Agreement.

This Compact is the entire agreement between the parties and supersedes all prior agreements, whether written or oral, with respect to the subject matter hereof.  Neither this Compact nor any provision herein may be changed, waived, discharged or terminated orally, but only by an instrument, in writing, signed by the Tribe and the State and approved by the Secretary of the Interior.  This Compact shall not be amended without the express approval of the Tribe, the Governor of the State and the State Legislature, as provided in the Compact Negotiation Act.

SECTION 15. Filing of Compact with State Records Center.

Upon the Effective Date of this Compact, a copy shall be filed by the Governor with the New Mexico Records Center.  Any subsequent amendment or modification of this Compact shall be filed with the New Mexico Records Center.

SECTION 16. Counterparts.

This Compact may be executed by the parties in any number of separate counterparts with the same effect as if the signatures were upon the same instrument.  All such counterparts shall together constitute one and the same document.

SECTION 17. Internet Gaming.

In the event that internet gaming is authorized within the State, the State and the Tribe agree that they will reopen good faith negotiations to evaluate the impact, if any, of internet

gaming and consider adjustments to the Compact.  The parties understand and agree that it is not possible to determine at this time what, if any, adjustments to the Compact would be necessary.

SECTION 18. Applicability.

The Tribe has informed the State that it does not intend to conduct Class III Gaming on Indian Lands which are eligible for gaming pursuant to 25 U.S.C.  §§ 2719 (a)(2)(B), (b)(1)(A), (b)(1)(B)(ii) or (b)(1)(B)(iii).   The Tribe acknowledges and agrees that there are unique circumstances and conditions that are often implicated by such lands and that it has not asked the State to consider those issues during these negotiations.  With that understanding, the Tribe has agreed that it will not conduct Class III Gaming on such lands pursuant to 25 U.S.C.  §§ 2719 (a)(2)(B), (b)(1)(A), (b)(1)(B)(ii) or (b)(1)(B)(iii) under the terms of this Compact and will negotiate a separate Compact in the future if it desires to conduct Class III Gaming on Indian Lands that are eligible for gaming pursuant to 25 U.S.C. §§ 2719 (a)(2)(B), (b)(1)(A), (b)(1)(B)(ii) or (b)(1)(B)(iii).

SECTION 19. Severability.

Should any provision of this Compact be found to be invalid or unenforceable by any court, such determination shall have no effect upon the validity or enforceability of any other portion of this Compact, and all such other portions shall continue in full force and effect, except that this provision shall not apply to Sections 3, 4, 5, 6, 9, 11, and 12 hereof, or to any portions thereof, which the parties agree are non-severable.

Executed this _____ day of _____, 2015.


TRIBE


By:_____
              [Authorized Official]




STATE OF NEW MEXICO

By:_____
Governor




29

## APPENDIX to the 2015 Compact Amendments

WHEREAS, the _____("Tribe"), a federally recognized Indian tribe, operates a Gaming Enterprise on its land located within the exterior boundaries of the Tribe's Indian Lands;

WHEREAS, the Tribe conducts gaming activities on its Indian Lands pursuant to a compact entered into between the Tribe and the State and approved by the United States Department of Interior;

WHEREAS, the _____ is the Tribal Gaming Agency ("TGA") identified to the State Gaming Representative ("SGR") as the agency responsible for actions of the Tribe set out in the Compact and is the single contact with the State and may be relied upon as such by the State;

WHEREAS, the SGR is the person designated by the New Mexico Gaming Control Board ("NMGCB") pursuant to the Gaming Control Act [NMSA 1978, § 60-2E-1 to -62 (1997, as amended through 2014)] who shall be responsible for the actions of the State set out in the Compact;

WHEREAS, the Tribe and the State have engaged in negotiations leading to this Compact to be submitted for approval by the 2015 Legislature; and

WHEREAS, the Tribe and the State wish to submit for approval certain details concerning aspects of their agreement to be made an integral part of the 2015 Compact, but to be designated as the Appendix to the Compact;

NOW, THEREFORE, the State and the Tribe agree to the following additional terms and conditions:

I.     Gaming Machines and Table Games

Section 2(K) and Section 2(W) of the Compact provide definitions for Class III Gaming Machines and Table Games.  The definition of a Class III Gaming Machine is intended to encompass the traditional slot machine.  The definition of a Table Game is intended to encompass traditional games that use cards such as Pai-gow and blackjack, wheel games such as roulette and the Big Wheel, and dice games such as craps.

However, technology is constantly changing in the area of casino gaming and the once clear line between slot machines and Table Games is becoming less clear.  It is the intention of the parties to accommodate and clarify revenue sharing requirements of new games that blur the line between traditional games.    Generally, games that are predominantly mechanical, electromechanical or electronic are subject to revenue sharing and games that rely significantly on a casino attendant (a live person) to play the game are not subject to that obligation.  Casino attendant involvement ranges from minimal interaction such as initiating the game and taking bets and/or making payout to substantial interaction such as participating in the game as a player (e.g. blackjack) or being involved in nearly every aspect of the game (e.g. craps).  The greater the involvement of the casino attendant, the more likely the game is a Table Game.  For example, a

casino attendant may have some minimal involvement in an electromechanical slot machine game, such as making a pay-out, but that is not a significant enough involvement to exclude it from revenue sharing obligations. Likewise, although roulette has a mechanical aspect, it is not significant enough to make it subject to revenue sharing obligations.

Recognizing the dynamic nature of gaming technology, the parties shall attempt to agree on whether new mechanical, electromechanical or electronic games that utilize traditional components of Table Games, e.g. cards, wheels or dice, are subject to revenue sharing on a case by case basis. In the event the parties are unable to agree, the matter shall be submitted to arbitration pursuant to Section 7.

State Monitoring and Control System. Section 4(B)(13) of the Compact provides that the Tribe shall make available to the SGR, unaltered data from all Gaming Machines. The information shall be downloadable from the Tribe's monitoring and control system. The parties agree that access to such data shall be made available as follows:

A.      The SGR or designee shall have access to the Gaming Machine accounting data from the production side of the Tribe's monitoring and control system. The Gaming Machine accounting data consists of the raw, unaltered, data used by the Tribe to calculate Net Win. This information shall not be in an altered, processed or manipulated format. This information shall be accessible by the SGR, as the SGR shall from time to time determine is required, on a per machine and/or aggregate basis based on a full game day cycle. The purpose of this information is to allow the SGR to verify the Tribe's Net Win calculation. A system for electronic access to the Tribe's Gaming Machine accounting data shall be constructed and installed at the State's cost.

B.      The security codes for log-in by the SGR or designee shall be defined collectively by the TGA, the manufacturer of the monitoring and control system, and the SGR.

C.      Access to the Gaming Machine accounting data shall be limited to the SGR or designee solely for purposes authorized in the Compact.

D.      Any part of the Gaming Machine accounting data obtained herein is designated as confidential under the Compact and shall not be made available for public inspection by the SGR.

E.      The information referred to herein shall be transferred over secure telecommunications lines.

F.      The TGA shall ensure that the systems and connections necessary to provide access to the Gaming Machine accounting data are in place and operating as required under the Compact.

G.    The TGA shall ensure that the SGR or designee is notified promptly either by electronic mail or telephone of any technical problems related to the generation, transfer or access of the Gaming Machine accounting data.

H.    The TGA shall ensure that the SGR has access to the Gaming Machine accounting data on a periodic basis as determined from time to time by the SGR, but in no event shall access be more often than once in a 24 hour period and the SGR shall strive to access such information in a reasonable manner and only to the extent necessary to meet his obligations under the Compact.

I.    The TGA shall at all times designate a person and an alternate as the daily contact person of the SGR or designee.

II.    Audits and Compliance

A.    Section 4(E)(2) provides that the TGA will certify annually to the SGR that the TGA has met its obligations under this Compact.

1.    The TGA shall annually certify to the SGR that the Tribe is in compliance with the provisions of the Compact by completing and submitting a Compliance Report.

2.    The Compliance Report contains a checklist of the applicable sections of the Compact substantially similar to the form outlined as "Form A" provided at the end of this Appendix.  The Compliance Report shall serve as an annual attestation to certify that the Tribe, TGA and the Tribal Gaming Enterprise have met the obligations under the Compact.

3.    The TGA shall complete and submit to the SGR its Compliance Report within thirty (30) days of the end of the Tribe's fiscal year.

4.    The TGA shall rely upon its records in preparing the Compliance Report. As evidence that the elements or requirements of the Compact have been met, the TGA shall conduct a comprehensive review of their gaming operations, which may include sample testing.  The TGA shall determine the sample size to be used and will provide the methodology of the chosen sample size to the SGR.  The TGA shall maintain all records relied upon in preparing the Compliance Report.  The records shall be made available for review by the SGR or agent as requested.

5.    The TGA shall attach a written explanation of the course of action taken to remedy or explain any portions of the audit checklist that are listed as non-compliant or partially compliant.  The SGR reserves the right to review the audit checklist and request additional documentation if necessary, including all source documents and data.

6.      The SGR reserves the right to inspect and verify pursuant to Section 4(E)(3) of the 2015 Compact.

7.      In addition to the Compliance Report, and within thirty (30) days of the end of the Tribe's fiscal year, the TGA shall provide the SGR an annual report accounting for the Tribe's use of the funds identified in Section 4(B)(16) and Section 4(F)(2)(b)(iii) of the Compact, including the organizations or programs funded, the amount of funding provided to each, and demonstrating that the funds were used for the purposes described in Section 4(B)(16) of the Compact.

B.      Section 4(E)(3) of the Compact provides authorization for the SGR to inspect a Gaming Facility, Class III gaming activity, individual Gaming Machines and all records relating to Class III Gaming of the Tribe.  The parties agree that the protocol for inspection of Gaming Machines shall include the following:

1.      The SGR shall have access to inspect individual Gaming Machines upon the terms and conditions set forth in Section 4(E)(3) of the 2015 Compact.

2.      The SGR recognizes that the Tribal Gaming Enterprise is a business and will take reasonable steps to not interfere with the normal conduct of the gaming business.

3.      The SGR recognizes that the TGA has primary responsibility to administer and enforce the regulatory requirements of the Compact and does so through internal controls, direct control of the gaming media and the security and access of the gaming media in a Gaming Machine.

4.      The TGA shall be present at any inspection, upon having been given notice as set out in Section 4(E)(3), and testing of the gaming media shall be conducted by the TGA representative and verified by the SGR.

5.      The SGR's inspection of individual Gaming Machines shall be limited to purposes authorized by this Compact.

III.    Progressive Games, Participation Fees, Free Play and Point Play, and Players' Clubs and Complimentaries

A.      Pro-rata Portion of Wide-Area Progressive System Fees

Similar to the proprietary (in-house) progressive gaming devices, the top jackpots for wide-area progressive gaming devices increment with the level of play.  However, in the case of wide-area progressive gaming devices, a third-party vendor operates the system.  The system spans multiple casinos.  The top jackpots increment as each of the Gaming Machines in the system is played, regardless of the casino in which the gaming machine is located.  The third-party vendor administers the system.  In return, the casinos make periodic payments to the third-

party vendor.  The vendor payments provide for the progressive jackpot and a fee to the third-party vendor.  The casinos collect the cash or cash equivalents from these Gaming Machines as drop.  When a progressive jackpot is won, the third-party vendor pays the jackpot from funds collected from the casinos.

If in calculating Net Win, fees to the third-party vendor in excess of those amounts necessary to fund the progressive jackpots have been applied to reduce Net Win, then for purposes of calculating Adjusted Net Win, the Tribe shall add back those amounts that did not fund the progressive jackpots.  The third-party vendor will need to inform the Gaming Enterprise in writing as to the specific amount of the vendor payments that are contributed to the progressive system payouts (jackpots).

B.      Participation Fees

Broadly, participation fees are any contractual payments made by casinos that are set at a minimum or maximum amount per day or are tied to the total coin-in, or drop generated by the gaming devices being operated, or other financial measures related to the operation of the gaming devices.  An example of participation fees is the periodic payments casinos make to the third-party vendor for the use of a Gaming Machine.  Participation fees can also be royalty payments, lease payments, or payments for other contractual arrangements.

The participation fee is an expense and is not deductible for the purposes of revenue sharing and should be treated accordingly.

C.      Free Play and Point Play

Under the terms of this Compact, Free Play and Point Play do not increase Net Win, and amounts paid as a result of Free Play or Point Play reduce Net Win for purposes of the revenue sharing calculation in Section 11(C).  However, any form of credits with any cash redemption value increase Net Win when wagered on Gaming Machines and amounts paid as a result of such wagers reduce Net Win for purposes of calculating revenue sharing.

D.      Promotions, Players' Clubs, Non-Cash Prizes and Complimentaries

Any rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated), or promotion, or as a result of patron-related activities, are not deductible from Net Win.  The value of any complimentaries given to patrons in any form, including but not limited to food and lodging as addressed in Section 4(B)(19), is not deductible from Net Win.

If the Tribe chooses to use non-cash prizes in connection with play on a Gaming Machine, Net Win is reduced by the amount of the Gaming Enterprise's actual cost of a non-cash prize awarded as a direct result of a win on a Class III Gaming Machine.

IV.     Extension of Credit pursuant to Section 4(B)(10)

A.    Intent.  The State and Tribe acknowledge that when credit is provided to patrons that do not have sufficient assets or resources to repay the debt, there are negative impacts to the patron, the Gaming Enterprise and the State; however, the credit that is contemplated herein is designed to attract only certain qualified patrons that meet certain criteria and have demonstrated sufficient available funds and assets to repay the debt.  Specifically, the extension of credit is designed to allow high income, high volume players more convenient access to their own available funds.  In recognition of the fact that granting credit is an important marketing tool for Tribes and may be helpful in attracting certain patrons to the State, the State and Tribe have agreed to allow for short term credit but have agreed to careful regulation and incorporated several safeguards to protect from any unintended consequences.

B.    State Requirements.  In addition to the provisions set forth herein, the State has requested, and the Tribe has agreed, to comply with the following requirements:

1.    Credit extensions shall be no less than ten thousand dollars ($10,000.00).

2.    Credit extensions shall be required to be repaid by the patron within thirty (30) days.

3.    The Tribe may only extend credit to patrons that have an annual income of at least $200,000 for a single person or $300,000 for a couple and available cash balances that exceed the amount of credit extended to the patron.

4.    Approvals of any credit extension shall require that the Gaming Enterprise perform the following verifications:

i.    Any patron requesting credit shall be required to verify that the patron has an annual income of at least $200,000 for a single person or $300,000 for a couple. Verification of the patron's annual income shall be satisfied by the patron signing a statement, signed under penalty of perjury, confirming the amount of the patron's annual income; and

ii.    Any patron requesting credit shall be required to verify that the patron has available cash balances that exceed the amount of the credit to be extended.  Verification of the patron's available cash balances shall be satisfied by the patron signing a statement, signed under penalty of perjury, confirming that the patron has available cash balances that exceed the amount of the credit to be extended.  As an additional safeguard, verification of the patron's personal checking account information shall be performed by the Gaming Enterprise directly with the patron's bank or a bank verification service before extending credit to the patron.  The

6

verification shall include verifying that: (1) the patron has an existing and active checking account, (2) the checking account is in the patron's name; and (3) the total amount in all of the patron's accounts with that bank is in excess of the amount of credit requested.   A bank verification service utilized by a Gaming Enterprise may make use of another bank verification service to make direct communication with the patron's bank. The Gaming Enterprise shall record the source of verification and the method by which each verification was performed in the patron's credit file.   The verification may be performed telephonically prior to the credit approval provided the Gaming Enterprise or bank verification service requests written documentation of all information obtained as soon as possible and such written documentation is included in the patron's credit file. All requests for written information shall be maintained in the patron's credit file until such documentation is obtained.

     5.    Approvals to increase the amount of credit granted shall require a 24-hour "cooling off" period between the time a request for an increase in the credit is received and when the additional credit amount will be made available to the patron.

C.    Tribal Minimum Internal Control.  The Tribe or TGA shall adopt the minimum internal control standard set forth in 25 C.F.R. § 542.15, as may be amended from time to time (the "Tribal Credit MICS") and shall comply with any and all other applicable federal law.  The Tribe or TGA may amend the Tribal Credit MICS and/or may enter into additional minimum internal control standards in order to continue efficient regulation and address future circumstances; provided that: (i) any amendments or additional standards shall be at least as stringent as 25 C.F.R. § 542.15 in its current form as of the Effective Date of the Compact; and (ii) the Tribe provides a copy of the amendments and/or additional standards to the State for review and comment prior to implementation.  The Gaming Enterprise shall offer Credit pursuant to written internal policies and procedures.  The internal policies and procedures shall implement the minimum internal control standard.

D.    Certification.  The following shall occur on an annual basis:

     1.    The TGA shall certify that the Tribal Credit MICS meet or exceed the standards set forth in 25 C.F.R. § 542.15 (as in effect on the Effective Date of this Compact or as it may be amended, provided that any later amendments are at least as stringent as the version in effect on the Effective Date of this Compact).

     2.    The TGA shall certify that the Gaming Enterprise's written system of internal controls comply with the Tribal Credit MICS.

3.      The TGA shall cause internal audits to be conducted in conformance with the Tribal Credit MICS to test the Gaming Enterprise's compliance with the written system of internal controls and require that an Internal Audit Report be prepared, consistent with applicable provisions of the Tribal Credit MICS, a copy of which Internal Audit Report shall be provided to the SGR.

4.      The TGA shall investigate any exceptions identified in the Internal Audit Report and require the Gaming Enterprise to correct any substantiated exceptions.

5.      The TGA or the Tribe shall engage an independent certified public accountant to conduct agreed-upon procedures consistent with applicable provisions of the Tribal Credit MICS and prepare a report documenting the results of those procedures ("Agreed-Upon Procedures Report"), a copy of which report shall be provided to the SGR.  The independent certified public accountant shall be licensed in the State to practice as an independent certified accountant.

6.      The TGA shall send a report to the SGR which describes the status of compliance of the Gaming Enterprise with the Tribal Credit MICS.  The TGA's annual report to the SGR, shall certify if material compliance with the Tribal Credit MICS has been achieved and shall enclose:  (i) the TGA Internal Audit Report; (ii) the Agreed-Upon Procedures Report; and, (iii) any written communications of the independent certified public accountant including management letters regarding weaknesses or deficiencies in internal controls issued in connection with the Agreed-Upon-Procedures Report, including but not limited to documentation related to any financial review/audit of gaming revenue.

7.      If, upon review, the SGR reasonably determines that there is substantial evidence of material noncompliance with the requirements of the Tribal Credit MICS, the SGR may request a meeting to consult with the TGA regarding the method and means by which the Tribe determines that the Tribal Credit MICS are properly being enforced. The TGA and SGR shall meet within thirty (30) days of a written meeting request from the SGR. The SGR meeting request shall identify its basis for a determination that there is substantial evidence of material noncompliance with the requirements of the Tribal Credit MICS. During this meeting, the SGR and TGA shall make good faith efforts to address the issues identified in the SGR meeting request.

8.      A violation of the Tribal Credit MICS or any other applicable federal law or regulation or any other applicable law shall be considered a breach of the Compact.

E.      Compliance and Reporting.  The TGA shall audit compliance annually of policies and procedures for credit consistent with the MICS Audit Checklist – Credit promulgated by the National Indian Gaming Commission,[1] a copy of which shall be provided to the SGR.  In addition, on a quarterly basis, the Tribe or TGA shall report the following to the SGR for the previous quarter:

---

[1]http://www.nigc.gov/Laws_Regulations/Commission_Regulations/Minimum_Internal_Control_Standards/25_CFR_Part_542c.aspx

1.     the total amount of the credit extended;

2.     the number of credit extensions granted;

3.     the number of patrons receiving credit and the number of extensions per patron;

4.     the amount of each individual credit extension;

5.     the city and state of residence for each patron granted credit;

6.     the aging report of the Gaming Enterprise reflecting the amounts owed; and

7.     the amount of any write-offs and any collection efforts by collection agencies.

F.     **Consumer Protection.**    The Gaming Enterprise is obligated to observe the following terms and conditions associated with granting credit:

1.     The Gaming Enterprise is prohibited from allowing a patron to directly purchase gaming chips, checks or credits with a credit card.  However, nothing herein prevents a patron from making ATM withdrawals using a debit or a credit card.

2.     The Gaming Enterprise is prohibited from charging interest or fees for credit extended to patrons.

3.     Outstanding balances are payable within thirty (30) days.

4.     The Gaming Enterprise reserves the right to require the payoff of outstanding balances from table games winnings or slot jackpots.

5.     The Gaming Enterprise is prohibited from selling delinquent account balances to collection specialists for purposes of collecting outstanding amounts owed.

6.     The Gaming Enterprise is prohibited from awarding, granting or paying incentives of any kind to Gaming Enterprise employees based on the granting of credit or the amount of credit extended.

7.     The Gaming Enterprise is prohibited from awarding, granting or paying incentives of any kind to induce any Gaming Enterprise patron to obtain credit.

8.     The Gaming Enterprise shall designate certain employees as credit department representatives or executives with the authority to approve credit for gaming activities.  A credit department representative shall not perform any duties incompatible with the assessment of a patron's credit worthiness such as recruitment of or marketing to patrons or prospective patrons.

9.    Any patron that applies for a credit shall be provided written notice of the terms and conditions of the credit including the consequences for failure to repay the debt.

10.   In assessing whether to increase the credit limit to a patron, the Gaming Enterprise shall consider the patron's player rating based on a continuing evaluation of the amount and frequency of play subsequent to the patron's initial receipt of credit. The patron's player rating shall be readily available to representatives of the Gaming Enterprise's credit department prior to their approving a patron's request for a credit limit increase. Significant deviations in the patron's player rating shall be viewed negatively in determining whether to grant or deny credit to a patron.

11.   Judicial collection of debts shall only be pursued in the state court where the patron resides and the law of the state in which the patron resides shall apply.

G.    No Reduction in Revenue Sharing.  There is no reduction in revenue sharing payments owed by the Gaming Enterprise for uncollectible debt related to credit extensions.

H.    Applicability.  The requirements of Section IV of this Appendix shall only apply in the event that the Tribe offers credit as permitted in Section 4(B)(10).   In the event that a Tribe does not offer credit as permitted in Section 4(B)(10), the requirements of Section IV shall not apply.

V.    Discretionary Complimentaries pursuant to Section 4 (B)(19)

A.    Tribal Minimum Internal Control Standard.  The Tribe or TGA shall adopt the minimum internal control standard set forth in 25 C.F.R. § 542.17, as may be amended from time to time ("Tribal Complimentaries MICS") and shall comply with any and all other applicable federal law.  The Tribe or TGA may amend the Tribal Complimentaries MICS and/or may enter into additional minimum internal control standards in order to continue efficient regulation and address future circumstances; provided that: (i) any amendments or additional standards shall be at least as stringent as the 25 C.F.R. § 542.17 in its current form as of the Effective Date of the Compact; and (ii) the Tribe provides a copy of the amendments and/or additional standards to the State for review and comment prior to implementation.   The Gaming Enterprise shall offer discretionary Complimentaries pursuant to written internal policies and procedures.   The internal policies and procedures shall implement the minimum internal control standard.

B.      Calculation of Complimentaries.   The "cumulative market value" shall be calculated based on the average daily rate (ADR) for lodging and the menu pricing for food.

C.      Compliance and Reporting.  The TGA shall audit compliance annually of policies and procedures for discretionary Complimentaries consistent with the MICS Audit Checklist – Complimentary Services and Items promulgated by the National Indian Gaming Commission,[2] a copy of which shall be provided to the SGR.   In addition, on a quarterly basis, the Tribe or TGA shall report the following to the SGR for the previous quarter: the total amount of the discretionary Complimentaries during the previous quarter (and a cumulative total of the previous quarters for the year) in dollars and as a percentage of Adjusted Net Win for such quarter.

D.      Applicability.  The requirements of Section V of this Appendix shall only apply in the event that the Tribe offers discretionary Complimentaries as permitted in Section 4(B)(19).    In the event that a Tribe does not offer discretionary Complimentaries as permitted in Section 4(B)(19), the requirements of Section V shall not apply.

---

[2]http://www.nigc.gov/Laws_Regulations/Commission_Regulations/Minimum_Internal_Control_Standards/25_CFR _Part_542c.aspx

FORM A

4900 Alameda Blvd. NE
Albuquerque, NM 87113
(Rev. 02/15)

### New Mexico Gaming Control Board
### COMPACT COMPLIANCE CHECKLIST
Compliance Report
Fiscal Year 20

Key:  X – Compliance          (Blank) – Non-Compliance
/ – Partial Compliance          NA – Not Applicable

| Compliance with Section | Tribal-State Compact | Compliance with Section | Tribal-State Compact | Compliance with Section | Tribal-State |
|---|---|---|---|---|---|
| ☐ | Section 3. Authorized Class III Gaming. | ☐ | Section 4.B.(17) | ☐ | Section 8. Protection of Visitors. |
| | | ☐ | Section 4.B.(18) | | Section 8.A. |
| | | ☐ | Section 4.B.(19) | ☐ | Section 8.B. |
| ☐ | Section 4. Conduct of Class III Gaming. | ☐ | Section 4.C. | ☐ | Section 8.C. |
| | | ☐ | Section 4.D. | ☐ | Section 8.D. |
| ☐ | Section 4.A.(1) | ☐ | Section 4.E.(1) | ☐ | Section 8.E. |
| ☐ | Section 4.A.(2) | ☐ | Section 4.E.(2) | ☐ | Section 8.F. |
| ☐ | Section 4.A.(3) | ☐ | Section 4.E.(3) | ☐ | Section 8.G. |
| ☐ | Section 4.A.(4) | ☐ | Section 4.E.(4) | ☐ | Section 8.H. |
| ☐ | Section 4.A.(5) | ☐ | Section 4.E.(5) | ☐ | Section 8.I. |
| ☐ | Section 4.A.(6) | ☐ | Section 4.E.(6) | | |
| ☐ | Section 4.A.(8) | ☐ | Section 4.F.(1) | | Section 10. Criminal Jurisdiction. |
| ☐ | Section 4.A.(9) | ☐ | Section 4.F.(2) | ☐ | |
| ☐ | Section 4.B.(1) | | | ☐ | Section 10.C. |
| ☐ | Section 4.B.(2) | ☐ | Section 5. Licensing Requirements. | | |
| ☐ | Section 4.B.(3) | | | | Section 11. Revenue |
| ☐ | Section 4.B.(4) | ☐ | Section 5.A. | ☐ | |
| ☐ | Section 4.B.(5) | ☐ | Section 5.B. | ☐ | Section 11.A. |
| ☐ | Section 4.B.(6) | ☐ | Section 5.C. | ☐ | Section 11.B. |
| ☐ | Section 4.B.(7) | ☐ | Section 5.D. | ☐ | Section 11.C. |
| ☐ | Section 4.B.(8) | | | | |
| ☐ | Section 4.B.(9) | ☐ | Section 6.  Providers of Class III Gaming Equipment or Devices or Supplies. | ☐ | Appendix |
| ☐ | Section 4.B.(10) | | | ☐ | Section II.A. Audit |
| ☐ | Section 4.B.(11) | | | ☐ | Section II.B. Inspection |
| ☐ | Section 4.B.(12) | ☐ | Section 6.A. | ☐ | Section III Progressive Games |
| ☐ | Section 4.B.(13) | ☐ | Section 6.B. | ☐ | Section IV Credit |
| ☐ | Section 4.B.(14) | ☐ | Section 6.C. | ☐ | Section V Comps |
| ☐ | Section 4.B.(15) | | | | |
| ☐ | Section 4.B.(16) | | | | |