UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

THE PUEBLO OF ISLETA, )
a federally-recognized Indian tribe, )
THE PUEBLO OF SANDIA, a )
federally-recognized Indian tribe, and )
THE PUEBLO OF TESUQUE, a )
federally-recognized Indian tribe, )
                                 )
                Plaintiffs, )
                                 )
PUEBLO OF SANTA ANA, )
a federally-recognized Indian tribe, and )
PUEBLO OF SANTA CLARA, a )
federally-recognized Indian tribe, )
                                 )
                Plaintiffs-in-Intervention, )
                                 )      No. 17-cv-0654—SCY-KK
v. )
                                 )
SUSANA MARTINEZ, in her official capacity )
as Governor of the State of New Mexico, )
JEFFREY S. LANDERS, in his official capacity )
as Chair of the Gaming Control Board of the )
State of New Mexico, PAULETTE BECKER, )
in her official capacities as State Gaming )
Representative and as a member of the Gaming )
Control Board of the State of New Mexico, and )
SALVATORE MANIACI, in his official )
capacity as a member of the Gaming Control )
Board of the State of New Mexico, )
                                 )
                Defendants. )
                                 )

**COMPLAINT-IN-INTERVENTION FOR
INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiffs-in-Intervention Pueblo of Santa Ana ("Santa Ana") and Pueblo of Santa Clara ("Santa Clara"), by and through their counsel, hereby allege as follows:

## I.   INTRODUCTION

1. This is an action for declaratory and prospective injunctive relief brought by Plaintiffs-in-Intervention the Pueblos of Santa Ana and Santa Clara (collectively, "the Plaintiff Pueblos"), under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), alleging that the Defendants, all state officials of the State of New Mexico (the "State"), are violating federal law, specifically the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 ("IGRA"), and regulations issued thereunder, and the tribal-state class III gaming compacts entered into between the State and the Plaintiff Pueblos, respectively, and by trying to impose on the Plaintiff Pueblos' class III gaming operations certain financial obligations that are contrary to and prohibited by federal law and the compacts. Plaintiff Pueblos seek a declaration that the Defendants' actions are in violation of federal law, and prospective injunctive relief enjoining Defendants, their agents and employees, from seeking to enforce these illegal financial obligations against the Plaintiff Pueblos, by means of arbitration or otherwise.

## PARTIES

2. The Pueblos of Santa Ana and Santa Clara are both federally-recognized Indian tribes, situated in New Mexico.

3. Defendant Susana Martinez is the Governor of the State of New Mexico, and is sued in her official capacity.

4. Defendant Jeffrey S. Landers is Chair of the New Mexico Gaming Control Board (the "Board"), and is sued in his official capacity as Chair of the Board.

5. Defendant Paulette Becker is the State Gaming Representative and a member of the Board, and is sued in her official capacities as State Gaming Representative and as a member of the Board.

6. Defendant Salvatore Maniaci is a member of the Board, and is sued in his official capacity as a member of the Board.

## II.     JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362 because it is brought by federally-recognized Indian tribes with governing bodies duly recognized by the Secretary of the Interior, and arises under federal law, in that the Pueblos allege that Defendants' actions violate IGRA and the regulations issued under IGRA, and the compacts.

8. Venue is proper in the District of New Mexico under 28 U.S.C. § 1391(b), in that all parties reside or are situated in this district and the matters at issue arose in this district.

## III.     FACTS

9. Under the provisions of IGRA, a federally recognized Indian tribe is entitled to engage in class III ("Las Vegas"-style) gaming, provided that it has entered into a class III gaming compact with the State in which the tribe is located and the gaming will take place. Such compacts are explicitly authorized by IGRA, and must be approved by the Secretary of the Interior under IGRA's provisions.

10. Santa Ana and the State entered into a gaming compact (the "2007 Santa Ana Compact"), that was approved by the Secretary of the Interior effective as of July 5, 2007.

11. Santa Ana and the State subsequently entered into a successor compact (the "2015 Santa Ana Compact"), that was submitted to the Secretary of the Interior pursuant to IGRA on October 25, 2016. The Secretary of the Interior took no action on the 2015 Santa Ana Compact, as a result of which it is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]." 25 U.S.C. § 2710(d)(8)(C).

12. Santa Clara and the State entered into a gaming compact (the "2007 Santa Clara Compact"), that was approved by the Secretary of the Interior effective as of July 5, 2007.

13. Santa Clara and the State entered into a successor compact (the "2015 Santa Clara Compact"), that was submitted to the Secretary of the Interior pursuant to IGRA on July 20, 2015. The Secretary of the Interior took no action on the 2015 Santa Clara Compact, as a result of which it is "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]." 25 U.S.C. § 2710(d)(8)(C).

14. The 2007 and 2015 Santa Ana and Santa Clara Compacts were executed on behalf of the State pursuant to the State's Compact Negotiation Act, NMSA 1978 §§ 11-13A-1 to -5 (1999), which provides that the State's Governor "shall approve and sign" a compact which is "identical to a compact . . . previously approved by the legislature except for the name of the compacting tribe . . . ." *Id.* § 11-13A-4(J). Thus, the Santa Ana 2007 Compact and the Santa Clara 2007 Compact are identical, except for the difference in each Pueblo's name. Similarly, the 2015 Santa Ana Compact and the 2015 Santa Clara Compact are identical, except for the difference in each Pueblo's name. (Hereinafter, references to the "2007 Compact" and the "2015 Compact" should be understood to refer to both Plaintiff Pueblos' compacts, unless otherwise specified.)

15. In the 2007 Compact, both Plaintiff Pueblos agreed to pay the State specified percentages of their respective "Net Wins," as "revenue sharing," as consideration for the State's agreement not to allow gaming activity by non-Indians beyond certain specific types and amounts of such gaming, as set forth in Section 11 of the 2007 Compact. "Net Win" is defined in the 2007 Compact, in pertinent part, as,

> the total amount wagered in Class III Gaming at a Gaming Facility, on all Gaming Machines less:

     (a) the amount paid out in prizes to winning patrons, including the cost to the Tribe of noncash prizes, won on Gaming Machines.

16. Nearly all tribal (and other) gaming operations, including those of the Plaintiff Pueblos, operate some form of "frequent player" program, under which regular players are issued cards, looking similar to a credit card, bearing a chip or strip of magnetic tape.  When the card is inserted into the appropriate slot on a gaming (or "slot") machine, it electronically accesses the customer's account at the facility.  That enables the customer to accumulate "points" for every dollar that the customer bets on gaming machines in the facility (the use of which is called "point play"), and it enables the gaming operation to monitor and to collect data on the gaming behavior of its customers.

17. Many gaming facilities in New Mexico, including those of the Plaintiff Pueblos, use "free play credits" as a promotional tool, to provide an incentive for loyal customers to play gaming machines, or as an introductory gesture for customers when they first sign up for the facility's "frequent player" program.  When a customer is notified (usually by mail or e-mail) that he or she has been awarded some amount of free play credits, the customer can come into the gaming facility and upon inserting his or her "frequent player" card into the appropriate slot on a gaming machine, will see the credits show up on the machine.  Free play credits are not redeemable for cash or merchandise, but can be played on gaming machines like currency.  The concept behind free play credits is that they encourage the customer to return to the gaming facility, and that once the customer has played all of his or her free play credits, he or she will likely continue to play with his or her own money.  In the experience of the Plaintiff Pueblos' gaming facilities, the appropriate utilization of free play credits ultimately increases the revenue received by the facility.

18. Beginning at least as early as 2010 or 2011, the Board, whose members were the predecessors of Defendants Landers, Becker and Maniaci (the "GCB Defendants"), began claiming that the value of free play credits redeemed and played at each gaming tribe's gaming facility, including those of the Plaintiff Pueblos, should be included as part of the "amount wagered" in each tribe's calculation of "Net Win," for purposes of determining the tribe's revenue sharing obligation to the State. The gaming tribes, including the Plaintiff Pueblos, insisted that the contention that they should make "revenue sharing" payments on something—free play—that was manifestly not revenue, was utterly illogical and contrary to the language of the 2007 Compact. Moreover, they showed, such a requirement would violate generally accepted accounting principles ("GAAP"), which the tribes must comply with in all financial accounting related to their gaming operations under applicable federal law, especially 25 C.F.R. § 571.12.

19. Although various of the GCB Defendants' predecessors continued to assert that the gaming tribes owed the State revenue sharing payments attributable to the value of free play credits that had been played at their respective gaming facilities, none of them or the GCB Defendants pursued those claims in any formal way, until April 13, 2017, when Defendant Becker sent nearly identical letters, labeled "Notice[s] of Noncompliance," to each of the Plaintiff Pueblos and certain other gaming tribes, demanding that they pay specified amounts calculated by the Board as the applicable revenue sharing percentage applied to amounts of free play credits redeemed at each tribe's gaming facility, from April 1, 2011, to the date on which each tribe's 2015 Compact went into effect. The Plaintiff Pueblos understand that these letters were sent to the tribes at the express direction of Defendant Martinez, or someone within her office.

20. The Plaintiff Pueblos, and other gaming tribes, responded to Defendant Becker's Notices of Noncompliance by letter of May 19, 2017, explaining to Ms. Becker why they believed that the State's claim violated the terms of the 2007 Compact and federal law, and refusing to pay any amount. On May 31, 2017, Defendant Becker sent each of the Plaintiff Pueblos and the other gaming tribes a "Notice to Cease Conduct," demanding that each tribe "cease its failure to comply with the requirements of Section 11 of the 2007 Compact related to the computation of 'Net Win' and the payment of revenue sharing."

21. Defendant Becker's letters claim that the Board is following the procedure set forth in Section 7 of the 2015 Compact for resolution of disputes between the parties. Should the parties fail to resolve their dispute after a "Notice to Cease Conduct" is served by one party on the other, the noticing party may invoke arbitration of the dispute, in the manner set forth in that Section. Section 7(B), however, states that "[n]othing in [this section] shall be construed to waive, limit or restrict any remedy that is otherwise available to either party to enforce or resolve disputes concerning the provisions of this Compact." Consequently, arbitration is not the sole remedy allowed by the 2015 Compact.

22. Moreover, inasmuch as Defendant's claims depend on the effectiveness of Section 9(B) of the 2015 Compact, which purports to preserve claims of non-payment under the 2007 Compact, which claims, as has been shown, clearly violate federal law and regulations, those claims cannot have been preserved under Section 9(B), and in any event, such unlawful claims, and the issue whether Section 9(B) validly preserves such claims, are expressly excluded from arbitration by the language of Section 7(A)(3) of the 2015 Compact ("the arbitrators shall have no

7

authority to determine any question as to the validity or effectiveness of this Compact or of any provision hereof"). *See infra*, ¶ 36(C).

23. Since 1993, federal law has required Indian tribes engaged in class III gaming to maintain their gaming records and account for their gaming revenues in accordance with generally accepted accounting principles ("GAAP"). *See* 25 C.F.R. §§ 542.19(b), 571.12(b) (2013) (current regulations); Compliance and Enforcement Procedures Under the Indian Gaming Regulatory Act, 58 Fed. Reg. 5833, 5843 (Jan. 22, 1993) (promulgating regulations requiring GAAP in 1993).

24. In conformance with federal law, the 2007 Compact, at Section 4(C), explicitly "require[s] all books and records relating to Class III Gaming to be maintained in accordance with generally accepted accounting principles."

25. That section of the 2007 Compact further expressly requires each Pueblo to

> require an audit and a certified financial statement covering all financial activities of the Gaming Enterprise, *including written verification of the accuracy of the quarterly Net Win calculation*, by an independent certified public accountant licensed by the State. The financial statement shall be prepared *in accordance with generally accepted accounting principles* and shall specify *the total amount wagered in Class III Gaming on all Gaming Machines at the Tribe's Gaming Facility for purposes of calculating "Net Win" under Section 11*. . .

(Emphasis added.)

26. The treatment of free play credits in the financial accounting of tribal gaming enterprises is, like all other facets of gaming accounting, controlled by GAAP. And the reporting procedures required by GAAP are defined in the American Institute of Certified Public Accountants, Audit & Accounting Guide: Gaming (2014 ed.) ("AICPA Gaming Guide") which is the judicially-recognized source of GAAP for Indian gaming. *See Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 813 (6th Cir. 2007). The AICPA Gaming Guide

provides that the use by patrons of free play "has no effect on the reporting of net win or loss from gaming activities." *Id.* § 6.13.[1] As the AICPA Gaming Guide explains, this means that "if a customer bets $5 of his or her own cash and wins $1, the gaming entity reports revenue of $4. If a customer bets $5 of his or her own cash, uses $5 of credits from his or her club card, and wins $1, the gaming entity reports revenue of $4." *Id.*

27. The Defendants are aware that their position, that the tribes, including the Plaintiff Pueblos, owe revenue sharing payments on the value of free play credits redeemed at their gaming facilities, is contrary to federal law and to the language of the 2007 Compact. In 2013, the State negotiated a proposed new compact with the Navajo Nation, that by its language expressly exempted the calculation of Net Win from GAAP, and required the Navajo Nation to include in its calculation of Net Win an amount equal to 35% of the value of free play and point play credits redeemed in play of gaming machines at its gaming facilities. The draft compact was submitted for preliminary review to the Office of Indian Gaming ("OIG") within the Department of the Interior, the office that reviews gaming compacts submitted for Secretarial approval under IGRA. OIG informed the State, including Defendant Martinez, that the draft compact would not be approved, primarily because of the provisions purporting to exempt the Net Win calculation from GAAP and requiring payment of revenue sharing on free play and point play credits. Those provisions, OIG informed the State, were in clear violation of federal law.

28. In consequence of this determination, the compact that was ultimately negotiated with the Navajo Nation and other gaming tribes, and that has now been entered into by nearly all

---

[1] The prior edition of the AICPA Gaming Guide took the same position, using the very same language. *See* American Institute of Certified Public Accountants, Audit & Accounting Guide for Gaming (2011 ed.) ("2011 AICPA Gaming Guide").

of the gaming tribes in New Mexico (including the Plaintiff Pueblos), the 2015 Compact, expressly *excludes* the value of free play and point play credits from the Net Win calculation required by the 2015 Compact. *See* 2015 Compact, Appendix, Section III(C) ("Free Play and Point Play do not increase Net Win, and amounts paid [as prizes] as a result of Free Play or Point Play reduce Net Win for purposes of the revenue sharing calculation in Section 11(C).").

29. Section 9(B) of the 2015 Compact, however, purports to preserve "payment disputes" arising under the terms of the 2007 Compact, which are to be resolved through the dispute resolution procedures of Section 7 of the 2015 Compact (which allows a two-year limitations period for resolution of disputes).

30. As was explained *supra*, in paragraphs 11 and 13, the Secretary of the Interior did not affirmatively approve the 2015 Compacts for any New Mexico gaming tribe, but rather allowed them to be "considered to have been approved" pursuant to 25 U.S.C. § 2710(d)(8)(C), by taking no action on them within the 45-day period specified in that provision. By the terms of that provision, however, a compact that takes effect under this "no-action" alternative is approved "only to the extent the compact is consistent with the provisions of this chapter [*i.e.*, IGRA]."

31. In materially similar letters sent to each of the New Mexico gaming tribes, including the Plaintiff Pueblos, explaining the Department's action--or inaction—in this instance, the Assistant Secretary for Indian Affairs stated,

> We wish to commend the Tribe and the State for the successful resolution of the free play and point play issue. Free play and point play will now be treated according to industry standards and Generally Accepted Accounting Principles (GAAP) by excluding both from the definition of "net win," which forms the basis for revenue sharing calculations. We note, however, that Section 7 of the 2015 Compact reserves a two-year period from its effective date for the State to pursue its assertion that the Tribe's net win—and thus their revenue sharing payments—should include wins and losses arising from free play or point play. In light of its conflict

> with industry standards and GAAP, it is our view that such an assertion by the State to include such sums in revenue sharing calculations would constitute an impermissible tax on tribal gaming revenues in violation of IGRA.

*See, e.g.*, Letter of October 16, 2015, from Kevin K. Washburn, Assistant Secretary—Indian Affairs, to Hon. J. Michael Chavarria, Governor, Pueblo of Santa Clara, at 3.

32. IGRA expressly forbids a state from imposing any "tax, fee, charge or other assessment" on a tribe engaged in class III gaming, other than assessments of amounts "necessary to defray the costs of regulating such activity." 25 U.S.C. § 2710(d)(3)(C)(iii), (4).

33. Notwithstanding these clear federal law prohibitions, the Defendants appear determined to try to enforce their unlawful claims against the Plaintiff Pueblos, amounting to millions of dollars to which the State is not entitled under IGRA.

34. The arbitration proceedings that the Defendants appear determined to force on the Plaintiff Pueblos are not proper forums for the determination of these federal law issues, and the Plaintiff Pueblos should not be forced to submit to them.

**CLAIM**

35. The Plaintiff Pueblos reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

36. The Defendants' demands that the Plaintiff Pueblos pay revenue sharing payments on the "value" of redeemed free play credits, and their efforts to enforce those demands through arbitration under the 2015 Compact, violates federal law in the following respects: (A) It forces on the Plaintiff Pueblos a method of calculating Net Win that violates GAAP, contrary to Section 4(C) of the 2007 Compact and 25 C.F.R. §§ 542.19(b), 571.12(b); (B) Inasmuch as the Defendants' position violates IGRA, governing federal regulations, the 2007 Compact and GAAP,

11

and thus may not properly be considered a valid means of calculating Net Win, the Defendants' efforts to require Plaintiff Pueblos to pay revenue sharing on free play credits amount to the imposition of a "tax, fee, charge or other assessment" on the Plaintiff Pueblos, in violation of IGRA, specifically 25 U.S.C. § 2710(d)(4); and  (C)  Inasmuch as the 2015 Compact took effect "only to the extent the compact is consistent with the provisions of [IGRA]," and the Defendants' claim that the Plaintiff Pueblos owe revenue sharing payments on free play credits redeemed during the term of the 2007 Compact is plainly in violation of IGRA, the Defendants have no right under the terms of the 2015 Compact to attempt to enforce that unlawful claim on the Plaintiff Pueblos, as such unlawful claim cannot be said to be preserved under Section 9(B) or any other provision of the 2015 Compact.

37. The Defendants, their agents and employees, should therefore be enjoined from attempting to enforce their unlawful claims against the Pueblos in any manner, including by attempting to force the Pueblos into participating in arbitration proceedings on their unlawful claims.

WHEREFORE, the Pueblos respectfully ask this Court to enter judgment in their favor and to:

- A. Issue a declaratory judgment, declaring that the Defendants' claim that the Plaintiff Pueblos owe revenue sharing payments based on the value of free play credits redeemed during any portion of the term of the 2007 Compact violates federal law, and that Defendants have no authority as a matter of federal law to pursue such claims against the Plaintiff Pueblos;

- B. Enjoin the Defendants, their agents and employees, from pursuing or taking any actions whatsoever to attempt to enforce their unlawful claims against the Plaintiff Pueblos;

C.  Award the Plaintiff Pueblos their costs; and

D.  Grant such other and further relief as this Court deems just in the premises.

Dated:  June 23, 2017                                    Respectfully submitted,

*/s/ Richard W. Hughes*
Richard W. Hughes
rwhughes@rothsteinlaw.com
Donna M. Connolly
dconnolly@rothsteinlaw.com
Reed C. Bienvenu
rbienvenu@rothsteinlaw.com
Rothstein Donatelli LLP
Post Office Box 8084
Santa Fe, New Mexico 87504
505/988-8004
Fax: 505-982-0307

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that service of the foregoing Complaint-in-Intervention was made by CM/ECF on the following counsel of record on this 23rd day of June, 2017:

| | |
|---|---|
| David C. Mielke | Thomas J. Peckham |
| Sonoskey, Chambers, Sachse, Mielke & Brownell, LLP | Nordhaus Law Firm, LLP |
| 500 Marquette Ave., N.W., Suite 660 | 6705 Academy Rd., N.E., Suite A |
| Albuquerque, New Mexico 87102 | Albuquerque, New Mexico 87109 |

Maxine R. Velasquez
General Counsel
Pueblo of Tesuque
Rte. 42, Box 360-T
Santa Fe, New Mexico 87506

_____*s/Richard W. Hughes*_____
Rothstein Donatelli LLP