**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

PUEBLO OF ISLETA *et al.*,

     Plaintiffs,

vs.                                     Civ. No. 17-654 KG/KK

MICHELLE LUJAN GRISHAM[1] *et al.*,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on: (1) Defendants' Motion for Summary Judgment on the Issue of Arbitrability (Doc. 55) ("Defendants' Summary Judgment Motion"), filed January 4, 2018; (2) Plaintiffs-in-Intervention Santa Ana, Santa Clara and San Felipe's and Plaintiff Tesuque's Motion for Summary Judgment (Doc. 67), and Plaintiffs Pueblo of Isleta's and Pueblo of Sandia's Motion for Summary Judgment and Supporting Authorities (Doc. 68) (collectively, "Pueblos' Summary Judgment Motions"), both filed April 10, 2018; (3) Defendants' Motion to Compel Discovery and for Sanctions (Doc. 81) ("Defendants' Motion to Compel"), filed June 8, 2018; (4) Plaintiffs' and Plaintiffs-in-Intervention's Consolidated Motion for Protective Order to Quash Defendants' Rule 30(b)(6) Deposition Notices (Doc. 84) ("Pueblos' Motion for Protective Order"), filed June 20, 2018; and (5) Defendants' Motion for Settlement Conference Pursuant to Rule 16 (Doc. 102) ("Defendants' Motion for Settlement Conference"), filed October 3, 2018.[2]

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Governor Lujan Grisham has been automatically substituted for former Governor Susana Martinez.

[2] Defendants' Summary Judgment Motion and the Pueblos' Summary Judgment Motions are before the Court pursuant to the Notice, Consent, and Reference of Dispositive Motions to a Magistrate Judge filed in this case on October 16, 2018. (Doc. 105.) The remaining motions, which are nondispositive, are before the Court pursuant to Local Rule of Civil Procedure 73.1(a). D.N.M.LR-Civ. 73.1(a); *see also* Fed. R. Civ. P. 72(a).

Having reviewed the parties' submissions, the record, and the relevant law, and for the reasons set forth below, the Court finds that: (1) Defendants' Summary Judgment Motion should be DENIED; (2) the Pueblos' Summary Judgment Motions should be GRANTED; and, (3) Defendants' Motion to Compel, the Pueblos' Motion for Protective Order, and Defendants' Motion for Settlement Conference should be DENIED AS MOOT.

## I.    **INTRODUCTION**

Plaintiffs the Pueblos of Isleta, Sandia, and Tesuque, and Plaintiffs-in-Intervention the Pueblos of Santa Ana, Santa Clara, and San Felipe (collectively, "the Pueblos"), are six (6) federally recognized Indian tribes that operate casinos in New Mexico pursuant to identical gaming compacts with the State of New Mexico ("the State"). (Doc. 67-1 at 6; Doc. 68 at 10; Doc. 99 at 6-7.) Defendants are the State Governor, the State Gaming Representative, and the Chair and members of the State Gaming Control Board ("NMGCB") in their official capacities. (Doc. 67-1 at 6-7; Doc. 68 at 10; Doc. 99 at 6-7.) The Pueblos and the State entered into gaming compacts in 2007 ("2007 Compacts"), and again in 2015 and 2016 ("2015 Compacts"). *Inter alia*, the compacts require the Pueblos to make quarterly revenue sharing payments to the State, in exchange for the Pueblos' nearly exclusive right to conduct certain kinds of gaming in New Mexico. (Doc. 67-3 at 20; Doc. 68-3 at 27.)

In 2017, Defendants sent the Pueblos notices of non-compliance and notices to cease conduct, asserting that the Pueblos had miscalculated their revenue sharing obligations under the 2007 Compacts beginning as early as April 2011. (*See, e.g.*, Docs. 1-8, 1-9, 1-10.) Specifically, Defendants claimed that, in calculating their revenue sharing payments, the Pueblos had improperly excluded the face value of free play and deducted the value of prizes won by patrons as a result of

free play wagers from their Class III gaming machines' "Net Win."[3]  (*Id.*)  Pursuant to the 2015

Compacts, which preserved Defendants' claims, Defendants instructed the Pueblos to make

additional revenue sharing payments to the State under the 2007 Compacts.  (*Id.*)

The Pueblos of Isleta, Sandia, and Tesuque filed this civil action on June 19, 2017 in

response to Defendants' notices.  (Doc. 1.)  The Pueblos of Santa Ana and Santa Clara intervened

on June 29, 2017, and the Pueblo of San Felipe intervened on August 31, 2017.  (Docs. 11, 36.)  In

their complaints, the Pueblos ask the Court for a judgment declaring that:  (1) Defendants' claims

pursuant to the 2015 Compacts for additional revenue sharing payments under the 2007 Compacts[4]

violate federal law, and the 2015 Compacts are therefore invalid and ineffective to preserve

Defendants' unlawful claims, (Doc. 1 at 32-33); (2) neither the Pueblos' claims in this lawsuit nor

Defendants' claims for additional revenue sharing payments are subject to arbitration under the

2015 Compacts, (*id.* at 33); and, (3) Defendants have no authority as a matter of federal law to

pursue their claims for additional revenue sharing payments against the Pueblos.  (Doc. 11 at 12;

Doc. 36 at 12.)  The Pueblos further ask the Court to enjoin Defendants from:  (1) continuing to

violate federal law by seeking to impose a tax, fee, charge, or other assessment on the Pueblos in

the guise of asserting claims for additional revenue sharing payments under the 2007 and 2015

---

[3] As used in this Memorandum Opinion and Order, the term "free play" refers to play on a Class III gaming machine
initiated by points or credits that the casino provided to the patron without consideration, and which have no cash
redemption value.  (*Cf.* Doc. 1-3 at 6.)  "Free play" includes but is not limited to "point play," *i.e.*, play on a Class III
Gaming Machine initiated by points earned or accrued by a patron through previous gaming machine play, players'
clubs, or any other method, and which have no cash redemption value.  (*Cf. id.*)  "Free play" as used in this
Memorandum Opinion and Order excludes play initiated by points or credits that can be redeemed for cash or
merchandise.

[4] As used in this Memorandum Opinion and Order, the phrase "Defendants' claims for additional revenue sharing
payments" refers specifically to Defendants' claims pursuant to the 2015 Compacts that the Pueblos owe the State
additional revenue sharing payments under the 2007 Compacts because they did not include the face value of free play,
and deducted the value of prizes won by patrons as a result of free play wagers, from their Net Win from 2011 to 2016.
Any other claims Defendants may have for additional revenue sharing payments are not before the Court in this civil
action.

Compacts, (Doc. 1 at 34); (2) continuing their efforts to arbitrate the dispute over their claims that free play must be treated as revenue under the 2015 or 2007 Compacts, (*id.*); and, (3) taking any other action to attempt to enforce their unlawful claims against the Pueblos. (Doc. 11 at 12; Doc. 36 at 12); *see Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) ("[U]nder *Ex Parte Young*, [209 U.S. 123 (1908)], a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief.").

## II.    **FACTS**[5]

The Pueblos and the State entered into the 2007 Compacts pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.* (Doc. 55 at 3; Doc. 67-1 at 6; Doc. 68 at 12; Doc. 99 at 6-7, 10). Additionally, the State executed the 2007 Compacts pursuant to the New Mexico Compact Negotiation Act, N.M. Stat. Ann. §§ 11-13A-1 *et seq.*, which provides that the Governor will approve and sign compacts "identical to a compact . . . previously approved by the legislature except for the name of the compacting tribe[.]" N.M. Stat. Ann. § 11-13A-4(J); (Doc. 68 at 12 n.6). Thus, the terms of each of the 2007 Compacts are identical except for the Pueblos' names. (Doc. 55 at 3; Doc. 67-1 at 7; Doc. 68 at 12 n.6; Doc. 99 at 6-7.)

The 2007 Compacts authorized the Pueblos to conduct "any or all forms of Class III Gaming" on Indian Lands in New Mexico and to establish the "betting and pot limits, applicable to such gaming." (Doc. 67-3 at 8; Doc. 68 at 7, 12; Doc. 68-2; Doc. 99 at 7.) Authorized forms of Class III gaming included gaming machines played "upon insertion of a coin, token or similar

---

[5] Unless otherwise noted, the Court has determined that the following facts are undisputed based on its review of the parties' briefs, admissible evidence in the record, and the relevant law. By separate order, the Court has excluded portions of the Affidavit of Craig S. Telle, JD, CFE, attached to Defendants' response to the Pueblos' Summary Judgment Motions. (Doc. 99-12.)

object, or upon payment of any consideration in any manner." (Doc. 67-3 at 3-4; Doc. 68 at 12-13; Doc. 99 at 7.)

Subsection 4(C) of the 2007 Compacts provided in pertinent part:

Audit and Financial Statements. The Tribal Gaming Agency shall require all books and records relating to Class III Gaming to be maintained in accordance with generally accepted accounting principles. . . . Not less than annually, the Tribal Gaming Agency shall require an audit and a certified financial statement covering all financial activities of the Gaming Enterprise, including written verification of the accuracy of the quarterly Net Win calculation, by an independent certified public accountant licensed by the State. The financial statement shall be prepared in accordance with generally accepted accounting principles and shall specify the total amount wagered in Class III Gaming on all Gaming Machines at the Tribe's Gaming Facility for purposes of calculating "Net Win" under Section 11 of this Compact using the format specified therein.

(Doc. 1-2 at 10; Doc. 68-2 at 10; Doc. 67-3 at 9; Doc. 99 at 6-7.)[6]

Section 7 of the 2007 Compacts pertaining to "Dispute Resolution" provided in relevant part:

A. In the event either party believes that the other party has failed to comply with or has otherwise breached any provision of this Compact, such party may invoke the following procedure:

1. The party asserting noncompliance shall serve written notice on the other party. The notice shall identify the specific Compact provision believed to have been violated and shall specify the factual and legal basis for the allegation of noncompliance[.]

2. In the event an allegation by the complaining party is not resolved to the satisfaction of such party within twenty (20) days after service of the notice set forth in Paragraph A(1) of this section, the complaining party may serve upon the other party a notice to cease conduct of the particular game(s) or activities alleged by the complaining party to be in noncompliance. Upon receipt of such notice, the responding party may elect to stop the game(s) or

---

[6] Attached to numerous pleadings on the docket in this case are true and correct copies of the generic form of the 2007 Compacts, (Doc. 1-2; Doc. 67-2 at 1 ¶ 2; Doc. 67-3; Doc. 68-2), and the 2015 Compacts. (Doc. 1-3; Doc. 68-3; Doc. 68-1 at 2 ¶ 3.) Defendants do not dispute the authenticity and veracity of these documents. (Doc. 99 at 6-7.) To avoid confusion, the Court will hereafter cite only to the 2007 Compact attached as Exhibit A (Doc. 67-3) to the Declaration of Richard Hughes (Doc. 67-2) in support of the Motion for Summary Judgment of the Pueblos of Santa Ana, Santa Clara, San Felipe, and Tesuque. (Doc. 67.) The Court will likewise cite only to the 2015 Compact attached as Exhibit 2 (Doc. 68-3) to the Declaration of David C. Mielke (Doc. 68-1) in support of the Motion for Summary Judgment of the Pueblos of Isleta and Sandia. (Doc. 68.)

activities specified in the notice or invoke arbitration and continue the game(s) or activities pending the results of arbitration. The responding party shall act upon one of the foregoing options within ten (10) days of receipt of notice from the complaining party, unless the parties agree to a longer period, but if the responding party takes neither action within such period the complaining party may invoke arbitration by written notice to the responding party within ten (10) days of the end of such period.

      3. The arbitrators shall be attorneys who are licensed members in good standing of the State Bar of New Mexico or of the bar of another state. . . . The arbitrators . . . shall permit the parties to engage in reasonable discovery, and shall establish other procedures to ensure a full, fair and expeditious hearing on the matters at issue. . . . The arbitrators shall make determinations as to each issue presented by the parties, but the arbitrators shall have no authority to determine any question as to the validity or effectiveness of this Compact or of any provision hereof.

      4. All parties shall bear their own costs of arbitration and attorneys' fees.

      5. The results of arbitration shall be final and binding, and shall be enforceable by an action for injunctive or mandatory injunctive relief against the State and the Tribe in any court of competent jurisdiction. For purposes of any such action, the State and the Tribe acknowledge that any action or failure to act on the part of any agent or employee of the State or the Tribe, contrary to a decision of the arbitrators in an arbitration proceeding conducted under the provisions of this section, occurring after such decision, shall be wholly unauthorized and ultra vires acts, not protected by the sovereign immunity of the State or the Tribe.

B. Nothing in Subsection 7(A) shall be construed to waive, limit or restrict any remedy that is otherwise available to either party to enforce or resolve disputes concerning the provisions of this Compact. Nothing in this Section shall be deemed a waiver of the Tribe's sovereign immunity. Nothing in this Section shall be deemed a waiver of the State's sovereign immunity.

(Doc. 67-3 at 15-16.)

Section 11 of the 2007 Compacts, entitled "Revenue Sharing," provided in pertinent part:

      A. Consideration. The Tribe shall pay to the State a portion of its Class III Gaming revenues identified in and under procedures of this Section, in return for which the State agrees that the Tribe has the exclusive right within the State to conduct all types of Class III Gaming described in this Compact, with the sole exception of the use of Gaming Machines, which the State may permit on a limited basis for racetracks and for veterans' and fraternal organizations . . . .

B. Revenue to State. The parties agree that . . . the Tribe shall make the quarterly payments provided for in Paragraph C of this Section. Each payment shall be made to the State Treasurer for deposit into the General Fund of the State.

C. Calculation of Payment Amounts.

1. As used in this Compact, "Net Win" means the total amount wagered in Class III Gaming at a Gaming Facility, on all Gaming Machines less:

(a) the amount paid out in prizes to winning patrons, including the cost to the Tribe of noncash prizes, won on Gaming Machines. The phrase "won on Gaming Machines" means the patron has made a monetary wager, and as a result of that wager, has won a prize of any value. Any rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated) or as a result of patron-related activities, are not deductible. The value of any complimentaries given to patrons, in any form, are not deductible;

(b) the amount paid to the State by the Tribe under the provisions of Section 4(E)(6) of this Compact [representing the State's regulatory costs related to the Tribe's gaming activities]; and

(c) the sum of two hundred seventy-five thousand dollars ($275,000) per year as an amount representing tribal regulatory costs, which amount shall increase by three percent (3%) each year beginning on the first day of January occurring after the Compact has been in effect for at least twelve months.

2. The Tribe shall pay the State a percentage of its Net Win [ranging from 3 per cent to 10.75 per cent depending on the date and the amount of the Tribe's Annual Net Win] . . . .

3. . . . . Any payment or any portion thereof that is not made within ten (10) days of the due date shall accrue interest at the rate of ten percent (10%) per annum, from the original due date until paid. . . .

D. Limitations.

1. The Tribe's obligation to make the payments provided for in Paragraphs B and C of this Section shall apply and continue only so long as this Compact remains in effect; and provided that that obligation shall terminate altogether in the event the State:

a) passes, amends, or repeals any law, or takes any other action, that would directly or indirectly attempt to restrict, or has the effect of restricting, the scope or extent of Indian gaming; . . .

d) licenses, permits or otherwise allows any non-Indian person or entity to engage in any other form of Class III gaming other than a state-sponsored lottery, pari-mutuel betting on horse racing and bicycle racing, operation of Gaming Machines, and limited fundraising by non-profit organizations, as set forth in subsection (D)(2) . . . .

(Doc. 67-3 at 20-22.)

Section 11 of the 2007 Compacts differed from Section 11 of the previous gaming compacts between the State and the Pueblos ("2001 Compacts"). (Doc. 99 at 9-10; Doc. 110 at 19-21; *see* Doc. 99-8.) Subsection 11(C) of the 2001 Compacts provided:

C. Calculation of Payment Amounts.

1. As used in this Compact, "Net Win" means the total amount wagered in Class III Gaming at a Gaming Facility, on all Gaming Machines less:

(a) the amount paid out in prizes, including the cost to the Tribe of noncash prizes, won on Gaming Machines;

(b) the amount paid to the State by the Tribe under the provisions of Section 4(E)(5) of this Compact; and

(c) the sum of two hundred seventy-five thousand dollars ($275,000) per year as an amount representing tribal regulatory costs, which amount shall increase by three percent (3%) each year beginning on the first day of January occurring after the Compact has been in effect for at least twelve months.

(Doc. 99-8 at 20-21.) The State and the Pueblos negotiated the changes from the 2001 Compacts to the 2007 Compacts, including the changes to Subsection 11(C). (Doc. 99 at 10-11; Doc. 99-7;

Doc. 110 at 20-21.) The United States Secretary of the Interior ("the Secretary") approved the 2007 Compacts on July 5, 2007. (Doc. 55 at 3; Doc. 67-1 at 6; Doc. 68 at 12; Doc. 99 at 6-7); 72 Fed. Reg. 36,717-01, 2007 WL 1922332 (Jul. 5, 2007).

In 2015 and 2016, the State and each of the Pueblos entered into the 2015 Compacts. Like the 2007 Compacts, all of the terms of the 2015 Compacts are identical to each other except for the Pueblos' names. (Doc. 55 at 4; Doc. 67-1 at 8; Doc. 68 at 15; Doc. 99 6-7.) Subsection 9(A) of the 2015 Compacts provides that the 2015 Compacts "fully supplant[] and replac[e]" the 2007 Compacts, except that under Subsection 9(B), the terms of the 2007 Compacts

> (including, without limitation, any limited waiver of sovereign immunity and jurisdictional waivers and consents set forth therein) shall survive to permit the resolution of payment disputes. Such disputes shall be resolved through the procedures set forth in Section 7 of this Compact. Failure to abide by the procedures set forth in Section 7 or failure to comply with an arbitrator's final decision with respect to the parties' obligations under a Predecessor Agreement constitutes a breach of this Compact. This survival provision is intended to provide for the reasonable resolution of past disputes without hindering a Tribe's ability to obtain a new compact.

(Doc. 68-3 at 26.)

Section 7 of the 2015 Compacts regarding "Dispute Resolution" provides in pertinent part:

> A. In the event either party believes that the other party has failed to comply with or has otherwise breached any provision of this Compact, such party may invoke the following procedure within two (2) years from the date any alleged violation of this Compact is discovered or reasonably should have been discovered; or, if the State believes that, prior to the Effective Date of this Compact, the Tribe has failed to comply with or has otherwise breached any provision of a Predecessor Agreement affecting payment, the State may invoke the following procedure within two (2) years of the Effective Date of this Compact, as permitted in Section 9(B) of this Compact:

>> 1. The party asserting noncompliance shall serve written notice on the other party. The notice shall identify the specific Compact provision believed to have been violated and shall specify the factual and legal basis for the allegation of noncompliance. The notice shall specifically identify the date, time and nature of the alleged noncompliance.

2. In the event an allegation by the complaining party is not resolved to the satisfaction of such party within twenty (20) days after service of the notice set forth in Paragraph A(1) of this Section, the complaining party may serve upon the other party a notice to cease conduct of the particular game(s) or activities alleged by the complaining party to be in noncompliance. Upon receipt of such notice, the responding party may elect to stop the game(s) or activities specified in the notice or invoke arbitration and continue the game(s) or activities pending the results of arbitration. The responding party shall act upon one of the foregoing options within ten (10) days of receipt of notice from the complaining party, unless the State and the Tribe (hereinafter the "parties") agree to a longer period, but if the responding party takes neither action within such period the complaining party may invoke arbitration by written notice to the responding party within ten (10) days of the end of such period.

3. Unless the parties agree in writing to the appointment of a single arbitrator, or as otherwise provided below, the arbitration shall be conducted before a panel of three (3) arbitrators. . . . The arbitrators shall make determinations as to each issue presented by the parties, but the arbitrators shall have no authority to determine any question as to the validity or effectiveness of this Compact or of any provision hereof. . . .

4. The results of arbitration shall be final and binding, and shall be enforceable by an action for injunctive or mandatory injunctive relief against the State and the Tribe in any court of competent jurisdiction. For purposes of any such action, the State and the Tribe acknowledge that any action or failure to act on the part of any agent or employee of the State or the Tribe, contrary to a decision of the arbitrators in an arbitration proceeding conducted under the provisions of this Section, occurring after such decision, shall be wholly unauthorized and ultra vires acts, not protected by the sovereign immunity of the State or the Tribe.

B. Nothing in Subsection 7(A) shall be construed to waive, limit or restrict any remedy that is otherwise available to either party to enforce or resolve disputes concerning the provisions of this Compact. Nothing in this Section shall be deemed a waiver of the Tribe's sovereign immunity. Nothing in this Section shall be deemed a waiver of the State's sovereign immunity.

(Doc. 68-3 at 22-24.)

In addition, the Appendix to the 2015 Compacts provides that

Free Play and Point Play do not increase Net Win, and amounts paid as a result of Free Play or Point Play reduce Net Win for purposes of the revenue sharing calculation in Section 11(C). However, any form of credits with any cash redemption value increase Net Win when wagered on Gaming Machines and

amounts paid as a result of such wagers reduce Net Win for purposes of calculating revenue sharing.

(Doc. 68-3 at 37.)

"Free Play" means play on a Class III Gaming Machine initiated by points or credits provided to patrons without monetary consideration, and which have no cash redemption value. . . .

"Point Play" means play on a Class III Gaming Machine initiated by points earned or accrued by a player through previous Gaming Machine play, players' clubs, or any other method, and which have no cash redemption value.

(Doc. 68-3 at 6-7.)

The Secretary neither approved nor disapproved the 2015 Compacts within 45 days of their submission. (Doc. 55 at 4; Doc. 58 at 8; Doc. 67-1 at 8; Doc. 68 at 16-17; Doc. 99 at 6-7; *see, e.g.,* Doc. 1-7 at 2.) As such, the 2015 Compacts are "considered to have been approved by the Secretary, but only to the extent the [Compacts are] consistent with the provisions of [IGRA]."[7] 25 U.S.C. § 2710(d)(8)(C). The United States Department of the Interior ("DOI") sent letters to the Pueblos and the State explaining the Secretary's decision to neither approve nor disapprove the 2015 Compacts contemporaneously with the decision. (Doc. 1-4 at 5-6; Doc. 1-5 at 5-6; Doc. 1-6 at 4-5; Doc. 36-1 at 3-4; Doc. 58 at 8; Doc. 67-1 at 8; Doc. 67-4 at 3; Doc. 68 at 16; Doc. 99 at 6-7.) In one such letter, the DOI took the following position:

[w]e wish to commend the Tribe and the State for the successful resolution of the free play and point play issue. Free play and point play will now be treated according to industry standards and Generally Accepted Accounting Principles (GAAP) by excluding both from the definition of "net win," which forms the basis for revenue sharing calculations. We note, however, that Section 7 of the 2015 Compact reserves a two-year period from its effective date for the State to pursue

---

[7] The 2015 Compacts between the Pueblos and the State are considered to have been approved by the Secretary on the following dates: (a) Pueblo of Isleta, July 28, 2015, 80 Fed. Reg. 44,992-01, 2015 WL 4512708 (Jul. 28, 2015); (b) Pueblo of Tesuque, October 23, 2015, 80 Fed. Reg. 64,443-01, 2015 WL 6384819 (Oct. 23, 2015); (c) Pueblo of Santa Clara; October 23, 2015, 80 Fed. Reg. 64,443-02, 2015 WL 6384821 (Oct. 23, 2015); (d) Pueblo of Sandia, April 4, 2016, 81 Fed. Reg. 19,235-01, 2016 WL 1274294 (Apr. 4, 2016); (e) Pueblo of San Felipe, April 4, 2016, 81 FR 19,236-02, 2016 WL 1274296 (Apr. 4, 2016); and, (f) Pueblo of Santa Ana, December 30, 2016, 81 FR 96,477-01, 2016 WL 7481406 (Dec. 30, 2016).

its assertion that the Tribe's net win – and thus their revenue sharing payments – should include wins and losses arising from free play or point play. In light of its conflict with industry standards and GAAP, it is our view that such an assertion by the State to include such sums in revenue sharing calculations would constitute an impermissible tax on tribal gaming revenues in violation of IGRA.[8]

---

[8] The record includes the DOI's letters to five of the six Pueblos, in which the agency expressed its position in five slightly different ways. In his October 16, 2015 letter to the Governor of the Pueblo of Santa Clara, Assistant Secretary Kevin Washburn used the language quoted above. (Doc. 67-4 at 3.) In his July 21, 2015 letter to the Governor of the Pueblo of Isleta, Assistant Secretary Washburn stated:

> [w]e wish to commend the Tribe and the State for the successful resolution of the free play and point play issue. Free play and point play will now be treated according to industry standards and Generally Accepted Accounting Principles (GAAP) by excluding both from the definition of "net win," which forms the basis for revenue sharing calculations. We note, however, that Section 7 of the 2015 Compact reserves a two-year period from its effective date for the State to pursue its assertion that the Tribe's net win – and thus their revenue sharing payments – should include wins and losses arising from free play or point play. In light of its conflict with industry standards and GAAP, it is our view that the State's unilateral determination to include such sums in revenue sharing calculations would constitute an impermissible tax on tribal gaming revenues in violation of IGRA.

(Doc. 1-4 at 5.) In his October 16, 2015 letter to the Governor of the Pueblo of Tesuque, Assistant Secretary Washburn stated:

> [w]e are troubled by the assertion in the Tribe's response indicating that the State seeks additional revenue sharing payments stemming from free play under the 2007 Gaming Compact. Section 7 of the 2015 Compact provides a two-year period from its effective date for the State to pursue it assertion that the Tribe's net win should not deduct wins and losses arising from free play or point play. Our position remains the same. Free play and point play must be treated according to industry standards and Generally Accepted Accounting Principles (GAAP) by excluding both from the definition of "net win," which forms the basis for revenue sharing calculations. We are in agreement with the Tribe that its net win – and thus its revenue sharing payments – should include wins and losses arising from free play or point play and should result in a reduction in revenue sharing payments. In light of its conflict with industry standards and GAAP, it is our view that a contrary assertion by the State that includes such sums in revenue sharing calculations would constitute an impermissible tax on tribal gaming revenues in violation of IGRA.

(Doc. 1-6 at 4.) In his March 29, 2016 letter to the Governor of the Pueblo of Sandia, Assistant Secretary Roberts stated:

> Section 7 of the 2015 Compact provides a two-year period from its effective date for the State to pursue its assertion that the Tribe's net win should not deduct wins and losses arising from free play or point play. Our position remains the same. Free play and point play must be treated according to industry standards and Generally Accepted Accounting Principles (GAAP) by excluding both from the definition of "net win," which forms the basis for revenue sharing calculations.

(Doc. 1-5 at 5.) Finally, in his March 29, 2016 letter to the Governor of the Pueblo of San Felipe, Assistant Secretary Roberts stated:

> [w]e are troubled by the assertion in the Tribe's response indicating that the State seeks additional revenue sharing payments stemming from free play under the 2007 Gaming Compact. Section 7 of the 2015 Compact provides a two-year period from its effective date for the State to pursue it assertion that the Tribe's net win should not deduct wins and losses arising from free play or point play. Our position remains the same. Free play and point play must be treated according to industry

(Doc. 1-4 at 5; Doc. 1-5 at 5; Doc. 1-6 at 4; Doc. 36-1 at 3; Doc. 67-4 at 3.) In October 2017, the DOI reaffirmed its position regarding the State's claims for additional revenue sharing payments in reviewing the 2015 Compact between the State and the Pueblo of Pojoaque.[9] (Doc. 67-1 at 9; Doc. 67-5 at 2; Doc. 68 at 16; Doc. 99 at 6-7.)

On April 13, 2017, in her capacity as the Acting State Gaming Representative, Defendant Becker sent letters to each of the Pueblos with the subject line "Notice of Noncompliance." (Doc. 55 at 4-5; Doc. 58 at 7; Doc. 67-1 at 9; Doc. 68 at 17; Doc. 99 at 6-7; *see, e.g.*, Docs. 67-6, 68-22, and 68-23.) In these letters, Defendant Becker asserted that, beginning as early as April 2011, the Pueblos had underreported their Net Win and underpaid the State pursuant to the revenue sharing provisions of the 2007 Compacts, and that "prizes awarded as a result of the use of 'free play' are not deductible unless the face value of the 'free play' is included in the calculation of the total amount wagered." (Doc. 55 at 4-5; Doc. 67-1 at 9; Doc. 99 at 6-7; *see, e.g.*, Doc. 67-6 at 1.) On this basis, Defendant Becker instructed the Pueblos to make additional revenue sharing payments to the

---

standards and Generally Accepted Accounting Principles (GAAP) by excluding both from the definition of "net win," which forms the basis for revenue sharing calculations. In light of its conflict with industry standards and GAAP, it is our view that the State's unilateral determination to include such sums in revenue sharing calculations would constitute an impermissible tax on tribal gaming revenues in violation of IGRA.

(Doc. 36-1 at 3.)

[9] In his October 23, 2017 letter to the Governor of the Pueblo of Pojoaque, Deputy Assistant Secretary Clarkson repeated the language in Assistant Secretary Roberts' letter to the Governor of the Pueblo of Sandia quoted in footnote 8, *supra*, and added:

[b]eyond being contrary to longstanding industry standards and GAAP, our view is that the State's position constitutes an attempt to impose a "tax, fee, charge or other assessment" in violation of IGRA because the customer is using a form of "house money" derived from the net win on which the tribes have already made revenue sharing payments to the State. *See* 25 U.S.C. § 2710(d)(4).

(*Compare* Doc. 1-5 at 5 *with* Doc. 67-5 at 2 & n. 6.)

State in specified amounts.[10]  (Doc. 55 at 4-5; Doc. 67-1 at 9; Doc. 99 at 6-7; *see, e.g.*, Doc. 67-6 at 1-2.)  On May 19, 2017, the Pueblos sent responsive letters to Defendant Becker in which they objected to the State's requests for additional revenue sharing payments and asserted that the requests violated federal law and the terms of the 2007 Compacts.  (Doc. 67-1 at 9; Doc. 67-7; Doc. 68 at 17; Doc. 68-18; Doc. 68-19; Doc. 99 at 6-7.)

On May 31, 2017, Defendant Becker sent letters to each of the Pueblos with the subject line "Notice to Cease Conduct."  (Doc. 55 at 5; Doc. 58 at 7; Doc. 67-1 at 9; Doc. 68 at 17-18; Doc. 99 at 6-7; *see, e.g.,* Docs. 67-8, 68-24, and 68-25.)  These letters instructed the Pueblos to either "pay all sums due or . . . invoke arbitration."  (Doc. 55 at 5; Doc. 58 at 7; Doc. 67-1 at 9; Doc. 68 at 17-18; Doc. 99 at 6-7; *see, e.g.,* Doc. 67-8 at 2.)  However, the Pueblos neither made the additional revenue sharing payments requested in Defendant Becker's letters nor invoked arbitration.  (Doc. 55 at 5; Doc. 58 at 7.)  Rather, on June 19, 2017, Plaintiffs filed this civil action; and, on June 29, 2017, Plaintiffs-in-Intervention the Pueblos of Santa Ana and Santa Clara intervened.  (Docs. 1, 11.)

On June 30, 2017, Defendant Becker sent letters to each of the Pueblos with the subject line "Notice to Invoke Arbitration," in which she invoked arbitration pursuant to Section 7 of the 2015 Compacts on the State's behalf.  (Doc. 58 at 8; Doc. 58-3 at 1; Doc. 62 at 5.)  Plaintiff-in-Intervention the Pueblo of San Felipe then intervened in this action on August 31, 2017.  (Doc. 36.)

The Pueblos authorize patrons to play on Class III gaming machines using electronic free play credits.  (Doc. 11 at 5; Doc. 36 at 4-5; Doc. 68 at 13; Doc. 82-1 at 4 Doc. 99 at 10; Doc. 110 at 20.)  There is no difference in the payouts, prizes, or jackpots awarded to patrons for each instance

---

[10] For example, Defendant Becker instructed the Pueblo of Isleta to pay an additional $10,360,149, the Pueblo of Sandia an additional $26,491,350, and the Pueblo of Tesuque an additional $3,252,873.  (Doc. 1-8 at 3; Doc. 1-9 at 3; Doc. 1-10 at 3.)

of electronic free play versus cash play of the same face value. (Doc. 99 at 11; Doc. 110 at 21.) The Pueblos do not separately account for patrons' winnings from cash wagers and their winnings from electronic free play wagers. (Doc. 99 at 11; Doc. 110 at 21.) However, the Pueblos' slot accounting systems meter each instance of electronic free play and the face value of such free play, along with each instance of cash play, and this data is generated in daily reports. (Doc. 99 at 11; Doc. 110 at 21.)

For federally recognized Indian tribes, the Governmental Accounting Standards Board ("GASB") determines authoritative sources of generally accepted accounting principles ("GAAP"). (Doc. 67-10 at 5-6.) According to GASB statements, the American Institute of Certified Public Accountants' ("AICPA") 2011 Audit and Accounting Guide—Gaming ("Gaming Guide") was the authoritative source of GAAP for the Pueblos' gaming operations at the relevant times.[11] (*Id.* at 7-8; *see also* Doc. 99-12 at 3-4.)

The Gaming Guide provides that "monetary credits may be played [on slot machines] using bills, coins, tickets, electronic wagering credits recorded on cards, or by other means." (Doc. 67-11 at 3 & n.3.)[12] The Gaming Guide defines "free play" as "[f]ree wagering offered by a gaming entity to provide cashable benefits that increase the customer's odds of winning, changing the basic odds of the game." (Doc. 67-10 at 8; Doc. 68-4 at 11.) "In these circumstances the gaming entity is providing a chance for the customer to win a slot machine outcome for no cost (i.e. 'free')."

---

[11] In identifying and defining the applicable GAAP, the Court has considered the Declaration and Expert Report of the Pueblos' expert witness, Andrew Mintzer, C.P.A., in light of his professional education, training, and experience and the fact that Defendants have presented no evidence creating a genuine issue of material fact regarding his opinions or expertise. (*See* Doc. 67-10.) The Court has also considered the Affidavit of Craig S. Telle, JD, CFE (Doc. 99-12), to the extent it tends to identify and define the applicable GAAP, but not his opinions regarding ultimate legal issues, as explained in the Court's Order Granting in Part and Denying in Part Motion to Exclude Telle Affidavit filed contemporaneously with this Memorandum Opinion and Order. In addition, the Court has considered the portions of the Gaming Guide in the record.

[12] This provision is from the 2014 Gaming Guide; the record does not include a comparable provision from the 2011 Gaming Guide. (Doc. 67-11 at 1, 3.)

(Doc. 67-10 at 11.)  The Gaming Guide defines a gaming entity's "net win" as "the difference between [the entity's] gaming wins and losses before deducting costs and expenses.  Also called gross gaming revenue."  (Doc. 68-4 at 12; Doc. 99-12 at 16.)  Similarly, according to the Gaming Guide, "gross gaming revenue" is "the difference between gaming wins and losses from banked games before deducting incentives or adjusting for changes in progressive jackpot liability accruals."[13]  (Doc. 67-10 at 10; Doc. 99-12 at 9.)

Under GAAP, the face value of free play is not included in net win.  (Doc. 67-10 at 9-13.) The Gaming Guide states that

> the use of free play will not trigger accounting recognition because revenue is measured based on an aggregate daily (or shift) basis, rather than on a per bet or per customer basis.  Because revenue is the net win from gaming activities, the use of the benefit has no effect on the reporting of net win or loss from gaming activities.  For example, if a customer bets $5 of his or her own cash and wins $1, the gaming entity reports revenue of $4.  If a customer bets $5 of his or her own cash, uses $5 of credits from his or her club card, and wins $1, the gaming entity reports revenue of $4.  In each transaction, the net win is $4.

(Doc. 67-10 at 8; Doc. 68 at 12; Doc. 99 at 7.)  GAAP "permit *no recognition* in revenue for free play . . . so that the gaming entities [do] not *overstate* gross gaming revenue."  (Doc. 67-10 at 11 (emphases in original).)

In addition, under GAAP, the value of prizes won by patrons as a result of free play wagers must be deducted from net win.

> GAAP requires that the gross gaming revenue or net win is calculated using the cash value of what remains 'in' the machine – such as cash, coins, electronic money transfers, tickets with cash redemption values.  Thus in complying with GAAP all cash/cash equivalent payouts must be considered without regard as to whether the value was paid as the result of a paid bet or a free play bet.

---

[13] Somewhat confusingly, "net win" is also called "gross gaming revenue," while "net gaming revenue" refers to "gross gaming revenues less cash sales incentives and the change in progressive jackpot liabilities and revenue from gaming related activities."  (Doc. 99-12 at 15.)  The proper calculation of net gaming revenue under GAAP is not at issue in this case.

(*Id.* at 12.)  In contrast, the cost of "complimentaries" such as free food, drinks, and hotel rooms,[14] and the cost of loyalty program points redeemed for cash or merchandise are not deducted from net win under GAAP.  (*Id.* at 13-14.)

The Gaming Guide's treatment of free play and prizes won by patrons as a result of free play wagers is consistent with "economic reality and the representational faithfulness required by GAAP." (*Id.* at 9-10, 16.)  In general, "revenue" consists of "the economic resources provided by customers to the entity for the products or services the entity provides to the customers." (*Id.* at 9.) "Revenues represent actual or expected cash in-flows (or the equivalent) that have occurred." (*Id.* at 11.)  Thus, "providing a product or service to a customer for no . . . consideration provided by the customer does not create revenue." (*Id.* at 12.)  In the context of the gaming industry, a gaming entity's "revenue is the net win or loss from gaming activities"; and, free play is not included in a gaming entity's revenue because it does not represent actual or expected cash in-flow or its equivalent.  (*Id.* at 8, 12.)

## III.  ANALYSIS

### A.  Defendants' Summary Judgment Motion

The Court will first consider Defendants' Summary Judgment Motion, because it raises the threshold issue of whether the parties' dispute must be submitted to arbitration.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); Fed. R. Civ. P. 56(a).  "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving

---

[14] The Court understands the term "complimentaries" to refer to goods or services that a casino gives to a patron for no consideration, and not as a prize won by a patron as a result of a successful wager.  (*See* Doc. 68-4 at 6.)

party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and his entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If the movant carries this initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671 (internal quotation marks omitted). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to her. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In their motion, Defendants argue that the Court should grant them summary judgment "on the arbitrability issue," *i.e.*, on the Pueblos' claims for: (1) an injunction barring Defendants from taking any further steps to arbitrate or otherwise enforce their claims for additional revenue sharing payments; and, (2) a judgment declaring that neither the Pueblos' claims in this lawsuit nor Defendants' claims for additional revenue sharing payments are subject to arbitration. (Doc. 55 at 2, 10.) Defendants further ask the Court to dismiss the Pueblos' claims for a judgment declaring that: (1) Defendants' claims for additional revenue sharing payments violate federal law; (2) the 2015 Compact provisions preserving Defendants' claims are therefore invalid and ineffective, as are the 2007 Compacts' revenue sharing provisions if they mean what Defendants say they mean; and, (3) Defendants have no authority as a matter of federal law to pursue their claims for additional revenue sharing payments against the

Pueblos.[15]  (*Id.*)  In support of their motion, Defendants argue that the parties' dispute regarding the Pueblos' revenue sharing obligations under the 2007 Compacts is arbitrable because it is a payment dispute, and the 2015 Compacts provide that payment disputes under the 2007 Compacts are to be resolved by arbitration.  (*Id.* at 5-6.)  According to Defendants, "[t]he parties have explicitly agreed to resolve this payment dispute through arbitration, and the dispute therefore is arbitrable based on the plain language of the contract and the [federal] policy favoring arbitration."  (*Id.* at 7.)

The Pueblos respond that, under the 2015 Compacts, arbitration is not an exclusive remedy for resolving disputes under the Compacts.  (Doc. 58 at 9-13.)  In addition, the Pueblos assert that the 2007 and 2015 Compacts exclude from arbitration "any question as to the validity or effectiveness" of the Compacts or any of their provisions, whereas in this civil action they claim that certain Compact provisions on which Defendants rely are invalid and ineffective under IGRA and other federal law.  (*Id.* at 17-20.)  According to the Pueblos, they would be unfairly prejudiced if forced to submit to arbitration, because they could not defend against the State's claims for additional revenue sharing payments by challenging the validity and effectiveness of these Compact provisions.[16]  (*Id.*)

The law is well settled that disputes about arbitrability are for the courts to decide, unless there is clear and unmistakable evidence that the parties intended to submit such disputes to arbitration.  *BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25, 34 (2014); *AT & T Techs., Inc. v. Commc'ns Workers,* 475 U.S. 643, 649 (1986); *Commc'n Workers of Am. v. Avaya, Inc.*, 693 F.3d

---

[15] Defendants claim that if the Court grants them summary judgment on "the arbitrability issue," its ruling will necessarily resolve the issues raised by the Pueblos' remaining claims as well.  (Doc. 62 at 8-9.)

[16] The Pueblos also argue that Defendants did not timely invoke arbitration.  (Doc. 58 at 18-20.)  However, if the parties' dispute were otherwise arbitrable, this would be a question for the arbitrators to decide.  *BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25, 34–35 (2014); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–85 (2002).

1295, 1303 (10th Cir. 2012); *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779–80 (10th Cir. 1998). Disputes about arbitrability "include questions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *BG Grp., PLC*, 572 U.S. at 34. Here, there is no evidence that the parties intended to submit disputes about arbitrability to arbitration. In fact, the parties appear to agree that their arbitrability disputes are for the Court to decide. The Court will therefore address the arbitrability issues raised in Defendants' Summary Judgment Motion.

1.   The Pueblos' claims in this lawsuit fall outside the 2015 Compacts' arbitration clause and the Court must decide these claims in the first instance.

The Court must first consider the parties' competing arguments regarding whether the 2015 Compacts' arbitration clause applies to their claims. A tribal-state gaming compact under IGRA is "a form of contract" that must be interpreted according to federal common law. *Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1238-39 (10th Cir. 2018). "IGRA neither encourages nor discourages the inclusion of arbitration provisions in gaming compacts, leaving the matter entirely to the parties entering into such a compact." *Id.* at 1237. "Arbitration is a matter of contract," *id.*, "and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration[.]" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (emphasis in original) (quotation marks omitted); *see Commc'n Workers of Am.*, 693 F.3d at 1300 ("Because arbitration is a creature of contract, a party cannot be forced to arbitrate any issue he has not agreed to submit to arbitration."). Thus, where the parties to an agreement have specifically excepted certain types of claims from arbitration, "it is the duty of courts to enforce not only the full breadth of the arbitration clause, but its limitations as well." *State of N.Y. v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 62 (2d Cir. 1996).

Under Tenth Circuit law,

> [t]o determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should undertake a three-part inquiry. First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005) (emphasis, citations, and quotation marks omitted); *Burlington N. & Santa Fe Ry. Co. v. Pub. Serv. Co. of Okla.*, 636 F.3d 562, 569 (10th Cir. 2010). Nevertheless,

> even narrow arbitration clauses must be interpreted under the liberal federal policy favoring arbitration agreements. We resolve doubts concerning the scope of arbitrable issues in favor of arbitration. When considering narrow arbitration clauses, this liberal policy does not create a presumption of arbitrability because the policy favoring arbitration does not have the strong effect that it would have if we were construing a broad arbitration clause.

*Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1197 (10th Cir. 2009) (citations and ellipses omitted).

"[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT & T Techs., Inc.*, 475 U.S. at 649; *Local 5-857 Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Conoco, Inc.*, 320 F.3d 1123, 1126 (10th Cir. 2003); *but see Int'l Bhd. of Elec. Workers, Local #111 v. Pub. Serv. Co. of Colo.*, 773 F.3d 1100, 1110 (10th Cir. 2014) (holding that "incidental contact with the merits" was not error where trial court "devoted its entire discussion to answering the arbitrability question").

Defendants argue that the parties' dispute must be submitted to arbitration based on Section 9 of the 2015 Compacts, which provides that "payment disputes" under the 2007 Compacts "shall

be resolved through the procedures set forth in Section 7 of this Compact." (Doc. 68-3 at 26; Doc. 55 at 4; Doc. 68 at 15; Doc. 99 at 6-7.) Subsection 7(A) of the 2015 Compacts provides: "if the State believes that, prior to the Effective Date of this Compact, the Tribe has failed to comply with or has otherwise breached any provision of a Predecessor Agreement affecting payment, the State may invoke" arbitration. (Doc. 68-3 at 22.) To invoke arbitration, the party alleging noncompliance "shall" issue a notice of noncompliance and "may" issue a notice to cease conduct, after which it "may" invoke binding arbitration, all within specified time frames. (*Id.* at 22-23.) Subsection 7(A) further specifies that, in the event of arbitration, the arbitrators "shall make determinations as to each issue presented by the parties, but the arbitrators shall have no authority to determine any question as to the validity or effectiveness of this Compact or of any provision hereof." (*Id.* at 23.) Subsection 7(B), in turn, provides that "[n]othing in Subsection 7(A) shall be construed to waive, limit or restrict any remedy that is otherwise available to either party to enforce or resolve disputes concerning the provisions of this Compact," and that "[n]othing in this Section shall be deemed a waiver of the Tribe's [or the State's] sovereign immunity." (*Id.* at 23, 24.)

The Court finds that the relevant provisions of the 2015 Compacts constitute a narrow arbitration clause, because they limit arbitrable disputes under the 2007 Compacts to "payment disputes" premised on a breach of compact theory and exclude from arbitration "any question as to the validity or effectiveness" of the 2015 Compact provisions. (*Id.* at 22-24, 26.) Thus, though the Court must resolve doubts concerning the arbitration clause's scope in favor of arbitration, it may not find that a party's claim is arbitrable unless on its face the claim falls within the clause's purview. *Cummings*, 404 F.3d at 1261.

Clearly, Defendants allege that the Pueblos have "failed to comply with or otherwise breached" provisions of the 2007 Compacts "affecting payment," *i.e.*, the 2007 Compacts' revenue

sharing provisions, and the Pueblos disagree. Thus, on its face, the parties' dispute is a payment dispute premised on a breach of compact theory within the meaning of the 2015 Compacts' arbitration clause.

However, this is not the end of the inquiry in light of the additional language in the arbitration clause limiting its scope. As explained below, this language removes the Pueblos' claims under both the 2015 and 2007 Compacts from the arbitration clause's purview. First, regarding the 2015 Compacts, the Pueblos claim that the 2015 Compact provisions preserving Defendants' claims for additional revenue sharing payments are invalid and ineffective because Defendants' claims violate IGRA and other federal law. As such, though they do relate to the parties' payment dispute, these claims fall squarely within the 2015 Compacts' exclusion from arbitration, in Subsection 7(A), of questions regarding the validity or effectiveness of the 2015 Compacts or any of their provisions. (*See* Doc. 68-3 at 23 ("[T]he arbitrators shall have no authority to determine any question as the validity or effectiveness of this Compact or any provision hereof…..").) The Court therefore finds that, on their face and as a matter of law, the Pueblos' claims challenging the validity and effectiveness of the 2015 Compact provisions preserving Defendants' claims fall outside the purview of the 2015 Compacts' arbitration clause.

Second, regarding the 2007 Compacts, the Pueblos claim that the 2007 Compacts' revenue sharing provisions are also invalid and ineffective under IGRA and other federal law if they mean what Defendants say they mean. The Pueblos' claims regarding the validity and effectiveness of the 2007 Compacts' revenue sharing provisions also relate to the parties' payment dispute; and, the 2015 Compacts' exclusion from arbitration of questions regarding the validity or effectiveness of *the 2015 Compacts* does not apply to these claims. (*Id.*) Nevertheless, for the following reasons,

the Court finds that these claims fall outside the purview of the 2015 Compacts' arbitration clause as well.

As previously noted, Subsection 9(A) of the 2015 Compacts provides that the 2015 Compacts "fully supplant[] and replac[e]" the 2007 Compacts, except that under Subsection 9(B), the terms of the 2007 Compacts

> (including, without limitation, *any limited waiver of sovereign immunity and jurisdictional waivers and consents set forth therein*) shall *survive* to permit the resolution of payment disputes. . . . This *survival provision* is intended to provide for the reasonable resolution of past disputes without hindering a Tribe's ability to obtain a new compact.

(Doc. 68-3 at 26 (emphases added).)  Because rights that never existed cannot "survive," Subsection 9(B) of the 2015 Compacts only preserved rights that existed under the 2007 Compacts.  *See, e.g.*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/survive (to "survive" means "to remain alive or in existence" or "to continue to function or prosper") (last visited Mar. 29, 2019).  Thus, because Section 7 of the 2007 Compacts expressly limited the parties' waiver of sovereign immunity[17] and expressly excluded from arbitration "questions as to the validity or effectiveness of [the 2007 Compacts] or of any provision [t]hereof," (Doc. 67-3 at 15), Subsection 9(B) of the 2015 Compacts is likewise limited in scope.  Then, Sections 7 and 9 of the 2015 Compacts further limit the scope of arbitrable disputes under the 2007 Compacts to the resolution of "payment disputes" premised on the State's belief that "the Tribe has failed to comply with or has otherwise breached any provision of a Predecessor Agreement affecting payment." (Doc. 68-3 at 22.)

---

[17] *See* Doc. 67-3 at 16 ("[T]he State and the Tribe acknowledge that any action or failure to act on the party of any agent or employee of the State or the Tribe, contrary to a decision of the arbitrators in an arbitration proceeding conducted under the provisions of this section, occurring after such decision, shall . . . not [be] protected by the sovereign immunity of the State or the Tribe.") *and id.* ("Nothing in this Section shall be deemed a waiver of the Tribe's [or the State's] sovereign immunity.").

Pulling all of these limitations together, only claims for breach of a 2007 Compact provision affecting payment that do *not* raise questions regarding the validity or effectiveness of the 2007 Compacts or any of its provisions fall within the purview of the 2015 Compacts' arbitration clause insofar as it preserves claims under the 2007 Compacts. On their face and as a matter of law, the Pueblos' claims that the 2007 Compacts' revenue sharing provisions are invalid and ineffective under federal law fall outside the scope of the 2015 Compacts' arbitration clause because they raise questions regarding the validity and effectiveness of 2007 Compact provisions.

If further proof were needed that the 2015 Compacts do not restrict the Pueblos' ability to press in this forum their claims challenging the validity and effectiveness of the 2007 Compacts' revenue sharing provisions, one need only look at the one-sided nature of the 2015 Compacts' arbitration clause as it pertains to "payment disputes" under the 2007 Compacts. Specifically, under the 2015 Compacts, only the State may initiate the arbitration procedure to pursue payment disputes, based only on the State's belief that the Pueblos breached a 2007 Compact provision affecting payment.[18] (*Id.* at 22.) On its face, this procedure does not even apply to the Pueblos' claims challenging the validity and effectiveness of the 2007 Compacts' revenue sharing provisions, much less restrict them to arbitration.

Defendants attempt to avoid this outcome by arguing that

> [i]f the arbitrators find in the Pueblos' favor on the interpretation of the revenue sharing provisions of the Compact, no additional payments would be owed to the State and there would therefore be no issue with respect to any impermissible tax against the Pueblos, no violation of IGRA, and no validity concerns with respect to the Compact provisions. Similarly, if the arbitrators find in the State's favor, the payments that the Pueblos owe the State under the revenue-sharing provision of the 2007 Compact would not be an illegal tax against the Pueblos (and therefore would neither violate IGRA nor invalidate the Compact) because they would be a payment that the Pueblos voluntarily agreed to under the terms of the 2007 Compact.

---

[18] Subsection 9(B) further provides that Pueblos' "failure to comply with an arbitrator's final decision with respect to the parties' [contractual payment] obligations under a Predecessor Agreement constitutes a breach" of the 2015 Compacts. (Doc. 68-3 at 26.)

(Doc. 62 at 6.) Either way, Defendants conclude, the Compact provisions at issue would be valid. (*Id.*)

The Court declines to adopt Defendants' argument because it is a gross oversimplification of the parties' dispute and fails to address all of the reasons the Pueblos allege that the 2015 Compact provisions preserving Defendants' claims and the 2007 Compacts' revenue sharing provisions are invalid and ineffective. It is true that one of the theories on which the Pueblos rely is that Defendants' claims for additional revenue sharing payments violate federal law because the Pueblos did not agree to make these payments in the 2007 Compacts. (*See, e.g.*, Doc. 67-1 at 17-20.) However, the Pueblos offer other theories in support of their claims as well. Thus, for example, the Pueblos also allege that the 2015 Compact provisions preserving Defendants' claims for additional revenue sharing payments are invalid because Defendants' claims seek to force the Pueblos to calculate their net win in a manner contrary to federal regulations. (*See, e.g.*, *id.*) In addition, the Pueblos assert that the 2015 Compact provisions preserving Defendants' claims—and the 2007 Compacts' revenue sharing provisions, as well, if they mean what Defendants say they mean—are invalid because the additional payments Defendants claim are an illegal tax, rather than permissible revenue sharing, under IGRA. (*See, e.g.*, Doc. 68 at 20-22.) Even if an arbitration panel were to find that the Pueblos agreed to the 2007 Compacts' revenue sharing provisions as Defendants interpret them, the finding would not save the 2007 Compacts' revenue sharing provisions or the 2015 Compact provisions preserving Defendants' claims from invalidation under the latter theory. "[T]he negotiated terms of the Compact cannot exceed what is authorized by the IGRA." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1205 n.4 (10th Cir. 2018).

Moreover, the Court agrees with the Pueblos that their claims regarding the validity and effectiveness of Compact provisions under federal law must be resolved in this forum before

Defendants' claims, if they survive, may be resolved by arbitration or otherwise. (Doc. 68 at 18-20.) As discussed above, the Pueblos challenge the validity and effectiveness of the 2015 Compact provisions preserving Defendants' claims and the 2007 Compacts' revenue sharing provisions based on federal law; and, the arbitration clause at issue does not allow the parties to arbitrate such challenges, so they must be decided here. If the Pueblos are correct, and these Compact provisions are invalid and ineffective because their enforcement would violate federal law, then Defendants have no right to pursue such enforcement through arbitration or otherwise. Thus, to preserve the Pueblos' rights under federal law, the Court must decide their claims before arbitration—if any—occurs.[19]

> 2. The Pueblos' claims challenging the validity and effectiveness of the 2015 Compact provisions preserving Defendants' claims are not subject to arbitration because the 2015 Compacts' arbitration clause is permissive and the Pueblos have not consented to arbitration.

In opposition to Defendants' Summary Judgment Motion, the Pueblos also argue that the parties' dispute is not subject to arbitration because the arbitration clause in the 2015 Compacts is permissive and they have not consented to arbitration. "[A] party cannot be forced to arbitrate against its will if the arbitration clause permits, but does not require, arbitration." *Summit Packaging Sys., Inc. v. Kenyon & Kenyon*, 273 F.3d 9, 12 (1st Cir. 2001). The use of the term "may" in a document generally indicates that an action is permissive. *PCH Mut. Ins. Co. v. Cas. & Sur., Inc.*, 750 F. Supp. 2d 125, 144 (D.D.C. 2010). Nevertheless, the use of this term in an arbitration clause does not, standing alone, indicate that arbitration is permissive. *Id.* at 143-44.

---

[19] There are two incidental benefits to the Court's deciding the Pueblos' claims in the first instance. First, as the Pueblos observe, it will have "the salutary effect of resolving legal uncertainty," because other tribes entered into identical gaming compacts with the State, also offered free play to their patrons at the relevant times, and will benefit from a "roadmap[]" on how to account for free play and the prizes patrons won from the use of it. *Citizen Potawatomi Nation*, 881 F.3d at 1235. Second, it will conserve the parties' resources, because the Pueblos' Summary Judgment Motions are fully briefed and for the most part raise questions of law, whereas arbitration of Defendants' claims would likely involve fact discovery regarding the Pueblos' gaming operations and accounting for the last decade or more. (*See generally, e.g.,* Doc. 81.)

Rather, many courts have held that it simply means the party may either pursue arbitration or abandon its claim, *United States v. Bankers Ins. Co.*, 245 F.3d 315, 320–21 (4th Cir. 2001); *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 879 (4th Cir. 1996); *Am. Italian Pasta Co. v. Austin Co.*, 914 F.2d 1103, 1104 (8th Cir. 1990); *Bonnot v. Cong. of Indep. Unions, Local No. 14*, 331 F.2d 355, 359 (8th Cir. 1964); *Block 175 Corp. v. Fairmont Hotel Mgmt. Co.*, 648 F. Supp. 450, 452 (D. Colo. 1986), or that arbitration, though not an exclusive remedy, is mandatory once either party invokes it. *See, e.g.*, *Deaton Truck Line, Inc. v. Local Union 612, Affiliated with Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 314 F.2d 418, 422 (5th Cir. 1962); *Benihana of Tokyo, LLC v. Benihana Inc.*, 73 F. Supp. 3d 238, 251 (S.D.N.Y. 2014); *Conax Fla. Corp. v. Astrium Ltd.*, 499 F. Supp. 2d 1287, 1297–98 (M.D. Fla. 2007); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 204 n.1 (1985) ("The use of the permissive 'may' is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures."); *MEI Techs., Inc. v. Detector Networks Int'l, LLC*, Civ. No. 09-425 RB/LFG, 2009 WL 10665141, at *9 (D.N.M. Jul. 6, 2009) (collecting cases).

However, courts have construed arbitration clauses to be permissive when they used the term "may" and also included other language supporting that construction. Thus, for example, in *Independent Oil Workers at Paulsboro, New Jersey v. Mobil Oil Corp.*, the Third Circuit held that an arbitration clause was optional where it used the term "may" and provided that "[n]othing in this agreement shall prevent either [party] . . . from applying, during the term of this agreement to a court of competent jurisdiction for the relief to which such party may be entitled[.]" 441 F.2d 651, 653 (3d Cir. 1971). As the Third Circuit noted, "the qualification . . . that 'nothing in the agreement shall prevent' application to a court of competent jurisdiction takes away the mandatory aspect of the contractual grievance procedures." *Id.* "This is an 'escape' clause which nullifies the

mandatory terms of the earlier language and makes arbitration optional." *Id.* at 654; *see also Quam Constr. Co. v. City of Redfield*, 770 F.3d 706, 708-09 (8th Cir. 2014) (holding that arbitration clause was permissive where it used the term "may" and indicated that arbitration procedure applied "if the parties agree to arbitration"). In recognizing the existence of permissive arbitration clauses, these cases undercut the theory that an arbitration clause can never be permissive because then it would be superfluous, as parties to a contract can always consent to arbitration.[20] *See, e.g.*, *Bankers Ins. Co.*, 245 F.3d 320–21; *Austin*, 78 F.3d at 879.

Here, the Court finds that, as a matter of law, the arbitration clause in the 2015 Compacts is not mandatory as to claims to enforce or resolve disputes concerning 2015 Compact provisions. Initially, Subsection 7(A) of the 2015 Compacts provides that either party "may" invoke arbitration if it believes the other party has breached the Compact. (Doc. 68-3 at 22.) Further, Subsection 7(B) expressly states that "[n]othing in Subsection 7(A)," which describes the arbitration procedure, "shall be construed to waive, limit or restrict any remedy that is otherwise available to either party to enforce or resolve disputes concerning the provisions of this Compact." (*Id.* at 23.) Subsection 7(B) also provides that nothing in Section 7 should be deemed a waiver of either the Pueblos' or the State's sovereign immunity. (*Id.* at 23-24.)

Subsection 7(B) is very like the "escape clause" in *Independent Oil Workers* that, according to the Third Circuit, "ma[de] arbitration optional." 441 F.2d at 654. Its broad language expressly preserves, wholly intact, the parties' right to pursue remedies other than arbitration to enforce provisions of and resolve disputes under the 2015 Compacts.[21] The Court would necessarily nullify

---

[20] Arbitration clauses may serve purposes other than providing for an exclusive or mandatory remedy, for example, to specify the procedures to be followed in the event the parties agree to arbitration.

[21] It does not, however, preserve the parties' right to pursue remedies to enforce provisions of and resolve disputes under the 2007 Compacts. Subsections 7(A) and 9 of the 2015 Compacts narrowly preserve and limit the State's ability to pursue a payment related breach of Predecessor Compact dispute remedy under the specified arbitration procedure.

this subsection if it were to hold that Subsection 7(A) makes arbitration mandatory. Requiring either party to submit to arbitration would unquestionably waive, limit, or restrict the remedies otherwise available to that party to resolve disputes under the 2015 Compacts; "review of arbitration awards is among the narrowest known to the law." *Citizen Potawatomi Nation*, 881 F.3d at 1234, 1236-38.

Nullifying Subsection 7(B) would, in turn, violate the "cardinal principle of contract construction . . . that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *see Citizen Potawatomi Nation*, 881 F.3d at 1239 ("[T]his court will construe the [tribal-state gaming c]ompact [at issue] to give meaning to every word or phrase."). The Court declines to read Subsection 7(B) out of the Compacts, especially in light of the fact that Defendants do not actually contest the permissive nature of the 2015 Compacts' arbitration clause in their reply. (*See* Doc. 62 at 2 ("[W]hether arbitration is the exclusive or one of many permissible avenues available for the parties to resolve their dispute is immaterial. . . . [A]rbitration is at least one forum in which the parties are permitted to bring claims related to payment disputes arising out of the 2007 Compact.").)

In addition, the Court will not order arbitration under Subsection 7(A) "at the expense of a specific provision[,]" *i.e.*, Subsection 7(B), "meant to maintain critical aspects of the parties' sovereign immunity." *Citizen Potawatomi Nation*, 881 F.3d at 1240-41. Reading Section 7 to

---

The Court's rulings in this Memorandum Opinion and Order may not foreclose the State's ability to pursue such remedies provided the dispute does not raise a question as to the validity or effectiveness of 2007 or 2015 Compact provisions. Defendants have offered evidence that the Pueblos miscalculated their revenue sharing obligations under the 2007 Compacts even using the GAAP-compliant formula the Pueblos believe to be lawful. (Doc. 99-11.) This issue is not before the Court, and the Court has not considered it in ruling on the parties' motions. Thus, the Court offers no opinion on whether if the State wished to pursue claims for additional revenue sharing payments against the Pueblos on the basis of this evidence and otherwise met the procedural requirements for invoking arbitration, Subsections 7(A) and 9(B) of the 2015 Compacts would require the Pueblos to submit to mandatory arbitration.

provide for permissive but binding arbitration of disputes concerning 2015 Compact provisions best gives meaning and purpose to both of its parts in this sense as well:  Subsection 7(B) preserves the parties' sovereign immunity, while Subsection 7(A) provides for its limited waiver if both parties agree to it by consenting to arbitration.  (*See* Doc. 68-3 at 23 (providing that results of arbitration are "enforceable by an action for . . . mandatory injunctive relief against the State and the Tribe in any court of competent jurisdiction," and that any official's act contrary to an arbitration decision is "not protected by . . . sovereign immunity").  Because the 2015 Compacts' arbitration clause is permissive as to disputes regarding the 2015 Compacts, and the Pueblos brought this action in lieu of arbitration (and, incidentally, before Defendants invoked arbitration), the Court finds that, as a matter of law, the parties' claims to enforce or resolve disputes concerning the provisions of the 2015 Compacts are not subject to arbitration.

In spite of all of the foregoing, Defendants argue that the Court should require the Pueblos to arbitrate Defendants' claims for additional revenue sharing payments, because the Pueblos' sovereign immunity has prevented the State from pursuing these claims in federal court.  (Doc. 55 at 9); *see State of N.M.  v. Pueblo of Isleta et al.*, Civ. No. 17-995 JB/KK (Notice of Dismissal, Doc. 13, D.N.M. filed Nov. 14, 2017).  However, if, as the Pueblos allege, Defendants' claims violate federal law, then the lack of a forum in which to pursue them is of no consequence, because they would be unenforceable regardless.  Moreover, while the Pueblos' sovereign immunity may prevent the State from pursuing the remedies it prefers, the Court is "not persuaded that [the State] lacks any adequate alternatives."  *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 514 (1991).  For example, the Supreme Court has "never held that individual agents or officers of a tribe are not liable for damages in actions brought by the State."  *Id.*  Also, the State is free to negotiate with the Pueblos to modify the dispute resolution procedures in the

2015 Compacts; and, if the State "find[s] that none of these alternatives produce the revenues to which [it believes it is] entitled, [it] may of course seek appropriate legislation from Congress." *Id.*

In sum, the Court must resolve the Pueblos' claims regarding the validity and effectiveness of Compact provisions in the first instance to preserve the Pueblos' rights under federal law; and, the parties' claims to enforce or resolve disputes concerning the 2015 Compacts are not arbitrable because the 2015 Compacts' arbitration clause is permissive as to these claims and the Pueblos have not consented to arbitration. In these circumstances, Defendants have failed to show their entitlement to judgment as a matter of law on Plaintiffs' arbitrability claims, and the Court will deny Defendants' Summary Judgment Motion.

### B.      The Pueblos' Summary Judgment Motions

Having denied Defendants' request for summary judgment on the threshold issue of arbitrability, the Court turns to the Pueblos' Summary Judgment Motions and Defendants' request for additional discovery under Federal Rule of Civil Procedure 56(d). (Doc. 67 at 2; Doc. 68 at 33.) As an initial matter, the Court must address the proposition at the heart of the Pueblos' claims, *i.e.*, that according to GAAP, a gaming entity must exclude the face value of free play, and deduct the value of prizes won as a result of free play wagers, from its net win. (Doc. 67-1 at 14, 22, Doc. 68 at 26.)

GAAP "are the conventions, rules, and procedures that define accepted accounting practices." *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n.7 (1984); *see also In re Imergent Sec. Litig.*, No. 2:05-CV-204, 2009 WL 3731965, at *7 (D. Utah Nov. 2, 2009) (GAAP are a set of "broad accounting principles . . . approved by the [AICPA that] establish guidelines for measuring, recording and classifying the transactions of a business entity"); *N.J. & its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1146 n.24 (D. Kan. 2004) (same). In his report, the Pueblos'

expert witness Andrew Mintzer stated that, under GAAP, the face value of free play is not included in, and the value of prizes won by patrons as a result of free play wagers must be deducted from, gross gaming revenue or net win. (Doc. 67-10 at 9-13.)

Mr. Mintzer also stated that the treatment of free play and prizes won as a result of free play wagers under GAAP is consistent with "economic reality." (*Id.* at 9-10, 16.) According to Mr. Mintzer, free play is not included in a gaming entity's revenue because it does not represent actual or expected cash in-flow or its equivalent, (*id.* at 8, 12), or, in simpler terms, because a casino doesn't make any money when a customer uses it.[22] Defendants have presented no evidence that refutes Mr. Mintzer's statements on these points.[23] (*See generally* Doc. 99.) The Court therefore finds that under GAAP the face value of free play must be excluded, and the value of prizes won by patrons as a result of free play wagers must be deducted, from net win.

       1.       <u>Defendants' claims for additional revenue sharing payments constitute an attempt to impose an illegal tax under IGRA and the *per se* rule, and the 2015 Compact provisions preserving these claims are invalid and ineffective.</u>

In their motions, the Pueblos first assert that the 2015 Compact provisions preserving Defendants' claims for additional revenue sharing payments under the 2007 Compacts are invalid and ineffective, because Defendants' claims constitute an attempt to impose a tax on the Pueblos in violation of IGRA and the *per se* rule prohibiting state taxation of Indian tribes without express

---

[22] Likewise, the value of prizes won by patrons as a result of free play wagers is deducted from revenue because such prizes are a net "loss from gaming activities." (Doc. 67-10 at 8.) In other words, a casino loses money when a patron wins a prize as a result of a free play wager.

[23] In his affidavit, Mr. Telle quotes portions of the Gaming Guide to the effect that "incentives," including "free play," are not deducted from net win. (Doc. 99-12 at 5-6.) At least two factors prevent Mr. Telle's quotations from creating a genuine issue of material fact regarding whether the value of prizes won as a result of free play wagers must be deducted from net win under GAAP. First and foremost, Mr. Telle stops short of contradicting Mr. Mintzer and asserting that the value of prizes won as a result of free play wagers must *not* be deducted from net win under GAAP. (*Id.*) Second, it appears that "deducting free play" is distinct from "deducting the value of prizes won as a result of free play wagers" in the Gaming Guide. (*See* Doc. 68-4 at 6-7 (discussing the deduction of "free play offered through nondiscretionary loyalty programs" from net gaming revenue).)

Congressional authorization. The Pueblos offer two arguments in support of this assertion, *i.e.*, that

(1) the Pueblos did not, in the 2007 Compacts, agree to make the additional payments Defendants

seek, and (2) the additional payments are not permissible revenue sharing payments under IGRA.

The Court will address these related arguments in turn.

    a.  *Defendants' claims for additional revenue sharing payments constitute an attempt to impose an illegal tax under IGRA and the* per se *rule because the Pueblos did not agree to make these payments.*

The Pueblos first argue that Defendants' claims for additional revenue sharing payments

constitute an attempt to impose an illegal tax under IGRA and the *per se* rule prohibiting state

taxation of Indian tribes without express Congressional authorization because the Pueblos did not

agree to make these payments in the 2007 Compacts. For the following reasons, the Court agrees.

"IGRA provides a comprehensive approach to the controversial subject of regulating tribal

gaming, and strikes a careful balance among federal, state, and tribal interests." *Alabama v. PCI*

*Gaming Auth.*, 801 F.3d 1278, 1283 (11th Cir. 2015) (quotation marks and brackets omitted).

IGRA's

> first stated purpose is to provide a statutory basis for the operation of gaming by
> Indian tribes as a means of promoting tribal economic development, self-
> sufficiency, and strong tribal governments. Its second stated purpose is to provide
> a statutory basis for the regulation of gaming by an Indian tribe, adequate to shield
> it from organized crime and other corrupting influences, to ensure that the Indian
> tribe is the primary beneficiary of the gambling operation, and to assure that gaming
> is conducted fairly and honestly by both the operator and players. The third and
> final declared purpose of the IGRA is to declare as necessary the establishment of
> independent Federal regulatory authority, Federal standards and a National Indian
> Gaming Commission—all to meet congressional concerns regarding gaming and to
> protect such gaming as a means of generating tribal revenue.

*Pueblo of Santa Ana v. Nash*, 972 F. Supp. 2d 1254, 1263 (D.N.M. 2013) (citations omitted); 25

U.S.C. § 2702; *see also City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 785 F.3d

1207, 1211 (8th Cir. 2015) ("Congress has noted that for tribes, gaming income often means the

difference between an adequate governmental program and a skeletal program that is totally

dependent on [f]ederal funding.") (quotation marks omitted); *Flandreau Santee Sioux Tribe v. Gerlach*, 155 F. Supp. 3d 972, 992 (D.S.D. 2015) (same).

> IGRA
>
> divides gaming into three classes. Class III gaming, the most closely regulated and the kind involved here, includes casino games, slot machines, and horse racing. A tribe may conduct such gaming on Indian lands only pursuant to, and in compliance with, a compact it has negotiated with the surrounding State. A compact typically prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms.

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014) (citations omitted).

"IGRA expressly prescribes the matters that are permissible subjects of gaming-compact negotiations between tribes and states." *Navajo Nation*, 896 F.3d at 1201–02. Specifically, the statute lists seven categories of provisions a gaming compact may include, 25 U.S.C. § 2710(d)(3)(C); and, provisions falling outside of these seven categories are unlawful. *Navajo Nation*, 896 F.3d at 1205 n.4 ("[T]he negotiated terms of the Compact cannot exceed what is authorized by the IGRA."); *Pueblo of Santa Ana*, 972 F. Supp. 2d at 1265 ("the negotiated scope" of a compact under IGRA "is controlled by § 2710(d)(3)(C).").

Tribes and states have relied on two of Section 2710(d)(3)(C)'s categories to authorize compact provisions that require a tribe to make direct payments to a state. These two categories are: (1) provisions relating to "the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity," 25 U.S.C. § 2710(d)(3)(C)(iii); and, (2) the catch-all category of provisions regarding "any other subjects that are directly related to the operation of gaming activities."[24] 25 U.S.C. § 2710(d)(3)(C)(vii); *see, e.g., Rincon Band of Luiseno*

---

[24] Section 2710(d)(3)(C) provides in full that

> [a]ny Tribal-State compact negotiated under subparagraph (A) may include provisions relating to--
> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity; (ii) the

*Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010); *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095 (9th Cir. 2006); *In re Indian Gaming Related Cases*, 331 F.3d 1094 (9th Cir. 2003). However, IGRA limits the ability of compact parties to include provisions requiring a tribe to make direct payments to a state by further providing that,

> [e]xcept for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity.

25 U.S.C. § 2710(d)(4).

In light of Section 2710(d)(4), courts considering compact provisions requiring a tribe to make direct payments to a state under Section 2710(d)(3)(C)(vii) have found that such provisions are lawful only if they meet three criteria. First, as Section 2710(d)(3)(C)(vii) expressly requires, the payments must be directly related to the operation of gaming activities. *Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1033. Second, the payments must be "consistent with the purposes of IGRA." *Id.*; *accord City of Duluth*, 785 F.3d at 1210 (holding that trial court was required to consider "Congress's express intent that tribes be the primary beneficiaries of Indian casinos" in deciding whether to grant tribe's motion for relief from consent decree requiring it to pay percentage of casino's gross revenues to city as rent).

Finally, the parties must have

---

allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations; (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity; (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities; (v) remedies for breach of contract; (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and (vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).

*negotiated* a bargain permitting such payments in return for meaningful concessions from the state (such as a conferred monopoly or other benefits). Although the state [does] not have *authority* to exact such payments, it [can] bargain to receive them in exchange for a quid pro quo conferred in the compact.

*Shoshone-Bannock Tribes*, 465 F.3d at 1101–02 (emphases in original) (citation omitted). In other words, courts "have interpreted § 2710(d)(4) as precluding state authority to *impose* taxes, fees, or assessments, but not prohibiting states from *negotiating* for such payments where 'meaningful concessions' are offered in return." *Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1036 (emphases in original). These courts have concluded that, if a state's demand for tribal payments under Section 2710(d)(3)(C)(vii) is not based on a bargained-for and agreed-upon compact provision where meaningful concessions are offered in return, it is an impermissible tax, fee, charge, or other assessment under IGRA.[25] *Id.* at 1042; 25 U.S.C. § 2710(d)(4).

Defendants claim that the additional revenue sharing payments they seek are permissible revenue sharing payments under Section 2710(d)(3)(C)(vii).[26] However, the Pueblos argue that the payments do not comply with Section 2710(d)(3)(C)(vii) because the Pueblos did not, in the 2007 Compacts, agree to make them, and they would therefore constitute an illegal tax under Section 2710(d)(4) if imposed. To determine whether the 2007 Compacts required the Pueblos to make the additional revenue sharing payments Defendants seek, and therefore whether the Pueblos agreed to

---

[25] "While this court strives to avoid conflicts with sister circuits, it has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit." *State of N.M. v. Dep't of Interior*, 269 F. Supp. 3d 1145, 1152 (D.N.M. 2014) (quotation marks omitted). Thus, the Court, though cognizant and respectful of other circuits' decisions regarding IGRA, has engaged in an independent reasoned analysis of the issues raised in the Pueblos' Summary Judgment Motions.

[26] Defendants do not claim that the additional payments they seek are payments to reimburse the State for regulatory costs under Section 2710(d)(3)(C)(iii). Subsection 4(E)(6) of the 2007 Compacts provided for the Pueblos to make payments to the State under Section 2710(d)(3)(C)(iii), and there appears to be no dispute that the Pueblos properly made those payments.

make them, the Court must apply federal common law regarding contracts. *Citizen Potawatomi Nation*, 881 F.3d at 1238-39; *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1163 (9th Cir. 2015); *see also Shoshone-Bannock Tribes*, 465 F.3d at 1098 ("We apply general principles of contract interpretation to construe a contract governed by federal law.").

According to the Tenth Circuit,

[u]nless a contrary intention appears in the instrument, the words used [in a contract] are presumed to have been used in their ordinary or customary meaning, deliberately and with intention. The law does not assume that the language of the contract was carelessly chosen; but it must be presumed that the parties meant something by the words used, that they intended to achieve something definite and concrete in the contract, and that they intended the consequences of its performance. Where words having a definite legal meaning are knowingly used in a contract, the parties thereto will be presumed to have intended such words to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the instrument.

*Raulie v. United States*, 400 F.2d 487, 521 (10th Cir. 1968). Moreover,

a contract should be interpreted as a harmonious whole to effectuate the intentions of the parties, and every word, phrase or part of a contract should be given meaning and significance according to its importance in context of the contract. Further, in construing the contract, reasonable rather than unreasonable interpretations are favored by the law.

*Doña Ana Mut. Domestic Water Consumers Ass'n v. City of Las Cruces, N.M.*, 516 F.3d 900, 907 (10th Cir. 2008) (citation and quotation marks omitted); *see also Mastrobuono*, 514 U.S. at 63 ("[A] document should be read to give effect to all its provisions and to render them consistent with each other."); *Citizen Potawatomi Nation*, 881 F.3d at 1239 ("[T]his court will construe the Compact to give meaning to every word or phrase."). In the same vein, courts "presume that words have the same meaning throughout the contract." *McLane & McLane v. Prudential Ins. Co. of Am.*, 735 F.2d 1194, 1195 (9th Cir. 1984).

"Under federal contract principles, if the terms of a contract are not ambiguous, this court determines the parties' intent from the language of the agreement itself." *Citizen Potawatomi Nation*, 881 F.3d at 1239; *Shoshone-Bannock Tribes*, 465 F.3d at 1099 ("[W]hen the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself."). Extrinsic evidence is admissible "only to resolve ambiguity in the contract." *Citizen Potawatomi Nation*, 881 F.3d at 1239; *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 812 (6th Cir. 2007) ("Where a contract is unambiguous on its face, extrinsic evidence is inadmissible because no outside evidence can better evince the intent of the parties than the writing itself."). In addition, "[e]xtrinsic evidence must be relevant in order to be admitted to resolve an ambiguity." *Id.* at 815. "We have consistently held that where an industry is specialized, extrinsic evidence that helps define words within their specialized context is admissible." *Id.*; *accord* 11 Williston on Contracts § 32:4 (4th ed.) ("[T]echnical terms or words of art will be given their technical meaning."). Whether contract terms are ambiguous, and the interpretation of unambiguous terms, are questions of law. *Bank of Okla. v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1171 (10th Cir. 1992)*; see also Sault Ste. Marie Tribe of Chippewa Indians*, 475 F.3d at 810.

As a preliminary matter, the Court notes that both sides have submitted extrinsic evidence in support of their interpretation of the 2007 Compacts' revenue sharing provisions. For example, the Pueblos have offered evidence that their slot accounting systems have never segregated prizes won by patrons using free play credits versus cash or cash equivalents, (Doc. 67-12); and, Defendants have offered evidence that, before the Pueblos instituted electronic free play, they gave patrons coupons that could be exchanged for cash or tokens, and included the value of cash and tokens wagered in their net win. (Doc. 99 at 22.) However, the Court finds the relevant provisions of the 2007 Compacts to be unambiguous except for the fact that they do not identify or define the

GAAP applicable to calculating net win. Thus, the Court will consider the parties' extrinsic evidence only to the extent that it tends to identify and define the applicable GAAP.[27] *Citizen Potawatomi Nation*, 881 F.3d at 1239 (extrinsic evidence is "relevant only to resolve ambiguity in the contract").

Applying federal common law principles of contract interpretation to the 2007 Compacts, the Court finds that these Compacts unambiguously required the Pueblos to calculate their Net Win for revenue sharing purposes in accordance with GAAP. First, Subsection 4(C) of the Compacts required the Pueblos to maintain "all books and records relating to Class III Gaming . . . in accordance with [GAAP]." (Doc. 67-3 at 9.) In addition, this subsection required the Pueblos to hire an independent certified public accountant to prepare annual financial statements that included "written verification of the accuracy of the quarterly Net Win calculation"; and, critically, these financial statements were to "be prepared in accordance with [GAAP]." (*Id.*) Finally, this subsection required the Pueblos' GAAP-compliant financial statements to "specify the total amount wagered in Class III Gaming on all Gaming Machines . . . for purposes of calculating 'Net Win' under Section 11 of this Compact using the format specified therein." (*Id.*)

To summarize, then, Subsection 4(C) of the 2007 Compacts required the Pueblos to: (1) maintain all of their gaming books and records in accordance with GAAP; (2) verify their Net Win calculations in accordance with GAAP; and, (3) specify the "total amount wagered" for purposes of calculating their Net Win in accordance with GAAP. Read together, these provisions are clear: the 2007 Compacts required the Pueblos to calculate their Net Win in accordance with GAAP. And, as previously discussed, under GAAP the face value of free play must be excluded, and the value of prizes won as a result of free play wagers must be deducted, from net win. Thus, Subsection

---

[27] Extrinsic evidence in the record relevant to identifying and defining the applicable GAAP includes Mr. Mintzer's affidavit, the admissible portions of Mr. Telle's affidavit, and portions of the Gaming Guide in the record.

4(C) required the Pueblos to exclude the face value of free play and deduct the value of prizes won as a result of free play wagers in calculating their Net Win.

Defendants argue that Section 11 of the 2007 Compacts nevertheless required the Pueblos to include either the face value of free play or the value of prizes won as a result of free play wagers in calculating their Net Win for revenue sharing purposes. The Court disagrees. Defendants' interpretation would require the Pueblos to calculate their Net Win using one set of rules—GAAP—under Subsection 4(C), and a different set of rules—rules contrary to GAAP—under Section 11. As such, it contravenes the principle of contract construction that a contract must be read as a harmonious whole, with words having the same meaning throughout. *Mastrobuono*, 514 U.S. at 63; *Citizen Potawatomi Nation*, 881 F.3d at 1239; *Doña Ana Mut. Domestic Water Consumers Ass'n*, 516 F.3d at 907; *McLane & McLane*, 735 F.2d at 1195–96. The Court finds that, in accordance with this principle, Section 11 can and should be read in harmony with Section 4 and therefore in conformity with GAAP.

Subsection 11(C)(1)(a) defined "Net Win" as "the total amount wagered in Class III Gaming at a Gaming Facility, on all Gaming Machines less . . . the amount paid out in prizes to winning patrons, including the cost to the Tribe of noncash prizes, won on Gaming Machines." (Doc. 67-3 at 20.) Other than limiting the Pueblos' Net Win to their net win from Class III gaming machines, this definition is consistent with the definition of net win under GAAP, *i.e.*, "the difference between [the gaming entity's] gaming wins and losses before deducting costs and expenses." (Doc. 68-4 at 12; Doc. 99-12 at 16.)

In support of their argument that Section 11 defines Net Win in a manner contrary to GAAP, Defendants rely on the additional language in Subsection 11(C)(1)(a) to the effect that

> [t]he phrase 'won on Gaming Machines' means the patron has made a monetary
> wager, and as a result of that wager, has won a prize of any value. Any rewards,

> awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated) or as a result of patron-related activities, are not deductible. The value of any complimentaries given to patrons, in any form, are not deductible.

(67-3 at 20-21.) According to Defendants, this language prohibited the deduction of any kind of marketing or promotional expense from Net Win, including the value of prizes won by patrons as a result of free play wagers. (Doc. 99 at 14, 30.)

In fact, however, this language also can and should be read in conformity with Subsection 4(C) and therefore GAAP. The Gaming Guide provides that "monetary credits may be played [on slot machines] using bills, coins, tickets, *electronic wagering credits recorded on cards*, *or by other means*." (Doc. 67-11 at 3 & n.3 (emphasis added).) Thus, under GAAP, "monetary credits" are not limited to cash or cash equivalents, and the term "monetary wagers" as used in Section 11(C)(1)(a) can be read consistently with GAAP to include wagers made using free play "monetary credits," *i.e.*, electronic free play credits assigned a monetary face value for the purpose of gaming machine play. Similarly, Section 11(C)(1)(a), though it prohibited the deduction of prizes a patron received from his or her participation in a players' club program or other "patron-related activities," did not even mention, much less prohibit the deduction of, prizes won by a patron as a result of free play wagers, which again is consistent with GAAP. Nowhere did Section 11(C)(1)(a) prohibit the deduction of all marketing or promotional expenses of any kind, as Defendants claim. Rather, in accordance with GAAP, Section 11(C)(1)(a) drew a line between the value of prizes won as a result of wagers, which were deductible, and the value of prizes awarded for other reasons, which were not.

If further support were needed, the Court notes that Section 11 was entitled "*Revenue Sharing*," and required the Pueblos to "pay to the State a portion of [their] Class III Gaming *revenues*." (Doc. 67-3 at 20 (emphases added).) However, as discussed above, free play is not

revenue, and neither is money (or the cost of non-cash prizes) the Pueblos paid out to patrons as a result of free play wagers. This is true not only under GAAP, but also in economic reality.[28] The law favors reasonable contract interpretations over unreasonable ones, *Doña Ana Mut. Domestic Water Consumers Ass'n*, 516 F.3d at 907, and it would be unreasonable to interpret Section 11 to require the Pueblos to make "revenue sharing" payments from nonrevenue. For all of these reasons, the Court finds that, under the 2007 Compacts and as a matter of law, the Pueblos did not agree to make the additional revenue sharing payments Defendants seek.

Then, because the Pueblos did not agree to them, the additional revenue sharing payments Defendants seek do not satisfy the requirements of Section 2710(d)(3)(C)(vii), *i.e.*, they are not payments made pursuant to a bargained-for and agreed-upon compact provision for which meaningful concessions were offered in return. 25 U.S.C. § 2710(d)(3)(C)(vii); *cf. Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1033-36; *Shoshone-Bannock Tribes*, 465 F.3d at 1101–02. Lacking any authorization under Section 2710(d)(3)(C), Defendants' claims for such payments from the Pueblos constitute an impermissible attempt to impose a tax, fee, charge, or other assessment under Section 2710(d)(4). 25 U.S.C. § 2710(d)(3)(C)(vii), (d)(4); *cf. Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1042.

The Court further finds that Defendants' claims for additional revenue sharing violate the "*per se* rule" prohibiting states from taxing federally recognized Indian tribes without express Congressional authorization. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 214-15 n.17 (1987), *superseded by statute on other grounds as stated in Bay Mills Indian Cmty.*, 572

---

[28] Economic reality likewise undermines Defendants' argument that it was inequitable for the Pueblos to exclude the face value of free play, and also deduct the value of prizes won as a result of free play wagers, from net win. (Doc. 99 at 21.) The apparent inequity merely reflects the actual nature of the transaction, *i.e.*, the Pueblos received no money from free play wagers but they did lose money when a patron won a jackpot on such a wager.

U.S. at 794-95; *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 475–76 (1976); *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 170–71 (1973); *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 467 (2d Cir. 2013); *Flandreau Santee Sioux Tribe*, 155 F. Supp. 3d at 995. A tax is "a monetary charge imposed by the government on persons, entities, transactions or property to yield public revenue." *Hill v. Kemp*, 478 F.3d 1236, 1245 (10th Cir. 2007). The Supreme Court "consistently has held that it will find the Indians' exemption from state taxes lifted only when Congress has made its intention to do so unmistakably clear." *Blackfeet Tribe of Indians*, 471 U.S. at 765.

Because the 2007 Compacts did not require the Pueblos to make the additional revenue sharing payments Defendants seek, IGRA does not authorize them. Thus stripped of IGRA's validation, they are simply payments Defendants insist the Pueblos make to the State's general fund on the basis of past transactions between the Pueblos and their gaming patrons. It is difficult to characterize such payments as anything other than a tax. "No amount of semantic sophistry can undermine the obvious: a non-negotiable, mandatory payment . . . into the State treasury for unrestricted use yields public revenue, and is a 'tax.'" *Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1029–30. Moreover, Congress has clearly not authorized the State to impose such a tax; on the contrary, it explicitly withheld its authorization in Section 2710(d)(4). The Court therefore finds that Defendants' claims pursuant to the 2015 Compacts for additional revenue sharing payments under the 2007 Compacts constitute an attempt to impose an illegal tax not only under IGRA, but also under the *per se* rule prohibiting state taxation of Indian tribes without express Congressional authorization.

*Defendants' claims for additional revenue sharing payments constitute an attempt to impose an illegal tax because they are not, in fact, permissible revenue sharing payments under IGRA.*

The Pueblos also contend that the additional payments Defendants seek are not in fact revenue sharing payments and would therefore constitute an illegal tax under IGRA even if the Pueblos had agreed to them. (*See, e.g.*, Doc. 68 at 20-22.) As discussed in Section III.B.1.a., *supra*, courts to date have recognized only two types of direct payments from a tribe to a state pursuant to a gaming compact under IGRA, *i.e.*, payments to defray the state's regulatory costs associated with the tribe's gaming activities, and revenue sharing payments if they are directly tied to gaming, consistent with IGRA's purposes, and bargained for and agreed upon in exchange for meaningful concessions. *See, e.g., Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1033-34; *Shoshone-Bannock Tribes*, 465 F.3d at 1101–02; *In re Indian Gaming Related Cases*, 331 F.3d at 1111-12; *but see Ho-Chunk Nation*, 512 F.3d at 932 ("The validity, under the IGRA, of revenue-sharing agreements in tribal-state compacts . . . is far from a settled issue.").

Defendants contend that the additional payments they seek from the Pueblos fall into the category of "revenue sharing" payments under 25 U.S.C. § 2710(d)(3)(C)(vii). In reality, however, and according to GAAP, Defendants are attempting to "share" funds that are not "revenue" to the Pueblos. As discussed at the beginning of Section III.B., free play is not revenue to the Pueblos because they receive no money from patrons when it is used; and, prizes won as a result of free play wagers are not revenue to the Pueblos because they lose money when they award prizes to patrons on winning free play bets. If the Pueblos were to include the face value of free play or the value of prizes won as a result of free play wagers in their Net Win as Defendants insist, the Pueblos would have to pay the State a percentage of these values even though they are not actually revenue. (Doc. 67-3 at 20-21 (requiring Pueblos to pay the State a percentage of their Net Win as revenue sharing).

As a matter of first impression, the Court finds that Section 2710(d)(4) does not allow a state to collect "revenue sharing" payments from a tribe pursuant to a gaming compact under IGRA where the funds the tribe is required to "share" are not, in fact, "revenue."  Such payments do not comport with GAAP or economic reality, and they do not fall within any category of direct tribal payments to states that courts have found to be permissible under IGRA.  25 U.S.C. § 2710(d)(C)(3)(iii), (vii); *cf. Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1033-35; *Shoshone-Bannock Tribes*, 465 F.3d at 1101–02; *In re Indian Gaming Related Cases*, 331 F.3d at 1111-13.

Moreover, such payments are inconsistent with IGRA's stated purposes to promote tribal economic development and self-sufficiency, ensure that the tribes are the primary beneficiaries of their gaming operations, and protect tribal gaming activities as a means of generating tribal revenue. 25 U.S.C. § 2702; *City of Duluth*, 785 F.3d at 1210-12; *Pueblo of Santa Ana*, 972 F. Supp. 2d at 1263; *see also Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1034 ("[N]one of the purposes outlined in § 2702 includes [promoting] the State's general economic interests. The only *state* interests mentioned in § 2702 are protecting against organized crime and ensuring that gaming is conducted fairly and honestly.") (emphasis in original).  If a compact provision is to increase a tribe's direct payments to a state under IGRA, it should do so expressly and accurately, so that the tribe and the DOI have the opportunity to assess whether the increase comports with IGRA's purposes.[29]  Increasing a tribe's revenue sharing payments to a state by including a percentage of nonrevenue in the payments creates an unacceptable risk of confusion and lack of mutual agreement between compact stakeholders about the nature and propriety of the

---

[29] For example, a compact provision could expressly provide for the tribe to pay the state a higher percentage of its net win.

payments under IGRA.  The Court therefore finds that Defendants' claims for additional "revenue sharing" payments constitute an attempt to impose a tax, fee, charge, or other assessment in violation of Section 2710(d)(4) not only because the Pueblos did not agree to the payments, but also because the payments are not permissible revenue sharing payments under Section 2710(d)(3)(C)(vii).

Relatedly, according to the Pueblos, the Court should defer to the DOI's determination that Defendants' claims for additional revenue sharing payments constitute an attempt to impose an illegal tax under IGRA.  The DOI made this determination in letters to the Pueblos explaining its decision to neither approve nor disapprove the 2015 Compacts, expressing concern regarding the 2015 Compact provisions preserving Defendants' claims.  (*See, e.g.*, Doc. 1-4 at 5.)  The Pueblos appear to concede that the statutory interpretation implicit in the DOI's determination is not binding legal authority, but they do argue that it is "persuasive authority" that is "due deference," citing *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001).  (Doc. 110 at 6-7.)

Initially, the Court agrees that the DOI's interpretation is not binding legal authority entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  An agency interpretation is entitled to *Chevron* deference only

> when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*Mead Corp.*, 533 U.S. at 226–27.  "Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."  *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000).

The DOI clearly did not promulgate the interpretation at issue in the exercise of the type of authority *Chevron* deference requires. The parties did not brief the process by which the DOI made its determination to neither approve nor disapprove the 2015 Compacts pursuant to 25 U.S.C. § 2710(d)(8)(C). However, there is no indication in the record that it made the determination pursuant to "adjudication or notice-and-comment rulemaking" or a comparably formal process. *Mead Corp.*, 533 U.S. at 226-27. Also, in the six letters in the record, the DOI expressed its interpretation variably and offered a variety of reasons for it, putting it firmly in the category of "[i]nterpretations such as those in opinion letters . . . which lack the force of law[.]" *Christensen*, 529 U.S. at 587.

The Court further finds that the Pueblos have failed to demonstrate that the DOI's interpretation is entitled to a lesser measure of deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). In *Skidmore*, the Supreme Court held that

> [t]he weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.* at 140. Recognizing the continuing validity of *Skidmore* deference after *Chevron*, in *Mead Corp.* the Supreme Court confirmed that "an agency's interpretation may merit some deference whatever its form," depending on "the agency's care, its consistency, formality, and relative expertness," and "the persuasiveness of the agency's position." *Mead Corp.*, 533 U.S. at 228, 234.

The Pueblos, however, fail to discuss or even acknowledge the factors listed in *Skidmore* and *Mead Corp.* (Doc. 110 at 6-7 & n.7.) Rather, they simply argue that the DOI's interpretation is due deference because it is "the product of IGRA's administrative process."[30] (*Id.*) This argument is gravely insufficient to support a finding that the interpretation is entitled to *Skidmore*

---

[30] In a footnote, the Pueblos also dispute Defendants' characterization of the contents of the DOI's letters. (Doc. 110 at 7 n.7.) However, the letters are in the record and therefore speak for themselves.

deference.  323 U.S. at 140; *Mead Corp.*, 533 U.S. at 228, 234; *but see Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 279-82 (D.D.C. 2018) (holding that DOI's decision to disapprove amendment to gaming compact was entitled to *Chevron* deference); *Fort Indep. Indian Cmty. v. California*, 679 F. Supp. 2d 1159, 1176-79 (E.D. Cal. 2009) (holding that DOI's approvals of gaming compacts that included unrestricted revenue sharing provisions were entitled to *Skidmore* deference).[31]

"Without a specific reference, [the Court] will not search the record in an effort to determine whether there exists dormant evidence" in support of the Pueblos' argument that the DOI's interpretation is entitled to *Skidmore* deference.  *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000) ("The district court was not obligated to comb the record in order to make [the plaintiff's] arguments for him.").  Thus, the Court will not rely on any deference to the DOI's interpretation to support its independent conclusion that Defendants' claims for additional "revenue sharing" payments constitute an attempt to impose a tax, fee, charge, or other assessment in violation of Section 2710(d)(4) regardless of whether the Pueblos agreed to them, because the payments are not, in fact, permissible revenue sharing payments under Section 2710(d)(3)(C)(vii).

        c.     *The 2015 Compact provisions preserving Defendants' claims for additional revenue sharing payments under the 2007 Compacts are invalid and ineffective.*

The Pueblos argue that, because Defendants' claims for additional revenue sharing payments under the 2007 Compacts are inconsistent with IGRA, the 2015 Compact provisions

---

[31] However, *Rincon Band of Luiseno Mission Indians of Rincon Reservation*, 602 F.3d at 1033-34, calls into question the continuing validity of *Fort Independence Indian Community* insofar as it held that unrestricted revenue sharing provisions in gaming compacts directly relate to gaming under Section 2710(d)(3)(C)(vii).  679 F. Supp.2d at 1179.

preserving Defendants' claims are invalid and ineffective. (*See, e.g.*, Doc. 67-1 at 17-20; Doc. 68 at 20-22.) A gaming compact under IGRA "takes effect" when the Secretary approves it and notice of the Secretary's approval is published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1552 (10th Cir. 1997). Because the Secretary did not approve or disapprove the 2015 Compacts within 45 days of submission, these Compacts are "considered to have been approved by the Secretary, but only to the extent the [Compacts are] consistent with [IGRA]." 25 U.S.C. 2710(d)(8)(C).

For the reasons discussed in Section III.B.1.a. and b., *supra*, Defendants' claims for additional revenue sharing payments under the 2007 Compacts constitute an attempt to impose a tax, fee, charge, or other assessment in violation of Section 2710(d)(4) and are therefore inconsistent with IGRA. To the extent that the provisions of the 2015 Compacts preserve Defendants' claims, they are likewise inconsistent with IGRA; and, to the extent the 2015 Compact provisions are inconsistent with IGRA, they are not considered to have been approved by the Secretary and did not "take effect." 25 U.S.C. § 2710(d)(3)(B), (8)(C). In addition, the 2015 Compact provisions preserving Defendants' claims are unenforceable to the extent that Defendants' claims violate the *per se* rule prohibiting state taxation of Indian tribes without express Congressional authorization. *Cabazon Band of Mission Indians*, 480 U.S. at 214-15 n.17; *Blackfeet Tribe of Indians*, 471 U.S. at 766; *Moe*, 425 U.S. at 475-76; *McClanahan*, 411 U.S. at 170-71. In short, because Defendants' claims for additional revenue sharing payments under the 2007 Compacts violate IGRA and the *per se* rule, the 2015 Compact provisions preserving those claims are invalid and ineffective.

2. <u>The Court need not decide whether federal regulations required the Pueblos to calculate their Net Win according to GAAP.</u>

The Pueblos also argue that Defendants' claims for additional revenue sharing payments are inconsistent with federal regulations that require the accounting records of the Pueblos' gaming

operations to comply with GAAP.  (Doc. 67-1 at 12, Doc. 68 at 26.)  In support of this argument, the Pueblos rely on three federal regulations.  First, they cite to 25 C.F.R. § 542.19(b), which provides that

> [e]ach gaming operation shall prepare general accounting records according to [GAAP] on a double-entry system of accounting, maintaining detailed, supporting, subsidiary records, including, but not limited to . . . [d]etailed records identifying revenues, expenses, assets, liabilities, and equity for each gaming operation[.]

25 C.F.R. § 542.19(b).  Second, they cite to 25 C.F.R. § 549.19(d), which defines gross gaming revenue from gaming machines in accordance with GAAP, *i.e.*, "[f]or gaming machines, gross [gaming] revenue equals drop,[32] less fills,[33] jackpot payouts and personal property awarded to patrons as gambling winnings."  25 C.F.R. § 542.19(d)(2); *see also* 25 C.F.R. § 542.2 ("Gross gaming revenue means annual total amount of cash wagered on . . . class III games . . . less any amounts paid out as prizes or paid for prizes awarded.").  Finally, they cite to 25 C.F.R. § 571.12, which provides that

> [a] tribe shall engage an independent certified public accountant to provide an annual audit of the financial statements of each . . . class III gaming operation on the tribe's Indian lands for each fiscal year. . . .  Financial statements prepared by the certified public accountant shall conform to generally accepted accounting principles[.]

25 C.F.R. § 571.12(b).

According to the Pueblos, these federal regulations require them to calculate their net win in accordance with GAAP.  Thus, the Pueblos continue, Defendants' demands that they calculate their Net Win in a manner contrary to GAAP for purposes of revenue sharing under the 2007

---

[32] "Drop (for gaming machines) means the total amount of cash, cash-out tickets, coupons, coins, and tokens removed from drop buckets and/or bill acceptor canisters."  25 C.F.R. § 542.2.

[33] "Fill means a transaction whereby a supply of chips, coins, or tokens is transferred from a bankroll to a . . . gaming machine."  25 C.F.R. § 542.2.

Compacts contravene these regulations. Defendants counter that: (1) the regulations do not prohibit the Pueblos from creating financial records in addition to their general accounting records and annual financial statements; (2) the regulations do not require these other financial records to comply with GAAP, and, (3) discrepancies between the net win in the Pueblos' GAAP-compliant records and the Net Win in their revenue sharing calculations can be addressed by "a simple footnote . . . explaining that the [r]evenue [s]haring calculation was performed in the format set forth in Section 11 of the 2007 Compact[s]." (Doc. 99 at 27.)

Neither side cites any caselaw discussing whether the regulations on which the Pueblos rely require all of their financial records, including their Net Win calculations under the 2007 Compacts, to comply with GAAP, and the Court's research has not uncovered any such cases. *But see Sault Ste. Marie Tribe of Chippewa Indians*, 475 F.3d at 813 (citing 25 C.F.R. § 571.12 for the proposition that the plaintiff tribe was "federally required to comply" with the Gaming Guide). Also, the Court notes that there is some doubt regarding whether the National Indian Gaming Commission had the authority to promulgate the regulations on which the Pueblos rely, *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 137-39 (D.C. Cir. 2006); and, Section 542.19 was stayed effective September 27, 2018 and is not currently enforceable. 83 Fed. Reg. 39,877-01, 2018 WL 3818191, at *39,879 (Aug. 13, 2018).

The Court need not decide whether complying with Defendants' demands for additional revenue sharing payments would require the Pueblos to violate 25 C.F.R. §§ 542.19, 542.2, and 571.12, in light of its determination that these claims constitute an attempt to impose a tax on the Pueblos in violation of IGRA and the *per se* rule. In addition, the lack of authority addressing these regulations and their uncertain validity and status make the Court reluctant to attempt to interpret them. The Court will therefore decline to decide whether these regulations required the Pueblos to

calculate their Net Win under the 2007 Compacts in accordance with GAAP. However, the Court notes that the regulations are at least consistent with the 2007 Compact provisions that required the Pueblos to calculate their Net Win in accordance with GAAP. *See Walsh v. Schlecht*, 429 U.S. 401, 408 (1977) ("[A] general rule of construction presumes the legality and enforceability of contracts.").

### 3. Defendants are not entitled to additional time to conduct discovery and respond to the Pueblos' Summary Judgment Motions under Rule 56(d).

Defendants argue that the Court should grant them more time to conduct discovery and respond to the Pueblos' Summary Judgment Motions under Rule 56(d) because they cannot currently present facts essential to justify their opposition to the motions. (Doc. 99 at 30); Fed. R. Civ. P. 56(d). Rule 56(d) provides that

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

> Although the Supreme Court has held that, under Fed. R. Civ. P. 56(f),[34] summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition, this protection arises only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion.

*Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1536 (10th Cir. 1994) (brackets omitted).

In its affidavit,

> a non-movant requesting additional discovery under Rule 56(d) must specify (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time

---

[34] When Rule 56 was amended in 2010, Rule 56(f) became Rule 56(d). Fed. R. Civ. P. 56(d), 2010 Advisory Committeee Notes.

will enable the party to obtain those facts and rebut the motion for summary judgment.

*Gutierrez*, 841 F.3d at 908 (quotation marks and brackets omitted); *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 732 (10th Cir. 2006). It is within the Court's discretion to deny a Rule 56(d) request based solely on a party's failure to present an affidavit that complies with the rule. *McKissick v. Yuen*, 618 F.3d 1177, 1190 (10th Cir. 2010). Also, if the information sought is irrelevant or cumulative, the nonmoving party is not entitled to relief under Rule 56(d). *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir. 1993).

In support of their Rule 56(d) request, Defendants argue that they require additional time to conduct discovery regarding: (a) whether the Pueblos actually applied GAAP to their revenue sharing calculations under the Compacts; (b) the parties' negotiations regarding the revenue sharing provisions in the 2007 Compacts[35]; (c) who decided to implement free play at the Pueblos' casinos and who decided how to account for it; (d) the accuracy of Defendants' calculation of the additional revenue sharing payments they claim the Pueblos owe under the 2007 Compacts; (e) when the Pueblos began offering patrons free play; (f) how the Pueblos determined the appropriate method for calculating their net win once they started offering free play; and, (g) whether the Pueblos ever intended to comply with GAAP or the 2007 Compacts. (Doc. 99 at 30-33.)

Initially, the Court notes that, except regarding one probable fact, Defendants have failed to present an affidavit that satisfies the *Gutierrez* requirements. 841 F.3d at 908. Defendants attach two affidavits to their response to the Pueblos' Summary Judgment Motions, those of Mr. Telle and Rainier Kamplain. (Docs. 99-11, 99-12.) Mr. Telle's affidavit contains only one sentence that even remotely supports Defendants' Rule 56(d) request, *i.e.*, "[t]he Pueblos have not been

---

[35] Defendants have not explained why information about the parties' compact negotiations is not equally available to both sides.

forthcoming with the data needed to assess the proper Net Win calculation, further delaying the State's actual notice of the accounting discrepancies." (Doc. 99-12 at 7.) This one sentence is too vague and conclusory to comply with Rule 56(d)'s requirements and concerns information that is irrelevant to the issues raised in the Pueblos' Summary Judgment Motions. *Gutierrez*, 841 F.3d at 908; *Birch*, 812 F.3d at 1249-50.

Mr. Kamplain's affidavit is more detailed, but only regarding one probable fact, *i.e.*, "whether the Pueblos have complied with the correct Net Win and revenue sharing calculations, regardless of which format or formula they are applying in determining Net Win." (Doc. 99-11 at 4.) In his affidavit, Mr. Kamplain explained why Defendants question whether the Pueblos correctly calculated their revenue sharing obligations under the 2007 Compacts regardless of which formula they used. (*Id.* at 2-4.) He also stated in general terms what steps Defendants have taken to obtain additional information on this point, and why additional time could allow them to do so. (*Id.* at 4-5.) However, Mr. Kamplain made no attempt to address any of the other probable facts Defendants listed in support of their Rule 56(d) request. (*See generally id.*) Thus, with the one exception noted, the Court could in its discretion deny Defendants' Rule 56(d) request based solely on their failure to present an affidavit that complies with the rule. *McKissick*, 618 F.3d at 1190.

The Court need not do so, however, because Defendants' Rule 56(d) request is also subject to denial for the substantive reason that all of the information Defendants seek additional time to discover is irrelevant to the issues raised in the Pueblos' Summary Judgment Motions. The Court's decision on the Pueblos' motions turns on the meaning of certain Compact provisions and whether Defendants' claims for additional revenue sharing payments comport with federal law. As discussed in Section III.B.1.a., the Compact provisions at issue are unambiguous except regarding the identification and definition of the applicable GAAP. As such, extrinsic evidence is irrelevant

to the Court's decision except to the extent it relates to the applicable GAAP; the interpretation of the Compacts and the federal law applicable to Defendants' claims are otherwise questions of law. *Citizen Potawatomi Nation*, 881 F.3d at 1239; *Sault Ste. Marie Tribe of Chippewa Indians*, 475 F.3d at 810, 812, 815; *Bank of Okla.*, 972 F.2d at 1171.

Yet, all of the probable facts on which Defendants rely in seeking additional time for discovery under Rule 56(d) are extrinsic to the Compacts, and none have any tendency to identify or define the applicable GAAP. Consequently, none are relevant to the Court's decision on the Pueblos' Summary Judgment Motions. *Garcia*, 232 F.3d at 768. Because the information Defendants seek is irrelevant, they are not entitled to relief under Rule 56(d). *Jensen*, 998 F.2d at 1554. The Court will therefore deny Defendants' Rule 56(d) request for additional time to conduct discovery and respond to the Pueblos' motions.

4.      Defendants' remaining arguments are unsupported and immaterial.

Finally, the Court must address Defendants' assertion that the Court should deny the Pueblos' Summary Judgment Motions because the Pueblos have breached the covenant of good faith and fair dealing and should not be unjustly enriched. (Doc. 99 at 27.) In support of this assertion, Defendants allege that the Pueblos failed to: (a) inform the State of their decision to offer patrons electronic free play credits rather than coupons to be exchanged for cash or tokens; (b) provide the State with documents regarding how they accounted for free play despite many requests; and, (c) attempt to renegotiate the 2007 Compacts when they began offering free play. (Doc. 99 at 28.)

Defendants fail to cite to any provision of law, equity, or contract that required the Pueblos to either inform the State of their decision to offer free play or try to renegotiate the Compacts when they did so. Defendants also fail to cite to any legal authority in support of their argument that the

Pueblos' alleged failure to produce documents under the 2007 Compacts invalidates their current claims for declaratory and injunctive relief under federal law. Interestingly, Defendants' evidence tends to show that the Pueblos and the State have been debating the proper treatment of free play in calculating the Pueblos' Net Win for revenue sharing purposes under various compacts off and on since June 2005, and neither side appears to have changed its position in all that time. (*See, e.g.*, Doc. 99-1 at 27-41; Doc. 99-2 at 4-21; Doc. 99-3 at 33-34, 47-58; Doc. 99-4 at 46-55; Doc. 99-5 at 39-46; Doc. 99-6 at 48-68.) This evidence casts some doubt on Defendants' claim of unfair surprise. However, even if Defendants' characterization of the Pueblos' past conduct is accurate, in the Court's view it is simply not relevant to the issues the Pueblos raised in their Summary Judgment Motions. Moreover, the Court declines to speculate about whether Defendants could have made a properly supported legal argument regarding the Pueblos' alleged past misconduct, or what this argument might have been. It is not the Court's role to construct the parties' arguments for them. *Smith v. United States*, 561 F.3d 1090, 1096 (10th Cir. 2009); *Brown v. City of Las Cruces Police Dep't*, 347 F. Supp. 3d 792, 811 (D.N.M. 2018). In short, the Court finds that Defendants' arguments regarding the Pueblos' alleged bad faith and inequitable conduct are unsupported and immaterial.

5.      The Pueblos are entitled to declaratory and injunctive relief.

To summarize, the Court finds that Defendants' claims for additional revenue sharing payments from the Pueblos constitute an attempt to impose a tax, fee, charge, or other assessment in violation of IGRA and the *per se* rule barring state taxation of Indian tribes without express Congressional authorization. The Court further finds that the 2015 Compact provisions preserving Defendants' claims under the 2007 Compacts are invalid and ineffective. The Court so finds both because the Pueblos did not, in the 2007 Compacts, agree to make the additional payments

Defendants seek, and because the payments are not permissible revenue sharing payments consistent with IGRA's requirements and purposes. The Court also finds that Defendants are not entitled to more time to conduct discovery under Rule 56(d), and that their arguments regarding the covenant of good faith and fair dealing and unjust enrichment are unsupported and immaterial. The Court therefore concludes that, as a matter of law, the Pueblos are entitled to declaratory and injunctive relief and it will grant their Summary Judgment Motions as set forth below.

### C. Defendants' Motion to Compel and the Pueblos' Motion for Protective Order[36]

 "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to opposition." *N.M. Consol. Constr., LLC v. City Council of the City of Santa Fe*, 97 F. Supp. 3d 1287, 1304 (D.N.M. 2015) (quoting *Price ex rel. Price v. W. Res., Inc.,* 232 F.3d 779, 783 (10th Cir. 2000)). "Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete." *Id.* If the information the non-moving party seeks under Rule 56(d) is "irrelevant to the summary judgment motion . . . no extension will be granted." *Id.*

As discussed in Section III.B.3., *supra*, the information Defendants seek under Rule 56(d) is irrelevant to the issues the Pueblos raised in their Summary Judgment Motions, and the Court has therefore declined to delay ruling on the Pueblos' motions to allow Defendants to complete discovery. *Id.* In these circumstances, and because the Court has determined that the Pueblos are entitled to summary judgment, the Court finds that Defendants' Motion to Compel and the Pueblos' Motion for Protective Order are moot and should be denied.

### D. Defendants' Motion for Settlement Conference

---

[36] The Court held a hearing on Defendants' Motion to Compel and the Pueblos' Motion for Protective Order on August 16, 2018. (Docs. 94, 123.) At the hearing, the Court deferred ruling on the motions and ordered Defendants to submit a fully compliant Rule 56(d) affidavit within 30 days of the hearing to the extent they believed they needed more discovery to respond to the Pueblos' Summary Judgment Motions. (Doc. 94 at 1-2.)

In light of the Court's determination that the Pueblos are entitled to summary judgment, Defendants' Motion for Settlement Conference Pursuant to Rule 16 (Doc. 102) is also moot and should be denied.

## IV.    <u>CONCLUSION</u>

IT IS THEREFORE ORDERED as follows:

1.      Defendants' Motion for Summary Judgment on the Issue of Arbitrability (Doc. 55) is DENIED;

2.      Plaintiffs-in-Intervention Santa Ana, Santa Clara and San Felipe's and Plaintiff Tesuque's Motion for Summary Judgment (Doc. 67) and Plaintiffs Pueblo of Isleta's and Pueblo of Sandia's Motion for Summary Judgment and Supporting Authorities (Doc. 68) are GRANTED. Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, the Court hereby declares that:

a.      Defendants' claims that the Pueblos owe the State additional revenue sharing payments because the Pueblos excluded the value of free play, and deducted the value of prizes won by patrons as a result of free play wagers, from their Net Win at any time between 2007 and 2016 constitute an attempt to impose a tax, fee, charge, or other assessment in violation of IGRA and the *per se* rule prohibiting state taxation of federally recognized Indian tribes without express Congressional authorization;

b.      As such, the provisions of the 2015 Compacts preserving Defendants' claims that the Pueblos owe the State additional revenue sharing payments because the Pueblos excluded the value of free play, and deducted the value of prizes won by patrons as a result of free play wagers, from their Net Win at any time between 2007 and 2016 are invalid and ineffective; and

c.     Neither the Pueblos' claims in this civil action, nor Defendants' claims that the Pueblos owe the State additional revenue sharing payments because the Pueblos excluded the value of free play, and deducted the value of prizes won by patrons as a result of free play wagers, from their Net Win at any time between 2007 and 2016, are subject to arbitration under the 2015 Compacts.

For the reasons set forth herein, and pursuant to Federal Rule of Civil Procedure 65, the Court hereby permanently enjoins Defendants from taking any further action, including but not limited to pursuing arbitration under the 2015 Compacts, to enforce their claims that the Pueblos owe the State additional revenue sharing payments because the Pueblos excluded the value of free play, and deducted the value of prizes won by patrons as a result of free play wagers, from their Net Win at any time between 2007 and 2016, except that Defendants may pursue any and all appeals to which they are entitled in this civil action; and,

3.     Defendants' Motion to Compel Discovery and for Sanctions, Plaintiffs' and Plaintiffs-in-Intervention's Motion for Protective Order to Quash Defendants' Rule 30(b)(6) Deposition Notices (Doc. 84), and Defendants' Motion for Settlement Conference Pursuant to Rule 16 (Doc. 102) are DENIED AS MOOT.

IT IS SO ORDERED.

_____

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE